PAUL D. CLEMENT*
ERIN E. MURPHY*
MATTHEW D. ROWEN (Cal. Bar # 292292)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
matthew.rowen@clementmurphy.com

*application for admission *pro hac vice* forthcoming

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| National Shooting Sports Foundation, <br><br>       *Plaintiff,* <br><br>     v. <br><br> Rob Bonta, Attorney General of California, <br><br>       *Defendant.* | No. **'23 CV 0945 AGS KSC** <br><br> **COMPLAINT FOR DECLARATORY, INJUNCTIVE, OR OTHER RELIEF** |

COMPLAINT - 1

Plaintiff National Shooting Sports Foundation ("NSSF") brings this complaint against Rob Bonta, Attorney General of California.   NSSF brings this complaint based on personal knowledge as to all NSSF facts, and on information and belief as to all other matters.

## **PRELIMINARY STATEMENT**

1.      This lawsuit challenges the constitutionality of a new California statute that, both by design and in effect, evades the judgment of the Supreme Court and laws enacted by Congress.

2.      In *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (2022), the Supreme Court made clear beyond cavil that "the Second Amendment protects the possession and use of weapons that are 'in common use,'" and that the only arms a state may ban consistent with "historical tradition" are those that are *not* "in common use today," but rather are "highly unusual in society at large." *Id.* at 2128, 2143 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008)).   In other words, states may not ban arms just because it deems them too "dangerous"; states may ban only those arms that are both "dangerous *and unusual*" in modern America.  *Id.* (emphasis added).

3.      *Bruen* came down on June 23, 2022.  At that point, the California State Legislature had pending before it Assembly Bill 1594, titled the "Firearm Industry

COMPLAINT - 2

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

Responsibility Act," 2022 California Laws ch. 98 ("AB 1594"), which would layer several more restrictions and requirements on top of California's already byzantine firearms-regulation regime.  The natural thing to do at that point would have been to hit pause, take account of the monumental Supreme Court decision that had just issued, and go back to the drawing board to ensure that any additional laws implicating the Second Amendment would actually be consistent with *Bruen*.

4.    Instead, California did exactly the opposite.  The Legislature pressed ahead with its pre-*Bruen* bill, presenting an unchanged AB 1594 to Governor Gavin Newsom on June 30, 2022, a mere week after *Bruen*.  Governor Newsom then signed AB 1594 into law on July 12, 2022, in an elaborate ceremony in which he explicitly decried the Supreme Court's decision and implicitly told the world that the Golden State would not comply with *Bruen* unless forced to do so.

5.    The time has now come for California's reckoning.  AB 1594 does exactly the opposite of what *Bruen* requires.  The statute explicitly bans the manufacture, sale, and marketing of firearms that the state deems "abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety in California," Cal. Civ. Code §3273.51(c), regardless of how common they

COMPLAINT - 3

are.  By banning firearms based on a test far different from—and far less protective than—the one laid out in *Bruen*, AB 1594 violates the Second Amendment.

6.  Unfortunately, defying *Bruen* is not AB 1594's only problem.  AB 1594 is also squarely preempted by federal law.  In the late 1990s and early 2000s, several state and local governments, including several California cities and counties, sought to use novel applications of common-law theories like negligence and nuisance to impose civil liability on federally licensed manufacturers and sellers of firearms when third parties criminally and unlawfully misused their products.  Congress saw these lawsuits for what they were: unconstitutional efforts to stamp out lawful (and constitutionally protected) activity.  To end such incursions, Congress enacted the Protection of Lawful Commerce in Arms Act ("PLCAA") in 2005 by wide margins on a substantially bipartisan basis.  The PLCAA expressly prohibits and preempts state-law civil actions "brought by any person" (including government officials) "against a manufacturer or seller of [firearms or ammunition] … for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of [firearms or ammunition] by the person or a third party."  15 U.S.C. §7903(5)(A).

7.  California is now trying to resurrect the very kinds of lawsuits that Congress enacted the PLCAA to eliminate.  Under AB 1594, state officials and

COMPLAINT - 4

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

private parties may bring a "civil action" against "firearm industry member[s]" for damages and other relief resulting from the "criminal misuse of a firearm[ or] related product" by a third party.  Cal. Civ. Code §3273.52(b)-(d), (f).  AB 1594 therefore falls squarely within the express-preemption provision of the PLCAA.

8.      Defying the Supreme Court and Congress in one statute is no mean feat. But AB 1594 goes even further, violating long-settled constitutional law even outside Article VI and Amendment Two.

9.      Although criminal misuse of firearms is ostensibly what the state is concerned about, AB 1594 does not regulate the use of firearms.  Nor does it impose liability on individuals who criminally or unlawfully misuse firearms to the detriment of themselves or others.   Instead, AB 1594 regulates selling, manufacturing, and advertising lawful (and constitutionally protected) firearms and related products.   In other words, AB 1594 regulates commerce in and speech relating to arms—even when that commerce and speech takes place entirely outside of California.

10.     None of that is consistent with the Constitution.  The Constitution prohibits states from directly regulating conduct that takes place beyond their borders.  The First Amendment prohibits states from punishing wide swaths of

COMPLAINT - 5

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

truthful speech about lawful products.  And the Due Process Clause prohibits states from punishing one private party for the conduct of another.

11.    For these reasons and those set forth below, NSSF seeks a declaration that AB 1594 is preempted and unconstitutional, an injunction preventing California from enforcing it against NSSF or its members, nominal damages, and any other relief this Court deems proper.

## THE PARTIES

12.    NSSF is a Connecticut non-profit, tax-exempt, non-stock corporation with its principal place of business in Connecticut.  It is the trade association for the firearm, ammunition, and hunting and shooting sports industry.  It has a membership of more than 10,000, including manufacturers, distributors, and retailers of firearms, ammunition, and related products, as well as other industry members throughout the United States, including over 800 in California.  NSSF's mission is to promote, protect, and preserve hunting and shooting sports by providing leadership in addressing industry challenges, advancing participation in and understanding of hunting and shooting sports, reaffirming and strengthening its members' commitment to the safe and responsible sale and use of their products, and promoting a political environment supportive of America's traditional hunting and shooting heritage and firearms freedoms.  NSSF serves the interests of its members, which

COMPLAINT - 6

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

are impaired by the threat of sweeping liability under AB 1594.  NSSF is authorized to bring this action on its members' behalf, in light of the economic and other injuries AB 1594 will cause them.

13.    Defendant Rob Bonta is the Attorney General of California.  He is "the chief law officer of the State," and, in that capacity, has a "duty … to see that the laws of the State are uniformly and adequately enforced."  Cal. Const. art. V, §13. Attorney General Bonta is a resident of California, and his principal place of business is 1300 I Street, Sacramento, California.  At all relevant times, Attorney General Bonta, as well as those subject to his supervision, direction, or control, are and will be acting under color of state law.

## **BACKGROUND**

**Congress Enacts the PLCAA to Prevent State-Law Civil Actions that Unduly Burden the National Firearm Industry and Infringe Fundamental Constitutional Rights.**

14.    The Constitution "confer[s] an individual right to keep and bear arms." *Bruen*, 142 S.Ct. at 2127 (quoting *Heller*, 554 U.S. at 595); *see* U.S. Const. amend. II.  And "the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms."  *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017).

COMPLAINT - 7

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

15.     Nevertheless, in the late 1990s, state and local governments began trying to use novel applications of state tort law to hold "manufacturers, distributors, dealers, and importers of firearms that operate as designed and intended" accountable "for the harm caused by the misuse of firearms by third parties, including criminals." 15 U.S.C. §7901(a)(3); *see id.* §7901(a)(4).  They invoked a variety of theories, including: strict liability for abnormally dangerous activities or defective design, *Penelas v. Arms Tech., Inc.*, 778 So.2d 1042, 1043-44 (Fla. Ct. App. 2001); negligent marketing, *City of St. Louis v. Cernicek*, 145 S.W.3d 37, 38, 40 (Mo. Ct. App. 2004) (per curiam); *Hamilton v. Accu-Tek*, 62 F. Supp. 2d 802, 821 (E.D.N.Y. 1999), *vacated sub nom. Hamilton v. Beretta U.S.A. Corp.*, 264 F.3d 21 (2d Cir. 2001); negligent distribution, *District of Columbia v. Beretta U.S.A. Corp.*, 847 A.2d 1127, 1131 (D.C. Ct. App. 2004); deceptive trade practices, *Taurus Holdings, Inc. v. U.S. Fidelity & Guar. Co.*, 367 F.2d 1252, 1252-53 (11th Cir. 2004); and public nuisance, *Sills v. Smith & Wesson Corp.*, 2000 WL 33113806, at *7 (Del. Super. Ct. Dec. 1, 2000); *In re Firearm Cases*, 24 Cal. Rptr. 3d 659, 663 (Ct. App. 2005), among others.

16.     Some of these suits succeeded in stretching the common law far beyond its traditional limits—and in permitting one state's courts to police the business practices of industry members lawfully operating elsewhere.  *See, e.g.*, *City of*

COMPLAINT - 8

*Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1143-47 (Ohio 2002); *James v. Arms Tech., Inc.*, 820 A.2d 27, 37-44, 46-47, 50-53 (N.J. Super. Ct. 2003); *City of Gary ex rel. King v. Smith & Wesson Corp.*, 801 N.E.2d 1222, 1231-32, 1241-42 (Ind. 2003).  Others were unsuccessful.  *See, e.g.*, *Camden Cnty. Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp.*, 273 F.3d 536, 540 (3d Cir. 2001) (per curiam); *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1147-48 (Ill. 2004).

17.    But the final tally told only part of the story.  Had these sprawling suits been permitted to persist and proliferate, "[t]he legal fees alone" would have been "enough to bankrupt the industry."  Sharon Walsh, *Gun Industry Views Accord as Dangerous Crack in Its Unity*, Wash. Post (Mar. 18, 2000), https://wapo.st/2Zcp5KS.  That, indeed, was in large part the point:  "[M]unicipal leaders pressed on regardless of their chance of success, spending taxpayers' money in a war of attrition against the firearms industry."  Recent Legislation, *Protection of Lawful Commerce in Arms Act*, 119 Harv. L. Rev. 1939, 1940 (2006).

18.    It did not take long for Congress to recognize these lawsuits for what they were:  a coordinated effort to try to destroy the firearms industry by saddling it with liability for the acts of criminals.  States pressed "theories without foundation in hundreds of years of the common law and jurisprudence of the United States" and threatened inter-state comity by permitting one state to penalize lawful conduct in

COMPLAINT - 9

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

another state.  15 U.S.C. §7901(a)(7)-(8).  They did so, moreover, at substantial cost to individual rights, including the Second Amendment right to keep and bear arms, *id.* §7901(a)(2), (a)(6), as well as the rights of industry members to pursue their trade consistent with the Constitution's privileges and immunities guarantee, *id.* §7901(a)(7).  And it was profoundly unfair, to boot, to hold lawful businesses engaged in lawful (indeed, constitutionally protected) conduct liable "for the harm caused by those who criminally or unlawfully misuse … products that function as designed and intended." *Id.* §7901(a)(5).

19.    Congress enacted the PLCAA to put an end to such state-law actions. Indeed, the PLCAA's very first enumerated "purpose[]" is to "prohibit causes of action against manufacturers, distributors, dealers, and importers of firearms or ammunition products, and their trade associations" based on harm "caused by the criminal or unlawful misuse of firearm products" by third parties. *Id.* §7901(b)(l); *see also id.* §790l(a)(6) (finding that such suits are "an abuse of the legal system, … threaten[] the diminution of a basic constitutional right and civil liberty, … and constitute[] an unreasonable burden on interstate and foreign commerce").

20.    The statute makes good on that promise, prohibiting all such suits from being "brought in any Federal or State court." *Id.* §7902(a).  The PLCAA preempts "civil action[s] … brought by any person against a manufacturer or seller of a

COMPLAINT - 10

<span style="font-variant: small-caps;">Clement & Murphy</span>, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

qualified product, or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party." *Id.* §7903(5)(A); *see id.* §7903(2)-(4), (6), (8)-(9) (defining "person," "manufacturer," "seller," "trade association," "qualified product," and "unlawful misuse").

21.     Only six enumerated types of claims are not prohibited.  *See id.* §7903(5)(A).     These exceptions are limited to circumstances in which the manufacturer or seller itself engaged in some well-defined type of wrongful conduct, such as claims for design or manufacturing defect, illegal transfer, negligent entrustment, and breach of contract or warranty.

22.     None of the enumerated exceptions extends to state laws that authorize imposition of liability against licensed manufacturers and sellers of firearms and ammunition for harms more directly caused by the unlawful or criminal conduct of third parties.  In fact, such laws, founded on novel expansions of tort law, are exactly what the PLCAA was enacted to stamp out.  *See id.* §7901(a)(7).

**Courts Uphold the PLCAA Against Constitutional Challenges and Routinely Reject Efforts to Circumvent Its Protections.**

23.     After Congress passed the PLCAA, federal and state courts routinely rejected efforts to evade the law's protections for the firearms industry.

COMPLAINT - 11

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

24.     Some plaintiffs challenged the statute's constitutionality, but courts across the country have uniformly rejected such challenges, holding that the PLCAA is a lawful exercise of Congress' Commerce power, *see, e.g.*, *Adames v. Sheahan*, 909 N.E.2d 742, 765 (Ill. 2009); *City of N.Y. v. Beretta U.S.A. Corp.*, 524 F.3d 384, 393-95 (2d Cir. 2008); is consistent with the Constitution's separation of powers, *see, e.g.*, *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1139-40 (9th Cir. 2009); *District of Columbia v. Beretta*, 940 A.2d 163, 172-73 (D.C. Ct. App. 2008); *Beretta*, 524 F.3d at 395-96; comports with the Tenth Amendment, *see, e.g.*, *Delana v. CED Sales, Inc.*, 486 S.W.3d 316, 323-24 (Mo. 2016); *Beretta*, 524 F.3d at 396-97; *Adames*, 909 N.E.2d at 765; and does not violate the Takings, Equal Protection, Due Process, or Petition Clauses, *see, e.g.*, *Ileto*, 565 F.3d at 1140-42; *Delana*, 486 S.W.3d at 324; *District of Columbia*, 940 A.2d at 173-82; *Beretta*, 524 F.3d at 397-98.

25.     Other plaintiffs sought to skirt the PLCAA's general prohibition on covered actions.  Just as often, courts carefully policed the statute's ban and rejected efforts to expand its narrow exceptions.  For instance, the Missouri Supreme Court held that, to qualify as a prohibited action "resulting from criminal misuse" of a firearm under §7903(5)(A), the PLCAA does not require the criminal misuse to have resulted in criminal conviction or to have been the sole cause of injury.  *Delana*, 486 S.W.3d at 321.  The Supreme Court of Texas rejected an effort to invoke the

COMPLAINT - 12

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

negligent entrustment exception under §7903(5)(A)(ii) because that state's common law did not recognize such an action.  *In re Academy, Ltd.*, 625 S.W.3d 19, 30-32 (Tex. 2021).  And the Ninth Circuit and Second Circuit both concluded that statutory codification of state tort law on wrongful death, nuisance, and negligence actions could not satisfy the so-called "predicate exception" set forth in §7903(5)(A)(iii).  *Ileto*, 565 F.3d at 1137-38; *Beretta*, 524 F.3d at 400-04.

**In the Wake of *Bruen*, States Again Attempt to Circumvent the PLCAA.**

26.    Last year, the Supreme Court decided *New York State Rifle & Pistol Association v. Bruen*, which confirmed that the right "to keep and bear Arms" means just that—the right to keep *and bear* arms, whether inside or outside of the home. 142 S.Ct. at 2134-35.  That guarantee, moreover, is no "second-class right," subject to a unique set of rules or available to only those with "some special need" to exercise it.  *Id.* at 2156.  Accordingly, when evaluating government burdens on the Second Amendment's "unqualified command," courts must assess "this Nation's historical tradition" of regulating firearms—not conduct some means-end balancing. *Id.* at 2125-34.  Applying that test, the Court invalidated a New York law requiring law-abiding citizens to show special need to carry a firearm outside the home.  *Id.* at 2134-56.

COMPLAINT - 13

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

27.    In the course of doing so, *Bruen* also made clear how courts should analyze the constitutionality of laws that single out particular types of arms for special restrictions.  The Court explained that our nation's historical tradition is to protect arms that are "in common use today."  *Id.* at 2134.  Accordingly, historical tradition permits the prohibition of only those arms that are *both* dangerous *and* unusual—indeed, "highly unusual in society at large."  *Id.* at 2143 (quoting *Heller*, 554 U.S. at 627); *see also id.* at 2128 (explaining that, in *Heller*, the Court relied on "the historical tradition of prohibiting the carrying of dangerous *and unusual* weapons" in concluding that "the Second Amendment protects the possession and use of weapons that are in common use at the time" (quotation marks omitted, emphasis added)).

28.    *Bruen* should have led states to reconsider their laws to make them more protective of rights the Supreme Court had just reaffirmed as fundamental. Unfortunately, it has prompted the opposite reaction in several of the states that have consistently proven least protective of Second Amendment rights.

29.    Almost immediately, several of the very few states that had endeavored to keep their law-abiding citizens from carrying firearms before *Bruen* undertook efforts "to offset the impact of the court's decision."  Giavanni Alves, *N.Y.'s New Gun Control Laws*, Staten Island Live (July 9, 2022), https://bit.ly/3Q8l2K0.  Some

COMPLAINT - 14

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

of those efforts were re-runs.  In particular, a few states (following the lead of New York, the state whose restrictive carry regime was invalidated in *Bruen*) passed legislation purporting to authorize civil suits against firearms manufacturers, distributors, and sellers based on the harms caused by gun violence—in other words, purporting to authorize the very same suits that prompted Congress to pass the PLCAA almost 20 years ago.  *See, e.g.*, N.J. Stat. Ann. §§2C:58-35 (July 5, 2022); Del. Code Ann. tit. 10, §3930 (June 30, 2022); *cf.* N.Y. Gen. Bus. Law §§898-a–898-e (July 6, 2021).   Other post-*Bruen* state laws were more novel—but no less deficient.

**California Enacts AB 1594, Which Authorizes Sweeping Liability on Firearm Industry Members, in Direct Contravention of the Constitution and Federal Law.**

30.    On July 12, 2022, Governor Newsom signed into law AB 1594, which tracks in large part these recent efforts to circumvent the PLCAA, and in several respects goes even further.

31.    AB 1594 applies only to "firearm industry members."  That term is defined broadly to mean "a person, firm, corporation, company, partnership, society, joint stock company, or any other entity or association engaged in the manufacture, distribution, importation, marketing, wholesale, or retail sale of firearm-related products."  Cal. Civ. Code §3273.50(f); *see also id.* §3273.50(d) (defining "Firearm-

COMPLAINT - 15

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

related product" to mean "a firearm, ammunition, a firearm precursor part, a firearm component, and a firearm accessory that … is sold, made, or distributed in California," "is intended to be sold or distributed in California," or "is or was possessed in California [if] it was reasonably foreseeable that the item would be possessed in California"); *id.* §§3273.50(a), (b), (e) (defining "Ammunition," "Firearm," and "Firearm precursor part" by reference to the state Penal Code); *id.* §3273.50(c) (defining "Firearm accessory" to mean "an attachment or device designed or adapted to be inserted into, affixed onto, or used in conjunction with a firearm that is designed, intended, or functions to alter or enhance the firing capabilities of a firearm, the lethality of the firearm, or a shooter's ability to hold and use a firearm").

32.    AB 1594's operative section, Civil Code §3273.51, creates a new, four-pronged "standard of conduct" for "firearm industry member[s]." *Id.* §3273.51(a).

33.    First, under Civil Code §3273.51(b)(1), firearm industry members "shall … [e]stablish, implement, and enforce reasonable controls."

34.    The statute does not identify what "controls" are (or are not) "reasonable." It instead defines the term "reasonable controls" in terms of things that such controls should accomplish—namely, "reasonable procedures, acts, or practices that are designed, implemented, and enforced" to do the following:

COMPLAINT - 16

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

(1) Prevent the sale or distribution of a firearm-related product to a straw purchaser, a firearm trafficker, a person prohibited from possessing a firearm under state or federal law, or a person who the firearm industry member has reasonable cause to believe is at substantial risk of using a firearm-related product to harm themselves or another or of possessing or using a firearm-related product unlawfully.

(2) Prevent the loss or theft of a firearm-related product from the firearm industry member.

(3) Ensure that the firearm industry member complies with all provisions of California and federal law and does not otherwise promote the unlawful manufacture, sale, possession, marketing, or use of a firearm-related product.

Cal. Civ. Code §3273.50(g).

35.    California thus requires industry members to have in place, among other things, procedures designed to screen for customers who appear "at substantial risk of using a firearm-related product to harm … another," *id.* §3273.50(g)(1), which describes most individuals with a heightened need to lawfully possess and lawfully carry a lawful firearm for self-defense.  After all, using a firearm-related product for self-defense may entail harm to another—namely, the assaultive person who forced the law-abiding gun owner to resort to self-defense.

36.    A federally licensed manufacturer must employ all of these unidentified "reasonable controls," moreover, even if it manufactures all of its products outside of California, even if it completes all of its retail sales outside of California (i.e., it

COMPLAINT - 17

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

has no California retail stores), and even if all of its wholesale transactions with distributors take place outside of California.

37.     The statute creates "a rebuttable presumption that [a] firearm industry member failed to implement reasonable controls," *Id.* §3273.52(e)(1), and thus violated §3723.51(b)(1), if "(A) [t]he firearm industry member's action or failure to act created a reasonably foreseeable risk that the harm alleged by the claimant would occur," and "(B) [t]he firearm industry member could have established, implemented, and enforced reasonable controls to prevent or substantially mitigate the risk that the harm would occur." *Id.* §3273.52(e)(1). "If th[is] rebuttable presumption … is established, the firearm industry member has the burden of proving by a preponderance of the evidence that [it] established, implemented, and enforced reasonable controls." *Id.* §3273.52(e)(2).

38.     <u>Second</u> and relatedly, under Civil Code §3273.51(b)(2), firearm industry members "shall … [t]ake reasonable precautions to ensure that [they] do[] not sell, distribute, or provide a firearm-related product to a downstream distributor or retailer of firearm-related products who fails to establish, implement, and enforce reasonable controls."

39.     This provision takes extraterritorial regulation, and second-hand liability, to the next level.  It is not enough under AB 1594 for an out-of-state

COMPLAINT - 18

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

manufacturer *itself* to implement reasonable controls.  Under AB 1594, a federally licensed manufacturer of firearms or related products must also refrain from selling any products to distributors unless it has assured itself that both the distributors themselves and any retailers to whom the distributors may sell products have in place whatever unidentified procedures California considers "reasonable."

40.    Third, under Civil Code §3273.51(b)(2), AB 1594 effectively bans an unknown and unknowable set of firearms entirely:  Firearm industry members "shall not manufacture, market, import, offer for wholesale sale, or offer for retail sale a firearm-related product that is abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety in California."

41.    Notably, §3273.51(b)(2) does not track the test the Supreme Court has articulated for purposes of determining which arms may be banned consistent with the Second Amendment—i.e., whether arms are "in common use [today]."  *Bruen*, 142 S.Ct. at 2128.  Section 3273.51(b)(2) instead borrows from strict liability principles for "abnormally dangerous" products to create California's own, substantially less protective test for determining what arms people are entitled to keep and bear.

42.    On top of that, the statute departs substantially even from ordinary principles of strict liability.

COMPLAINT - 19

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

43.    Under California common law, manufacturers of "abnormally dangerous" products (or products that pose "an unreasonable risk of harm") can sometimes be subject to strict liability for harms that their products cause.  *See Anderson v. Owens-Corning Fiberglas Corp.*, 810 P.2d 549, 553 (Cal. 1991). Whether a product or activity is "abnormally dangerous" is usually decided by "look[ing] to the factors described in section 520 of the Restatement Second of Torts," i.e., "(a) existence of a high degree of risk of some harm …; (b) likelihood that the harm that results from it will be great; (c) inability to eliminate the risk by the exercise of reasonable care; (d) extent to which the activity is not a matter of common usage; (e) inappropriateness of the activity to the place where it is carried on; and (f) extent to which its value to the community is outweighed by its dangerous attributes."  *Ahrens v. Superior Ct.*, 243 Cal. Rptr. 420, 424 & n.5 (Cal. Ct. App. 1988).

44.    But that is not how things work under AB 1594.  Rather, under AB 1594, "[t]here shall be a presumption that a firearm-related product is abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety if any of the following is true:

(A) The firearm-related product's features render the product most suitable for assaultive purposes instead of lawful self-defense, hunting, or other legitimate sport and recreational activities.

COMPLAINT - 20

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

(B) The firearm-related product is designed, sold, or marketed in a manner that foreseeably promotes conversion of legal firearm-related products into illegal firearm-related products.

(C) The firearm-related product is designed, sold, or marketed in a manner that is targeted at minors or other individuals who are legally prohibited from accessing firearms.

Cal. Civ. Code §3273.51(c)(2).

45.     Unlike other presumptions in the law, the statute's "abnormally dangerous" presumption *does not appear to be rebuttable*. *Compare id.* §3273.51(c)(2) (nowhere using "rebuttable" or explaining how the abnormal-dangerousness presumption could be rebutted), *with id.* §3273.52(e)(1) & (2) (describing as "rebuttable" the separate "presumption that [a] firearm industry member failed to implement reasonable controls" under specific circumstances).

46.     AB 1594 does not define the term "assaultive purposes," *see id.* §3273.51(c)(2)(A), which finds no purchase in the Supreme Court's decisions articulating what takes a firearm outside the scope of the Second Amendment's protections.

47.     Nor does it explain why "minors" are treated the same way as "individuals who are legally prohibited from accessing firearms"—or how designing, selling, or marketing firearms that are safer for minors to use can be unlawful—when minors are permitted to access and use firearms under California law. *See, e.g.*, Cal. Penal Code §§29615(a)-(d), 29655 (minors may legally handle

COMPLAINT - 21

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

and shoot firearms in California under adult supervision or with parental consent); Cal. Bus. & Prof. Code §22949.80(a)(3) ("youth hunting program[s]" are "lawful hunting activ[ities]"; "firearm industry member[s]" are expressly authorized to market "youth hunting program[s]" "directed to minors," and are likewise expressly authorized to market to minors "any firearm safety program, hunting safety or promotional program, firearm instructional course, sport shooting event or competition, or any similar program").

48.    Moreover, §3273.51(c)(2)(C) oddly appears to ban the *sale* of certain firearms based on how they are *marketed*, rather than simply banning certain marketing practices.   To state what should be obvious, there is no Second Amendment exception allowing states to ban firearms that are designed to be easier and safer for minors to use.

49.    <u>Fourth</u>, under Civil Code §3723.51(d), "[a] firearm industry member shall not engage in any conduct related to the sale or marketing of firearm-related products that is in violation of" California's general statutory provisions prohibiting unfair methods of competition and deceptive acts, unfair competition, and false or misleading statements in advertising.

COMPLAINT - 22

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

50.    Failure to "comply with any requirement of [§3723.51]" "shall be a violation" of California law, *id.*, which "shall be actionable under [§3723.52]," *id.* §3273.52(a).

51.    To enforce the new standard of conduct it imposes, AB 1594 creates a "civil action" against firearm industry members for violations of the statute.  *Id.* §§3273.52(b)-(c).

52.    "A person who has suffered harm in California because of a firearm industry member's [violation of §3273.51] may bring an action in a court of competent jurisdiction." *Id.* §3273.52(b).

53.    "The Attorney General," "city attorney[s]," and "county counsel" may also "bring a civil action in a court of competent jurisdiction in the name of the people of the State of California to enforce [AB 1594] and remedy harm caused by a violation of [it]." *Id.* §3273.52(c).

54.    If the plaintiff in such an action prevails on the merits, then "the court may award any or all of the following:  (1) Injunctive relief sufficient to prevent the firearm industry member and any other defendant from further violating the law. (2) Damages.   (3) Attorney's fees and costs.   (4) Any other appropriate relief necessary to enforce this title and remedy the harm caused by the conduct."  *Id.* §3273.52(d).  These remedies are not exclusive. *See id.* §3273.54(a), (b).

COMPLAINT - 23

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

55.     Ordinary principles of proximate causation do not apply in actions under AB 1594.  "An intervening act by a third party, *including, but not limited to, criminal misuse of a firearm-related product*, shall not preclude a firearm industry member from liability under this section."  *Id.* §3273.52(f) (emphasis added).

56.     AB 1594 will "become operative on July 1, 2023."  *Id.* §3273.55.[1]

**California Separately Enacts Code of Civil Procedure §1021.11 to Deter Individuals and Associations from Challenging Unconstitutional Firearms Laws like AB 1594 in Court.**

57.     Shortly after signing into law AB 1594, Governor Newsom also signed into law Senate Bill 1327 ("SB 1327").

58.     Most of SB 1327 is devoted to creating a private right of action to enforce state laws relating to the unlawful manufacture, distribution, or sale of specified firearms.  *See* 2022 Cal. Stat. ch.146 (adding Cal. Bus. & Prof. Code §§22949.60-.71).  Plaintiffs do not challenge those provisions here.  But SB 1327 also establishes Code of Civil Procedure §1021.11, *see id.* (adding Cal. Code Civ. Proc. §1021.11), which is California's attempt to suppress firearms-related litigation

---

[1] The statute contains a severability clause.  "If any provision of this act, or part of this act, any clause within this act, any combination of words within this act, or the application of any provision or part or clause or combination of words of this act to any person or circumstance, is for any reason held to be invalid or unconstitutional, the remaining provisions, clauses, words, or applications of provisions, clauses, or words shall not be affected, but shall remain in full force and effect, and to this end the provisions of this measure are severable."  AB 1594 §4.

COMPLAINT - 24

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

by putting civil rights litigants and their attorneys on the hook for the government's

attorney's fees if a case raising Second Amendment challenges results in anything

short of victory on every single claim alleged in the complaint.

59.    Section 1021.11 is based on Texas's SB 8, enacted in 2021 in the

abortion context.  Indeed, it tracks the Texas statute almost word-for-word.  Notably,

Defendant Bonta decried that Texas law as "blatantly unconstitutional."  Press

Release, Cal. Dep't of Just., *Att'y Gen. Bonta: Texas Cannot Avoid Judicial Review*

*of Its Unconstitutional Abortion Ban* (Oct. 27, 2021), https://bit.ly/3pRWA4F.  And

after the Supreme Court held that a pre-enforcement challenge to the Texas law could

proceed "against some of the named defendants but not others," *Whole Woman's*

*Health v. Jackson*, 142 S.Ct. 522, 530 (2021), Governor Newsom lambasted the

Court's decision as "an abomination" because it did not prevent enforcement of SB

8.  Gavin Newsom, *The Supreme Court Opened the Door to Legal Vigilantism in*

*Texas.  California Will Use the Same Tool to Save Lives*, Wash. Post (Dec. 20, 2021),

https://wapo.st/3wxWoeI.

60.    California's new fee-shifting statute begins as follows:

Notwithstanding any other law, any person, including an entity,
attorney, or law firm, who seeks declaratory or injunctive relief to
prevent this state, a political subdivision, a governmental entity or
public official in this state, or a person in this state from enforcing any
statute, ordinance, rule, regulation, or any other type of law that
regulates or restricts firearms, or that represents any litigant seeking that

COMPLAINT - 25

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

> relief, is jointly and severally liable to pay the attorney's fees and costs of the prevailing party.

Code Civ. Proc. §1021.11(a).

61.     Unlike any other ordinary "fee shifting" statute, however, under §1021.11, a "prevailing party" categorically cannot be a *plaintiff* who brings a case seeking declaratory or injunctive relief regarding a state or local firearm regulation, even if the plaintiff wins on every claim it brought and receives all the relief it sought. *Id.* §1021.11(e).

62.     What is more, government defendants in a firearms case will be treated as a "prevailing party" under §1021.11(b) if the court either (1) "[d]ismisses *any* claim or cause of action" in the case, "regardless of the reason for the dismissal," or (2) "[e]nters judgment in favor of the [government] party" "on *any* claim or cause of action." *Id.* §1021.11(b) (emphasis added).

63.     What §1021.11(e) and §1021.11(b) mean is simple. Imagine that a plaintiff (such as NSSF) challenges a California firearms regulation (such as Business & Professions Code §22949.80) on multiple grounds; the plaintiff ends up prevailing on one of its claims, which is dispositive and results in facial invalidation of the challenged regulation; and the court, rather than waste its time, dismisses the plaintiff's remaining challenges as moot. In that case, under §1021.11, the plaintiff not only is *not* entitled to fees as a prevailing party, but will *owe* the state fees even

COMPLAINT - 26

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

though the state did not win anything.  And, to add insult to injury, the plaintiff's *attorneys* will also be on the hook, "jointly and severally," for the government's fees. *See* Code Civ. Proc. §1021.11(a) ("[A]ny person, *including an entity, attorney, or law firm*, who seeks declaratory or injunctive relief to prevent this state … from enforcing any statute … that regulates or restricts firearms, *or that represents any litigant seeking that relief*, is jointly and severally liable to pay the attorney's fees and costs of the prevailing party." (emphases added)).

64.   Section 1021.11(c) gives these "prevailing party" government defendants a three-year window to bring a state-law action against the plaintiff and its attorneys to recover their fees.

65.   Section 1021.11(a) explicitly applies "[n]otwithstanding any other law."  The most relevant "other law" is 42 U.S.C. §1983, which is the statute under which most firearms litigation, including this case, is brought.  Another relevant "other law" is 42 U.S.C. §1988, which provides that a party that prevails in a §1983 action is entitled to attorneys' fees as a matter of federal law.

66.   On December 19, 2022, the Honorable Judge Roger T. Benitez of this Court issued an opinion concluding (1) "that the purpose and effect of §1021.11 is to trench on a citizen's right of access to the courts and to discourage the peaceful vindication of an enumerated constitutional right" (and thus that "the state law chills

COMPLAINT - 27

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

the First Amendment right to petition government for the redress of grievances, which, in turn, chills the Second Amendment right"), and (2) that §1021.11 conflicts with federal law and is therefore preempted.  Op. & Order Enjoining Enforcement of Cal. Code of Civ. Pro. §1021.11, *Miller v. Bonta*, No. 22-cv-1446 (S.D. Cal.), Dkt.43.   The Court entered "a permanent negative injunction" in favor of the plaintiffs there, *id.* at 16, and later "Judgment … in favor of Plaintiffs" in both *Miller v. Bonta* and *South Bay Rod & Gun Club v. Bonta*, No. 22-cv-1461 (S.D. Cal.), on First Amendment, preemption, and Equal Protection Clause grounds.  Judgment, *Miller v. Bonta*, No. 22-cv-1446 (S.D. Cal. Mar. 20, 2023), Dkt.49.

## JURISDICTION AND VENUE

67.     Plaintiff's causes of action arise under 42 U.S.C. §1983 and the United States Constitution.  This Court therefore has jurisdiction pursuant to 28 U.S.C. §1331.

68.     This Court also has jurisdiction under 28 U.S.C. §1343(a)(3) because this action seeks to "redress the deprivation, under color of a[] State law," of "right[s], privilege[s] or immunit[ies] secured by … an[] Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States."

COMPLAINT - 28

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

69.     Venue lies in this district pursuant to 28 U.S.C. §1391 because Defendant is located in and performs his official duties in the Southern District of California, and is therefore considered to reside within this district as a matter of law.

## CLAIMS FOR RELIEF

### I.     Claims Against AB 1594

### COUNT ONE
### (Second Amendment)

70.     Plaintiff re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

71.     "[T]he Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense." *Bruen*, 142 S.Ct. at 2125; *see also* 15 U.S.C. §7901(a)(1)-(2).  And "the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms." *Teixeira*, 873 F.3d at 677.  Commerce in arms is thus constitutionally protected. *See Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair.").

72.     AB 1594 infringes this basic Second Amendment right, as well as the even-more-fundamental core component of keeping and bearing arms.

COMPLAINT - 29

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

73.     Under *Bruen*, a law that restricts activity protected by the Second Amendment is unconstitutional unless it "is consistent with this Nation's historical tradition." 142 S.Ct. at 2126.  AB 1594 is not remotely consistent with that decision or this nation's historical tradition.

74.     By its very terms, AB 1594 operates as a de facto ban on firearms protected by the Second Amendment.  *Bruen* made clear beyond all doubt that the Second Amendment fully protects arms that are "in common use today." *Id.* at 2134. The proper inquiry to determine whether an arm is protected thus focuses on whether it is "in common use" or is instead "highly unusual in society at large." *Id.* at 2143 (quoting *Heller*, 554 U.S. at 629).  If a firearm is in common use, then any effort to ban it is invalid, as a state may not "prohibit[] … an entire class of 'arms' that is overwhelmingly chosen by American society for [a] lawful purpose." *Heller*, 554 U.S. at 628.

75.     AB 1594 disregards that framework.  Indeed, it effectively tries to displace it.  Rather than track the test the Supreme Court has articulated, AB 1594 makes up its own test, forbidding firearm industry members from manufacturing, making, importing, or selling any "firearm-related product that is abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety in California." Cal. Civ. Code §3273.51(c).  On top of that, it creates an

COMPLAINT - 30

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

apparently non-rebuttable presumption that a firearm is "abnormally dangerous"—and thus unlawful to manufacture, market, or sell—if it is "most suitable for assaultive purposes" or "designed, sold, or marketed in a manner that foreseeably promotes conversion of legal firearm-related products into illegal firearm-related products" or "is targeted at minors or other individuals who are legally prohibited from accessing firearms." *Id.* §3273.51(c)(2).

76.    Those categories vividly illustrate the end-run around the Second Amendment that California's new law effects. While the Supreme Court has now thrice held that a state may not "prohibit[] … an entire class of 'arms' that is overwhelmingly chosen by American society for [a] lawful purpose," *Heller*, 554 U.S. at 628, AB 1594 turns a blind eye to the common-use inquiry and just makes up a new set of standards out of whole cloth.

77.    Making matters worse, AB 1594 provides no concrete guidance as to what suffices to make a firearm "most suitable for assaultive purposes," or what constitutes designing, selling, or marketing a firearm "in a manner that promotes conversion of legal firearm-related products into illegal firearm-related products" or "is targeted at minors or other individuals who are legally prohibited from accessing firearms." That is no minor oversight. Because of the nature of firearms and self-defense, characteristics that might make a weapon "most suitable for assaultive

COMPLAINT - 31

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

purposes" are quite likely the exact characteristics many citizens will prioritize in selecting a firearm for self-defense. *See Duncan v. Bonta*, 19 F.4th 1087, 1169 (9th Cir. 2021) (VanDyke, J., dissenting) ("[A]lmost every attribute of a weapon that makes it more effective for military purposes also makes it more effective for self-defense: more accurate, faster firing, the ability to engage multiple targets quickly—these are all characteristics of a weapon that make it better for both military and self-defense purposes."), *cert. granted, judgment vacated*, 142 S.Ct. 2895 (2022).

78.     More fundamentally, the very nature of the Second Amendment right is such that danger alone simply cannot be dispositive. *Cf. Heller*, 554 U.S. at 627 (noting "the historical tradition of prohibiting the carrying of 'dangerous *and unusual* weapons'" (emphasis added)). That is why the common-use inquiry is critical—the protections of the Second Amendment are the flip side of the historical tradition of prohibiting only those weapons that are *both* dangerous *and* unusual. Casting all that aside and asking only whether a weapon is "abnormally dangerous" thus defies both the Supreme Court's teachings and the realities of self-defense. A firearm's dangerousness—i.e., its lethality—is what provides its utility as a tool for self-defense or other lawful uses, like hunting. That is precisely why it has been a clear teaching since *Heller* itself that "firearms cannot be categorically prohibited

COMPLAINT - 32

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

just because they are dangerous." *Caetano v. Massachusetts*, 577 U.S. 411, 418 (Alito, J., concurring in the judgment).

79. Nor is there some free-floating Second Amendment exception for firearms "designed, sold, or marketed in a manner that is targeted at minors." Cal. Civ. Code §3273.51(c)(2)(C). Again, the key question under *Bruen* is whether a firearm is in common use for lawful purposes today. And unlike, say, tobacco or alcohol, there are many conditions under which minors may lawfully use a firearm in California. *See, e.g.*, Cal. Penal Code §§29615(a)-(d), 29655; Cal. Bus. & Prof. Code §22949.80(a)(3). Here again, then, asking the wrong question will lead to the wrong answers. That is no small thing for the many Americans who wish to introduce their children to hunting or shooting sports, and who would value a firearm designed for minors precisely because it would be safer and easier for a minor to use. For instance, a father looking to take his minor child bird hunting might select a lighter shotgun with a shorter or adjustable stock, as basic biomechanics mean that such a firearm will be easier for a minor to handle safely and fire accurately. But regardless of how commonly used such a firearm might be, and irrespective of the plainly lawful purpose of bird hunting, California has now created an apparently irrebuttable presumption that *any* firearm "designed … in a manner that is targeted at minors" is abnormally dangerous and thus unlawful in California. That cannot be

COMPLAINT - 33

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

reconciled with the Second Amendment or common sense.  *See Heller*, 553 U.S. at 624-25 (the Second Amendment protects firearms "typically possessed by law-abiding citizens for *lawful purposes*" (emphasis added)).

80.    AB 1594's efforts to saddle licensed industry members with the costs of harms created by those who criminally misuse firearms are equally inconsistent with the nation's historical tradition.  The Third Circuit explained as recently as 2001 that "[t]o extend public nuisance law to embrace the manufacture of handguns would be unprecedented."  *Camden Cnty.*, 273 F.3d at 540-41; *see also* 15 U.S.C. §7901 (Congress finding the same); *cf. Ileto v. Glock, Inc.*, 565 F.3d 1126, 1135 (9th Cir. 2009) (interpreting PLCAA in light of Congress' finding that such "liability actions ... are based on theories without foundation in hundreds of years of the common law and jurisprudence of the United States" (quoting 15 U.S.C. §7901(a)(7)).  California thus cannot justify its novel liability regime "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."  *Bruen*, 142 S.Ct. at 2130.

81.    In short, the bill as a whole does exactly what its preamble says it aims to do—namely, target manufacturers, distributors, and retailers simply for manufacturing or selling constitutionally protected "lethal products."  AB 1594 §2(b).  Indeed, it even goes so far as to ban the manufacture and sale of entirely new

COMPLAINT - 34

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

categories of firearms without regard to whether they are in common use for lawful purposes.  None of that is consistent with the Second Amendment.

### COUNT TWO
### (Preemption)

82.   Plaintiff re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

83.   The Supremacy Clause, which provides that the Constitution, federal statutes, and treaties are "the supreme Law of the Land," U.S. Const. art. VI, cl. 2, provides "a rule of decision" for determining whether federal or state law applies in a particular situation. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015).  When a federal law "imposes restrictions" and a state law "confers rights … that conflict with the federal law, the federal law takes precedence and the state law is preempted." *Kansas v. Garcia*, 140 S.Ct. 791, 801 (2020); *cf. Nat'l Pork Producers Council v. Ross*, 2023 WL 3356528, at *16 (U.S. May 11, 2023) ("the Framers equipped Congress with considerable power to regulate interstate commerce and preempt contrary state laws").

84.   That is exactly the situation here.  The PLCAA imposes clear restrictions:  States may neither authorize nor bring any "civil action … against a manufacturer or seller of a [firearms] product … for damages … or other relief, resulting from the criminal or unlawful misuse of a qualified product by … a third

COMPLAINT - 35

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

party." 15 U.S.C. §7903(5)(A).  AB 1594 in turn confers rights that conflict with the PLCAA:  Under California's new statute, state officials and private parties may bring a "civil action" against "firearm industry member[s]" for damages and other relief resulting from the "criminal misuse" of a firearm or related product.  Cal. Civ. Code §3273.52(b)-(d), (f).  AB 1594 therefore falls squarely within the express-preemption provision of the PLCAA.

85.    Under the PLCAA, "qualified civil liability action[s] may not be brought in any Federal or State court." 15 U.S.C. §7902(a).  The suits that AB 1594 authorizes are plainly "qualified civil liability actions" within the meaning of the PLCAA.

86.    The PLCAA defines "qualified civil liability actions" to mean "[1] civil action[s] … [2] brought by any person" ("including any governmental entity" §7903(3)) "[3] against a manufacturer or seller of a qualified product, or a trade association, [4] for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, [5] resulting from the criminal or unlawful misuse of a qualified product by the person or a third party." *Id.* §7903(5).

87.    AB 1594 satisfies every element.

COMPLAINT - 36

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

88.     A suit under AB 1594 is plainly [1] a civil action that [2] can be brought by individuals and state officials alike.  *See* Cal. Civ. Code §3273.52(b) ("A person who has suffered harm in California because of a firearm industry member's conduct described by subdivision (a) may bring an action in a court of competent jurisdiction."); *id.* §3273.52(c) ("The Attorney General may bring a civil action in a court of competent jurisdiction in the name of the people of the State of California to enforce this title and remedy harm caused by a violation of this title," as may "city attorney[s]" and "county counsel.").

89.     A suit under AB 1594 plainly [3] can be brought "against a manufacturer or seller of a qualified product, or trade association."   15 U.S.C. §7903(5)(A).  In fact, a suit under AB 1594 can be brought *only* against such a party; the statute applies to "firearm industry member[s]" and them alone.  *See* Cal. Civ. Code §3273.51(a)-(d); *see id.* §3273.50(f) (defining "Firearm industry member" to mean "a person, firm, corporation, company, partnership, society, joint stock company, or any other entity or association engaged in the manufacture, distribution, importation, marketing, wholesale, or retail sale of firearm-related products").

90.     Finally, AB 1594 plainly [4] authorizes recovery of damages and other relief from firearm industry members [5] for injuries "resulting from" third parties' misuse of their products.  *See* 15 U.S.C. §7903(5)(A).  Indeed, that is the statute's

COMPLAINT - 37

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

very reason for being.  As its codified findings explain, AB 1594 is designed to facilitate efforts to hold those engaged in "the sale, manufacture, distribution, importing, or marketing of lethal products" liable for harms resulting from third parties' "use[]" of those products "in California" in ways that "harm[] … individuals' and communities' health, safety, and well-being." AB 1594 §2(b).  And AB 1594 does just that, subjecting a firearm industry member to liability for harm caused by "intervening … criminal misuse" by "third part[ies]," Cal. Civ. Code §3273.52(f), if the industry member fails to, *inter alia*, "[e]stablish, implement, and enforce" "reasonable procedures, acts, or practices that are designed, implemented, and enforced" to keep guns out of the hands of third parties who misuse them, *id.* §§3273.50(g), 3273.51(b).  AB 1594 suits are "qualified civil liability actions" under the PLCAA.

91.    The kind of liability AB 1594 seeks to impose does not fit within any of the narrow exceptions to the PLCAA's preemptive scope enumerated in 15 U.S.C. §7903(5)(A).

92.    AB 1594 suits are not commenced by the U.S. Attorney General to enforce any federal laws. *Id.* §7903(5)(A)(vi).  The statute does not confine liability to instances in which a manufacturer or seller knowingly transferred a firearm to a prohibited person.  *Id.* §7903(5)(A)(i).  It does not deal with either "negligent

COMPLAINT - 38

entrustment," *id.* §7903(a)(5)(A)(ii), or "breach of contract or warranty," *id.* §7903(a)(5)(A)(iv). And it does not impose liability for "defect in design or manufacture." *Id.* §7903(a)(5)(A)(v).

93. Nor does AB 1594 fit within the PLCAA's so-called "predicate exception," which exempts "an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought." *Id.* §7903(5)(A)(iii).

94. As the Ninth Circuit has explained, the term "applicable" in §7903(5)(A)(iii) must be read in light of both "the specific context in which [it] is used" and "the broader context of the statute as a whole." *Ileto*, 565 F.3d at 1134 (quoting *Robinson v. Shell Oil Co*, 519 U.S. 337, 341 (1997)); *accord Beretta*, 524 F.3d at 400. And both the immediately surrounding text and the language that immediately follows provide clear indications that the predicate exception exempts from the PLCAA's preemptive reach only statutes that impose concrete obligations and prohibitions that a firearm industry member can understand and comply with, not statutes that merely impose broad duties of care. Indeed, that is the only sensible way to read the predicate exception, as interpreting it to permit states to reinstate exactly the same kinds of novel nuisance suits that led Congress to enact the PLCAA

COMPLAINT - 39

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

through the simple expedient of codifying the same amorphous theories in statutes would "allow the predicate exception to swallow the statute." *Beretta*, 524 F.3d at 403*; see also Ileto*, 565 F.3d at 1137 (noting that, in enacting the PLCAA, "Congress was primarily concerned with novel nuisance cases like *Ileto*" (quoting *Adames v. Sheahan*, 880 N.E.2d 559, 586 (Ill. App. Ct. 2007), *rev'd on other ground*s, 909 N.E.2d 742 (Ill. Sup. Ct. 2009)).

95.    AB 1594 could not be more different from the types of laws that the predicate exception contemplates.  AB 1594 allows liability to be imposed against firearm industry members not just for violating some specifically enumerated state requirement or prohibition, but based on the otherwise-lawful sale, manufacturing, or marketing of perfectly lawful (and constitutionally protected) firearms and related products.  Cal. Civ. Code §§3273.50(f), 3273.51(b), (c), 3273.52.

96.    At a minimum, AB 1594 is preempted to the extent it authorizes the imposition of liability in the absence of either knowing violations or traditional proximate cause.

97.    The predicate exception exempts only "an action in which a manufacturer or seller of a qualified product *knowingly* violated a State or Federal statute applicable to the sale or marketing of the product, *and the violation was a*

COMPLAINT - 40

*proximate cause of the harm for which relief is sought*." 15 U.S.C. §7903(5)(A)(iii) (emphases added).

98.   By its terms, however, AB 1594 does not require a "knowing[]" violation.  Neither the provision requiring a "firearm industry member" to "enforce reasonable controls" regarding its manufacture, sale, and marketing, nor the provision to "[t]ake reasonable precautions … not [to] sell, distribute, or provide a firearm-related product to a downstream distributor or retailer … who fails to establish, implement, and enforce reasonable controls," contain any mens rea element; both set up a strict liability offense based on any failure to "enforce reasonable controls" or "take reasonable precautions."   Cal. Civ. Code §3273.51(b)(1)-(2); *see also id.* §3273.50(g) (defining "[r]easonable controls"). Industry members thus can face liability for each and every failure to abide by these amorphous commands.  With regard to "reasonable controls," this means that industry members may be liable even if they do not know that their "procedures, acts, or practices" are "unreasonable" means of "prevent[ing]" or "ensur[ing]" AB 1594's abstract goals.  *See id.* §§3273.50(g), 3273.51(b)(1), (c).  And with regard to "reasonable precautions," this means that industry members can be held liable for their transactions with downstream distributors or retailers regardless of whether they had any idea that the precautions they took would later be deemed

COMPLAINT - 41

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

"unreasonable" by a California judge or jury.  *See id.* §§3273.50(g), 3273.51(b)(2), (c).

99.    Making matters worse, AB 1594 does not require proximate cause in the traditional sense.

100.    Courts "ordinarily presume that 'Congress intends to incorporate the well-settled meaning of the common-law terms it uses,'" *Jam v. Int'l Fin. Corp.*, 139 S.Ct. 759, 769-70 (2019), and "proximate cause" is a familiar common-law term. "The term 'proximate cause' is shorthand for a concept:  Injuries have countless causes, and not all should give rise to legal liability." *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 692 (2011) (emphasis omitted).  To distinguish proximate cause from cause-in-fact, courts have set down several guidelines:  "[F]oreseeability alone is not sufficient to establish proximate cause," *Bank of Am. Corp. v. City of Miami*, 137 S.Ct. 1296, 1305 (2017), and there must be a "direct relation between the injury asserted and the injurious conduct alleged," *Holmes v. Secs. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992).

101.    AB 1594 explicitly discards any such inquiry.  Under AB 1594, "[a]n intervening act by a third party, including, but not limited to, criminal misuse of a firearm-related product, shall not preclude a firearm industry member from liability under this section."  Cal. Civ. Code §3273.52(f).  That, of course, is consistent with

COMPLAINT - 42

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

AB 1594's chief aim—imposing liability on members of the firearm industry for harms caused by third parties. But it is fundamentally inconsistent with what the PLCAA demands. For that reason, too, AB 1594 is preempted.

## COUNT THREE
### (Unconstitutional Extraterritorial Regulation)

102. Plaintiff re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

103. The Constitution restricts the power of states to directly regulate conduct that takes place entirely in another state. That bedrock principle of equal sovereignty among the states is inherent in the plan of the Convention, apparent in several of the Constitution's structural protections, and deeply rooted in our nation's historical tradition. *See Nat'l Pork Producers Council v. Ross*, 2023 WL 3356528, at \*10 & n.1 (U.S. May 11, 2023); *id.* at \*22 (Kavanaugh, J., concurring in part and dissenting in part).

104. To be sure, the Supreme Court recently clarified that this principle does not erect a per se bar against laws that regulate conduct *within* one state in ways that have an "extraterritorial *effect*" in others. *Ross*, 2023 WL 3356528, at \*9 (emphasis added). But in doing so, the Court went out of its way to emphasize that it was not dealing with a law that "*directly* regulated out-of-state transactions." *Id.* at \*10 n.1. And it emphasized the importance of looking to "original and historical

COMPLAINT - 43

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

understandings of the Constitution's structure and the principles of 'sovereignty and comity' it embraces" when it comes to cases "testing the territorial limits of state authority under the Constitution's horizontal separation of powers" in that manner. *Id.* at *10 & n.1. Looking to those principles, it is plain that a state may not directly regulate conduct that neither occurs nor is directed within its borders.

105. At the outset, it is axiomatic that "all States enjoy equal sovereignty." *Shelby Cnty. v. Holder*, 570 U.S. 529, 535 (2013); *see also PPL Mont., LLC v. Montana*, 565 U.S. 576, 591 (2012) ("the States in the Union are coequal sovereigns under the Constitution"). Indeed, "the constitutional equality of the states is essential to the harmonious operation of the scheme upon which the Republic was organized." *Coyle v. Smith*, 221 U.S. 559, 580 (1911). When a state reaches beyond its own borders to "directly regulate[] out-of-state transactions by those with no connection to the State," *Ross*, 2023 WL 2023 WL 3356528, at *10 n.1 (emphasis omitted), it invades the sovereignty and impinges on the equality of other states. Accordingly, the plan of the Convention necessarily restricts one state from directly regulating conduct that neither occurs nor is directed within its borders, as a union of several *equal* states subject to the overarching regulation only of one federal sovereign could not succeed if each state could trump the others' sovereign powers whenever and however it saw fit. *Cf. PennEast Pipeline Co. v. New Jersey,* 141 S.Ct. 2244, 2259

COMPLAINT - 44

(2021) ("The plan of the Convention reflects the 'fundamental postulates implicit in the constitutional design.'" (quoting *Alden v. Maine*, 527 U.S. 706, 729 (1999)); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003) ("A basic principle of federalism is that each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders, and each State alone can determine what measure of punishment, if any, to impose on a defendant who acts within its jurisdiction."). Consistent with that understanding, several provisions of the Constitution impose and/or presuppose limits on the ability of one state to override the regulatory powers of another.

106.   For instance, Article I, section 10, of the Constitution deprives states of several powers that one sovereign might ordinarily exercise against another, including the right to "lay any Imposts or Duties on Imports or Exports," and to "lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, [or] enter into any Agreement or Compact with another State."

107.   Conversely, Article IV of the Constitution is devoted entirely to preserving the rights of each state vis-à-vis the others, requiring (among other things) that "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State," Art. IV, §1, that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several

COMPLAINT - 45

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

States," Art. IV, §2, cl. 1, that "no new State shall be formed or erected within the Jurisdiction of any other State," Art. IV, §3, cl. 1, and that "[t]he United States shall guarantee to every State in this Union a Republican Form of Government," Art. IV, §4.

108. Consistent with the Framers' "special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres," the Supreme Court has held that the Commerce Clause (U.S. Const. art. I, §8, cl. 3) prohibits any state from "control[ling] commerce occurring wholly outside [its] boundaries." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 335-36 (1989) (footnote omitted); *see also, e.g.*, *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986); *Edgar v. MITE Corp.*, 457 U.S. 624, 643 (1982).

109. The Court has also long interpreted the Due Process Clause to impose restrictions on a state's ability to regulate conduct occurring wholly outside its borders. *See, e.g.*, *Watson v. Emps. Liab. Assurance Corp.*, 348 U.S. 66, 70 (1954) (recognizing "the due process principle that a state is without power to exercise 'extra territorial jurisdiction,' that is, to regulate and control activities wholly beyond

COMPLAINT - 46

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

its boundaries"); *Home Ins. Co. v. Dick*, 281 U.S. 397, 407-08 (1930) (recognizing and applying the same principle).

110.   And, of course, the Tenth Amendment provides that "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States *respectively*, or to the people," U.S. Const. amend. X (emphasis added), making clear that each state retains its *own* "integrity, dignity, and residual sovereignty," *Bond v. United States*, 564 U.S. 211, 221 (2011).  It is little surprise, then, that the Supreme Court just reiterated that "the territorial limits of state authority under the Constitution's horizontal separation of powers" are grounded not just in any one provision, but in the "original and historical understandings of the Constitution's structure and the principles of 'sovereignty and comity' it embraces." *Ross*, 2023 WL 3356528, at *10 & n.1; *see also, e.g.*, *id.* at *25 (Kavanaugh, J., concurring in part and dissenting in part); *South Dakota v. Wayfair, Inc.*, 138 S.Ct. 2080, 2100-01 (2018) (Gorsuch, J., concurring).  And those understandings distill into the basic principle that a state cannot directly regulate conduct that neither occurs nor is directed within its borders.

111.   AB 1594 violates that bedrock constitutional constraint in multiple respects.

COMPLAINT - 47

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

112.   First, AB 1594 requires firearm industry members to "[e]stablish, implement, and enforce" "reasonable procedures, acts, or practices that are designed, implemented, and enforced to … [p]revent the loss or theft of a firearm-related product from the firearm industry member."   Cal. Civ. Code §§3273.50(g)(2), 3273.51(b)(1).  Most firearm industry members, however, do not have any physical presence in California, which means that most of the conduct this provision regulates will take place entirely outside of California.  For instance, if a California judge or jury decides that an Ohio-based manufacturer used too lax of security measures at its Ohio manufacturing plants, and a firearm produced there was later criminally misused in California, then that out-of-state entity could face California-law liability based solely on its out-of-state conduct—even if it employed every security measure that Ohio or Congress saw fit to impose.

113.   Second, AB 1594 requires firearm industry members to "[e]stablish, implement, and enforce" "reasonable procedures, acts, or practices that are designed, implemented, and enforced to … [p]revent the sale or distribution of a firearm-related product to … a person prohibited from possessing a firearm under state or federal law, or a person who the firearm industry member has reasonable cause to believe is at substantial risk of using a firearm-related product to harm themselves or another or of possessing or using a firearm-related product unlawfully."   *Id.*

COMPLAINT - 48

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

§§3273.50(g)(1), 3273.51(b)(1).  This provision is even more problematic.  Again, most firearm industry members do not have a physical presence in California, which means that most of the conduct this provision regulates will take place entirely outside it.  For instance, imagine that a retailer in St. Louis, Missouri, is about to sell a firearm that is fully lawful in Missouri to a customer who is permitted to own the firearm under Missouri law and under federal law.  If that same firearm is *not* lawful in California, then the retailer could face liability for selling it to the customer if, say, a sales clerk overhears the customer talking about a new job opportunity in California.

114.   And that is not even the worst part.  This provision imposes a duty on firearm industry members not to sell lawful firearms to any individual if they reasonably believe that the individual "is at substantial risk of using a firearm-related product to harm … another."  *Id.* §3273.50(g)(1).  While such a duty might make sense if the provision applied only where a firearm industry member has cause to believe that a customer is likely to *unlawfully* use a firearm to harm another, it is not so limited.  That is a problem, because the very core of the Second Amendment right to keep and bear arms is the right to have and use firearms for lawful self-defense, and using a firearm in lawful self-defense may cause harm to another (e.g., an assailant).  Thus, as a result of this provision, if a licensed retailer has reason to

COMPLAINT - 49

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

believe that a lawful customer faces an increased risk of needing to use a firearm in self-defense—because he is a Brinks truck driver, or because she has a restraining order against a stalker, or because he lives in a high-crime neighborhood, etc.—that retailer could face liability for selling the firearm to the customer, *even if that retailer is thousands of miles away from California.*

115.   Third, AB 1594 requires firearm industry members to "[t]ake reasonable precautions to ensure that [they] do[] not sell, distribute, or provide a firearm-related product to *a downstream distributor or retailer* of firearm-related products who fails to establish, implement, and enforce reasonable controls." *Id.* §3273.51(b)(2) (emphasis added).   This provision takes unconstitutional extraterritorial regulation to the next level.

116.   An example helps illustrate why that is so.  Among NSSF's members is a licensed, Delaware-based firearms manufacturer with manufacturing facilities in New Hampshire, Arizona, and North Carolina.  This company does not sell firearms directly to civilians; it sells its products only to licensed distributors, only a very small handful of which re-sell into California.  This NSSF member, then, is an out-of-state company that does not do any business in California, period.  Nevertheless, under §§3273.50(g)(1) & 3273.51(b)(1), it could potentially be held liable for failing to ensure that its downstream distributors and retailers comply with California's new

COMPLAINT - 50

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

law.  And because that out-of-state company and the vast majority of its distributors are not in California, even the contractual relationships between them will be entirely foreign to California.  So an out-of-state company could face California liability if one of its out-of-state distributors got robbed or, more likely, sold to a licensed retail outlet that inadvertently sold one of the manufacturer's products to a person prohibited from possessing it.

117.   None of that is remotely consistent with the Constitution.  Indeed, imposing state-law liability (and damages and other relief) on out-of-state actors for actions taken entirely out of state is the definition of unconstitutional extraterritorial state regulation.

118.   AB 1594 is no less unconstitutional vis-à-vis the out-of-state conduct of firearm industry members that *do* do business in California.  What matters under the extraterritoriality doctrine is where the regulated conduct takes place:  "If the transaction to be regulated occurs 'wholly outside' the boundaries of the state, the regulation is unconstitutional," even if the actor resides in, is incorporated in, or does some other business in the regulating state.  *A.S. Goldmen & Co. v. N.J. Bur. of Sec.*, 163 F.3d 780, 786 (3d Cir. 1999) (citation omitted); *see, e.g.*, *Sam Francis Found. v. Christie's, Inc.*, 784 F.3d 1320 (9th Cir. 2015) (en banc) (invalidating California statute that regulated out-of-state art sales, even though the statute only applied to

COMPLAINT - 51

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

transactions involving California residents); *Daniels Sharpsmart, Inc. v. Smith*, 889 F.3d 608, 612-16 (9th Cir. 2018).  After all the state must have some connection to the regulated *activity*, not just to the regulated *entity*.  Otherwise, a state could forever claim extraterritorial regulatory power over anyone who has ever visited, vitiating the power of other states to regulate within their own borders.

119.  By directly regulating commerce that takes place entirely in other states, AB 1594 plainly violates the constitutional prohibition on extraterritorial state regulation.

120.  AB 1594's remedial provisions make matters worse.  AB 1594 authorizes private persons, city and county attorneys, and the Attorney General to obtain, among other things, "[i]njunctive relief sufficient to prevent the firearm industry member and any other defendant from further violating the law."  Cal. Civ. Code §3273.52(d)(1).  If, as will almost always be the case, some or all of that otherwise-lawful conduct—manufacturing, marketing, selling, etc.—takes place in other states, then the injunctive relief the statute authorizes will necessarily end up regulating conduct occurring wholly outside California's borders.  Indeed, for some manufacturers or national distributors, that will allow for de facto nationwide injunctions regulating conduct far beyond—and entirely outside—California's borders.  That sort of nationwide sweep is a telling sign of unlawful extraterritorial

COMPLAINT - 52

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

legislation.  *See Edgar*, 457 U.S. at 643 (noting the "most obvious burden … impose[d] on interstate commerce arises from the statute's previously described nationwide reach"); *cf. Ross*, 2023 WL 3356528, at *21 (Roberts, C.J., concurring in part and dissenting in part) (noting that "by effectively requiring compliance by farmers who do not even wish to ship their product into California," a statute might have "a 'nationwide reach' similar to the regulation at issue in *Edgar*").

121.   AB 1594 violates the extraterritoriality doctrine in another way too.  In addition to prohibiting states from regulating conduct that takes place outside of their borders, the Commerce Clause "prohibit[s] States from discriminating against or imposing excessive burdens on interstate commerce" within their borders. *Comptroller of Treasury of Maryland v. Wynne*, 575 U.S. 542, 549 (2015); *see also Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970); *Nw. Airlines, Inc. v. Cnty. of Kent*, 510 U.S. 355, 373 n.18 (1994) (describing "a violation of the dormant Commerce Clause" as "discrimination against interstate commerce").  AB 1594 does that too.  Because it imposes liability for commercial transactions occurring in other states by inviting civil actions in California, AB 1594 unlawfully discriminates against and burdens out-of-state commercial interests within the state.

122.   It also negates the legitimate regulatory regimes governing the sale, marketing, and manufacture of firearms and related products in other states and

COMPLAINT - 53

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

under federal law by rendering conduct that is lawful where it occurs unlawful in California.  As discussed, that invades the sovereignty of other, co-equal states.

123.   Particularly given that it restricts conduct protected by the Second Amendment, the extreme burdens AB 1594 imposes on interstate commerce outweigh any benefits, and the local interest in reducing crime within California could be achieved by other restrictions that have a lesser impact on interstate commerce.  If other states were to enact similar laws, the PLCAA would be nullified (and the Second Amendment would be little better off).   And firearm industry members would have little choice but to attempt to comply with the strictest state restrictions (assuming compliance is even possible), regardless of federal law or the law of the individual state of operation.  AB 1594 therefore unduly burdens interstate commerce.  What is more, because AB 1594 creates liability based on the behavior of third parties who are outside their control, firearm industry members can do very little to even attempt to lessen their potential liability; the only way to truly eliminate all risk of liability under AB 1594 would be to cease operations altogether, even if those operations are lawful elsewhere.  That is the definition of unconstitutional discrimination against, and an unconstitutional undue burden upon, interstate commerce.  *Cf. Edgar*, 457 U.S. at 643 (even non-discriminatory law is invalid

COMPLAINT - 54

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

where "the burden imposed on that commerce [is] excessive in relation to the local interests served by the statute").

124.   California's overreach into other states is all the more flagrant given the constitutional protections accorded Second Amendment activity and that this is decidedly not an area where the state law has been adopted "against the backdrop of congressional silence." *Ross*, 2023 WL 3356528, at *16.

125.   To the contrary, Congress anticipated exactly this sort of problem in the PLCAA, which explicitly found that allowing civil actions like the ones AB 1594 authorizes would usher in "unreasonable burden on interstate and foreign commerce of the United States." 15 U.S.C. §7901(a)(6). Consistent with Congress' judgment, AB 1594 violates the constitutional prohibition on extraterritorial regulation that unlawfully burdens interstate commerce.

## COUNT FOUR
### (First Amendment)

126.   Plaintiff re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

127.   In addition to regulating commerce (*e.g.*, "the manufacture, distribution," and "sale of firearm-related products"), AB 1594 also regulates speech. In fact, the statute singles out speech on the basis of its content or viewpoint. "A firearm industry member" may be held liable under AB 1594 if its "market[ing]"

COMPLAINT - 55

is deemed to have been "likely to create an unreasonable risk of harm to public health and safety in California," Cal. Civ. Code §3273.51(c), or if it failed to impose "reasonable controls" on its "marketing," *id.* §§3273.50(g)(3), 3273.51(b).

128. AB 1594 thus on its face regulates speech based on its content or "the topic discussed." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S.Ct. 1464, 1471 (2022). After all, the statute does not apply to all marketing; it applies only to "market[ing]" of "a firearm-related product that is abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety in California." Cal. Civ. Code §3273.51(c). Indeed, it does not even apply to all such speech by all speakers—only the speech of "firearm industry member[s]," *id.*, i.e., those "engaged in the manufacture, distribution, importation, marketing, wholesale, or retail sale of firearm-related products," *id.* §3273.50(f). And that speaker-based discrimination is no accident. AB 1594 fixates on gun-related speech by gun-related actors because their speech is uniquely likely to communicate a point of view that California apparently disfavors. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564 (2011).

129. That is a textbook First Amendment violation. Laws that single out speech on the basis of content or viewpoint are subject to the strictest of scrutiny, which they "rare[ly]" survive. *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 790-

COMPLAINT - 56

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

91, 799 (2011); *see also Sorrell*, 564 U.S. at 555-56 ("The First Amendment requires heightened scrutiny whenever the government creates 'a regulation of speech because of disagreement with the message it conveys.' ... Commercial speech is no exception." (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

130.   The topics and views that California has singled out in AB 1594 do not fall into any "well-defined and narrowly limited classes of speech" unprotected by the First Amendment.  *Brown*, 564 U.S. 786, 791.  To be sure, the First Amendment does not preclude imposing liability for false, deceptive, or otherwise "misleading" commercial speech.  *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 (1980).  But AB 1594 does not even purport to target speech that is false or misleading.  It authorizes the imposition of liability for speech about a product—a product expressly protected by the Constitution, no less—even when that speech is truthful and not misleading.  Indeed, the words "false," "misleading," and "deceptive" appear nowhere in the statute.  A manufacturer that places online advertisements containing entirely accurate specifications of its products could be liable under AB 1594 for "market[ing] ... a firearm-related product," *even if that product is fully lawful in every state in which it is sold*, if a California court later deems the marketed product to be "abnormally dangerous and likely to create an

COMPLAINT - 57

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

unreasonable risk of harm to public health and safety in California." Cal. Civ. Code §3273.51(c).

131.    The state apparently thinks that laws restricting speech about firearms are subject to more relaxed scrutiny, perhaps because firearms are dangerous. But the Supreme Court has made clear that truthful speech promoting a lawful product or service is protected by the First Amendment even if the product or service is known to have deleterious health effects. *See, e.g.*, *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (tobacco); *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 184-85 (1999) (gambling); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 504 (1996) (liquor); *Bigelow v. Virginia*, 421 U.S. 809, 818-25 (1975) (abortion). Simply put, the mere fact a product is dangerous does not transform promotion of that product (i.e., speech) into a tort for which liability may be imposed. And that is of course true *a fortiori* when it comes to promotion of products that not only are legal, but protected by the Second Amendment.

132.    The only way California could justify AB 1594's speech restrictions, then, would be to affirmatively prove that those restrictions are sufficiently tailored to achieve a sufficiently important state interest. *See Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2384 (2021). That, it cannot do, as AB 1594 is both

COMPLAINT - 58

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

"seriously underinclusive" and "seriously overinclusive" in relating to any public safety interests the state may assert. *Brown*, 564 U.S. at 805.

133. AB 1594's most obvious defect—and one of the reasons it runs headfirst into the PLCAA—is its underinclusiveness. California's stated aim is to deter and punish those who cause "harms to individuals' and communities' health, safety, and well-being, as well as economic opportunity and vitality." AB 1594 §2(b). But AB 1594 does nothing to police the conduct of criminals who misuse firearms. Nor does it regulate, *e.g.*, direct incitements to violence or countless other forms of speech that may actually encourage criminal gun violence. Likewise, while AB 1594 restricts firearms-products marketing "targeted at minors," Cal. Civ. Code §3273.51(c)(2)(C), it does not address "indistinguishable ... effects produced by other media," such as movies and videogames that promote the use of firearms by minors. *Brown*, 564 U.S. at 800-01. That, in First Amendment terms, is "wildly underinclusive." *Id.* at 801-02.

134. Conversely, by imposing sweeping liability for firearms marketing, AB 1594 is also "vastly overinclusive," *id.* at 804, as California has impermissibly swept large amounts of protected speech "within the broad reach of" the statute, *United States v. Stevens*, 559 U.S. 460, 480 (2010).

COMPLAINT - 59

135.   As just noted, AB 1594 restricts the marketing of firearms in a manner "targeted at minors."   But *it is not illegal for minors to handle or use firearms in California*.  And nothing about AB 1594 changes that dynamic; the statute restricts only the provision of information that may encourage minors to use firearms even in lawful ways.

136.   Remarkably, the Supreme Court seems to have foreseen a law like this in *Brown*, writing that "California ha[d] (wisely) declined to restrict … the distribution of pictures of guns."  *Id.* at 801-02.  While that wisdom apparently has given way, the First Amendment has not.

137.   In short, AB 1594 "prohibit[s] or chill[s]" vast swaths of fully protected expression, *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002), destroying the "breathing space" that "the First Amendment needs," *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973).

138.   AB 1594 also suffers from fatal vagueness problems.

139.   Vagueness "raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno v. ACLU*, 521 U.S. 844, 871-72 (1997). After all, vague laws risk chilling would-be speakers by forcing them "to steer far wider of the unlawful zone" than they otherwise would "if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964).

COMPLAINT - 60

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

For that reason, laws touching on speech must themselves speak "only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963).

140.   AB 1594 does the opposite.  The statute makes it virtually impossible for regulated parties to tell what speech is and is not permitted, leaving them with no realistic choice but to err on the side of refraining from exercising their First Amendment rights.  By its terms, AB 1594 renders unlawful any marketing of a firearm-related product that a court deems to be "abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety in California." Cal. Civ. Code §3273.51(c).  And it is no defense to liability that the product was lawful when made and marketed *even under California law*.

141.   Making matters worse, AB 1594 creates a "presumption that a firearm-related product is abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety" if it is "marketed in a manner that is targeted at minors." *Id*. §3273.51(c)(2).  There is no shortage of problems with this provision, which on its face makes it illegal for a sporting goods store or firearms manufacturer to point out which firearms it sells are safest for minors.  As a result of this provision, a perfectly lawful product that no one thinks is "abnormally dangerous" becomes so under California law if it is marketed in a way deemed to be "targeted at minors"—

COMPLAINT - 61

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

even though, as explained, *it is not illegal for minors to handle or use firearms in California*.[2]

142.   The statute's "assaultive purposes" provision compounds this problem. Under that provision, "[a] firearm industry member shall not … market … a firearm-related product that is abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety in California"; and "[t]here shall be a presumption that a firearm-related product is abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety if … [t]he firearm-related product's features render the product *most suitable for assaultive purposes* instead of lawful self-defense, hunting, or other legitimate sport and recreational activities." *Id.* §3273.51(c)(2)(A) (emphasis added).  Yet, as explained, AB 1594 does not give any guidance on what would make a firearm suitable for "assaultive purposes," which is no minor omission given that virtually any firearm can be used for both "defensive" and "offensive" purposes.  *See Duncan*, 19 F.4th at 1151 (VanDyke, J., dissenting); *id.* at 1169.  Firearm industry members are thus left with

---

[2] Federal law and California law both prohibit *selling* firearms to minors, *see* 18 U.S.C. §922(b)(1); Cal. Penal Code §27505, but neither prohibits minors from using them.

COMPLAINT - 62

no meaningful guidance as to which firearms they "presumptively" may not market *at all*.

143.   AB 1594 thus necessarily "will provoke uncertainty among speakers" as to how they can promote any of their lawful (and constitutionally protected) products without incurring California's wrath. *Reno v. ACLU*, 521 U.S. 844, 871 (1997).

144.   That profound uncertainty not only "raises special First Amendment concerns because of its obvious chilling effect on free speech," but creates a "risk of discriminatory enforcement," which make the chilling effect even more acute. *Id.* After all, "[i]t is not merely the sporadic abuse of power by the censor but the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion." *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940).  And that threat is even more pervasive when, as here, a law "does not aim specifically at evils within the allowable area of State control but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech or of the press." *Id.*  AB 1594 therefore violates the First Amendment because it is unconstitutionally vague.

145.   There is another problem here too.  Even when speech about a product is actually proven to be false or misleading—which, again, is not required for

COMPLAINT - 63

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

liability under AB 1594—the traditional principles that govern judicial actions for misrepresentations, including proof of reliance on the allegedly false speech, have always required a substantial link between that speech and the injury for which redress is sought. *See, e.g.*, *Restatement (Second) of Torts* §525 (1977); Dee Pridgen & Richard M. Alderman, *Consumer Protection and the Law* §2.26, at 2-64 (2002); *Stewart v. Wyo. Cattle Ranche Co.*, 128 U.S. 383 (1888). That link is essential to ensure that efforts to impose liability based on speech remain consistent with the First Amendment. After all, if liability could be imposed for misleading (or even truthful) speech at the behest of plaintiffs who did not rely on it and cannot demonstrate injury from it (as opposed to from the intervening acts of a third party), then the threat of massive tort liability could inhibit a speaker from voicing his view "even though [he] believe[s] [it] to be true and even though it is in fact true." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964). Yet AB 1594 does not require proof of reliance.

146.   Nor does it require a plaintiff to trace alleged injuries directly to the speech in question. Under AB 1594, a firearm industry member may be held accountable *even* for the actions of an "intervening … third-party" (including one who is breaking the law) so long as its marketing is deemed somehow to be responsible—including, for instance, if it is deemed that it *could have* marketed in

COMPLAINT - 64

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

some other way than it did. (*E.g.*, if its "failure to act created a reasonably foreseeable risk that the harm alleged by the claimant would occur." Cal. Civ. Code §§3273.52(e)(1)(A), (f).

147. Furthermore, given that speech can now be broadcast across the world (including into California) nearly instantaneously, allowing liability based on speech without that core causation requirement could expose defendants to nearly limitless liability. A causation-free regime may well lead individuals to confine themselves to "statements which 'steer far wider of the unlawful zone,'" thereby "dampen[ing] the vigor and limit[ing] the variety of public debate." *Sullivan*, 376 U.S. at 279.

148. The First Amendment jealously protects speech by guarding against the imposition of massive liability on speech without significant protections. That is true even of torts that pre-date the Republic and the First Amendment. And it is true *a fortiori* of novel and extreme theories of liabilities with no comparable historical pedigree. By removing the traditional, constitutionally grounded safeguards for all speech-based torts, AB 1594 flunks First Amendment 101 at every turn.

## COUNT FIVE
### (Due Process)

149. Plaintiff re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

COMPLAINT - 65

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

150.   For many of the same reasons that AB 1594 is unconstitutionally vague with respect to speech protected by the First Amendment, it is also unconstitutionally vague under the Due Process Clause with respect to all other conduct it polices.  The Fourteenth Amendment prohibits a state from "depriv[ing] any person of life, liberty, or property without due process of law."  U.S. Const. amend. XIV, §1.  A law that forbids or requires an act "in terms so vague that men of common intelligence must necessarily guess at its meaning … violates the first essential of due process of law." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 390 (1926).  So too does a law with terms so malleable that it authorizes "arbitrary [or] discriminatory enforcement." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

151.   Because the text of the Fourteenth Amendment applies to all manner of state-sanctioned "depriv[ations]," moreover, this anti-vagueness guarantee applies to both criminal and civil laws.  *See id.* at 108-09 (collecting cases); *see also Sessions v. Dimaya*, 138 S.Ct. 1204, 1224-26 (2018) (Gorsuch, J., concurring in part and concurring in the judgment).

152.   For all the reasons already discussed, "[t]he vice of unconstitutional vagueness is further aggravated" in the First Amendment context.  *Cramp v. Bd. of Pub. Instruction of Orange Cty.*, 368 U.S. 278, 287 (1961).  A more "stringent" vagueness test applies, moreover, for statutes that "threaten to inhibit the exercise of

COMPLAINT - 66

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

constitutionally protected rights"—including not just the First Amendment, but also the Second Amendment—or that impose "quasi-criminal" penalties.  *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).

153.   The most protective vagueness standard known to our law thus applies here several times over, as AB 1594 not only directly regulates speech, *see* ¶¶118-28, *supra*, but also directly restricts the activities of those engaged in the lawful business of selling arms protected by the Second Amendment.  And the liability it threatens is no small matter:  "Injunctive relief sufficient to prevent the firearm industry member and any other defendant from further violating the law," "[d]amages," "[a]ttorney's fees and costs," and "[a]ny other appropriate relief necessary to enforce this title and remedy the harm caused by the conduct."  Cal. Civ. Code §3273.52(d).  AB 1594 thus brings with it the "possibility of imposing liability on an entire industry," which, among other things, "threatens the diminution of a basic constitutional right" enabled by that industry—namely, individuals' Second Amendment rights to keep and bear arms.  15 U.S.C §7901(a)(6).  As a result, it is subject to a "stringent" vagueness test even as to the non-speech conduct that it regulates.

154.   AB 1594 flunks that test, as the prohibitions it imposes are hopelessly vague.

COMPLAINT - 67

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

155.   Under AB 1594, not only is there "a presumption that a firearm-related product is abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety if" is "marketed in a manner that is targeted at minors"; that same presumption exists if "[t]he firearm-related product's features render the product most suitable for assaultive purposes instead of lawful self-defense, hunting, or other legitimate sport and recreational activities." Cal. Civ. Code §3273.51(c)(2). Both of those provisions are unconstitutionally vague, as they give no guidance as to what is and is not prohibited. *See* ¶129-35, *supra*.

156.   To be clear, "[w]hat renders [this] statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *United States v. Williams*, 553 U.S. 285, 306 (2008).  The problem with AB 1594 is not mere imprecision at the margins, but the failure to articulate any standard whatsoever.  Determining, for example, what makes a firearm most suitable for assaultive purposes invites "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *Id.*

157. Indeed, AB 1594 is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015).  Given its sheer breadth, its lack of any identifiable standards, and its stark departures from the

COMPLAINT - 68

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

common law, AB 1594 "impermissibly delegates basic policy matters to policemen, judges[,] and juries for resolution on an ad hoc and subjective basis," with the attendant dangers of arbitrary and discriminatory application. *Chatin v. Coombe*, 186 F.3d 82, 89 (2d Cir. 1999). The Due Process Clause demands far more.

158. And that is not the only due process problem with AB 1594. Proof that the defendant caused the plaintiff's injury is and always has been a core element of tort law. *See, e.g.*, *Restatement (Second) of Torts* §430 (1965); *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 201 (2017); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132-33 (2014). Indeed, even strict-liability torts require proof of causation. *See, e.g.*, *Restatement (Second) of Torts* §§504-05, 507, 509, 519 (1977). That is not just tradition; it is constitutionally mandated: Denying a defendant a meaningful opportunity to demonstrate that it did not actually cause a plaintiff's injuries would be a paradigm arbitrary deprivation of private property. Yet AB 1594 does just that by allowing liability for harms supposedly caused by conduct not just far out of state and back in time, but through the criminal acts of third parties. *See* Cal. Civ. Code §3273.52(f) ("An intervening act by a third party, including, but not limited to, criminal misuse of a firearm-related product, shall not preclude a firearm industry member from liability under this section.").

COMPLAINT - 69

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

159.   Finally, the statute's non-rebuttable presumption under §3273.51(c), *see* ¶¶44-45, is inconsistent with basic notions of due process.   It has long been established that "a presumption that is arbitrary, or that operates to deny a fair opportunity to repel it, violates the due process clause."   *W. & Atl. R.R. v. Henderson*, 279 U.S. 639, 642 (1929).   AB 1594 flouts that settled law.

## II.   Claims Against Code Civ. Proc. §1021.11

### COUNT SIX
### (Preemption)

160.   Plaintiff re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

161.   "[U]nder the Supremacy Clause," (U.S. Const. art. VI, cl. 2), "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield."   *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992).

162.   Section 1021.11 directly conflicts with federal law by establishing a wholly separate state-law fee regime even in cases (like this one) brought under 42 U.S.C. §1983.

163.   42 U.S.C. §1988 provides in relevant part that, in most categories of federal civil rights litigation brought under 42 U.S.C. §1983—including claims to vindicate federal statutory and constitutional rights relating to firearms—the court

COMPLAINT - 70

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

"may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs" of the case.  42 U.S.C. §1988(b).

164.   Under that provision, "a prevailing plaintiff 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.'" *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983).  Prevailing *defendants*, by contrast, may recover fees *only* "where the suit was vexatious, frivolous, or brought to harass or embarrass the defendant."  *Id.* at 429 n.2; *cf. Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 422 (1978) (holding, under the analogous fee-award language in Title VII, that "a plaintiff should not be assessed his opponent's attorney's fees unless a court finds that his claim was frivolous, unreasonable, or groundless").

165.   In stark contrast to §1021.11, federal law does not require a plaintiff to win every claim in order to be a "prevailing party" entitled to fees.  Quite the opposite.  Section 1988 fees are appropriate if a plaintiff has "prevailed on a significant issue in the litigation and have obtained some of the relief they sought," *even if the plaintiff lost on other issues or claims*.  *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 793 (1989).  In fact, the Supreme Court has "made clear that plaintiffs may receive fees under [Section] 1988 even if they are not victorious on every claim.  "A civil rights plaintiff who obtains meaningful relief has corrected a violation of federal law and, in so doing, has vindicated Congress's

COMPLAINT - 71

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

statutory purposes," and she is therefore entitled to fees under 42 U.S.C. §1988. *Fox v. Vice*, 563 U.S. 826, 834 (2011).

166. California's new fee-shifting statute is diametrically opposed to that federal regime. Under California Civil Procedure Code §1021.11(e), *only government defendants* can be "prevailing parties." And under §1021.11(b), a government defendant is a "prevailing party" if the plaintiff loses on *any* of its claims, even if the "loss" is just a dismissal on mootness grounds because the plaintiff won a dispositive judgment on one of its other claims—in which case §1021.11 makes the government defendant entitled to fees even though it has been found to violate the Constitution in the case. Section 1021.11 thus turns 42 U.S.C. §1988 on its head, putting government defendants in a better position than civil rights plaintiffs that vindicate federal law.

167. Section 1021.11 is not shy about its effort to evade federal law and federal supremacy. The statute explicitly provides that its terms apply *regardless of what any federal court does in an underlying civil rights case brought under 42 U.S.C. §1983*: Under §1021.11(d)(3), California government officials may sue a federal civil rights plaintiff (such as NSSF here) in California state court to enforce §1021.11's fee-shifting penalty *even when* "[*t*]*he court in the underlying* [*federal Section 1983*] *action held that any provision of this section is invalid,*

COMPLAINT - 72

*unconstitutional, or preempted by federal law, notwithstanding the doctrines of issue or claim preclusion*." (emphasis added). To repeat: If NSSF wins on every claim it has brought challenging Business & Professions Code §22949.80 except one, *and* this Court holds that §1021.11 is unconstitutional or preempted, California will *still* have license, absent an injunction, to go after NSSF and its counsel in state court for attorneys' fees. It is difficult to imagine a more obvious Supremacy Clause violation.

168.   In addition to directly conflicting with federal law, §1021.11 also "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," and so "must give way" for that reason too. *Jones v. Rath Packing Co.*, 430 U.S. 519, 526 (1977).

169.   Section 1988 is "a powerful weapon" for "victims of civil rights violations," as it "improves their ability to employ counsel, to obtain access to the courts, and thereafter to vindicate their rights." *Evans v. Jeff D.*, 475 U.S. 717, 741 (1986). That is by design. When it enacted 42 U.S.C. §1988, Congress made clear that the statute's fee-shifting provision plays a central role in encouraging private action to enforce federal rights. *See* S. Rep. No. 94-1011, at 6 (1976) ("If our civil rights laws are not to become mere hollow pronouncements which the average citizen cannot enforce, we must maintain the traditionally effective remedy of fee shifting in these cases."); *see also City of Riverside v. Rivera*, 477 U.S. 561, 576

COMPLAINT - 73

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

(1986) ("Congress enacted [Section] 1988 specifically because it found that the private market for legal services failed to provide many victims of civil rights violations with effective access to the judicial process.").  Congress also explained that because "governmental entities and officials have substantial resources available to them," awarding fees to prevailing defendants in §1983 cases "would further widen the gap between citizens and government officials and would exacerbate the inequality of litigating strength." H.R. Rep. No. 94-1558, at 7 (1976).

170.  But California's new fee-shifting statute renders that "powerful weapon" inoperable for plaintiffs who seek to vindicate their fundamental Second Amendment rights.  Section 1021.11 threatens to bankrupt anyone considering a challenge to a state or local firearm law, and it will make it much harder for potential plaintiffs to find willing counsel given that its fee-shifting explicitly applies to lawyers too.  In short, whereas 42 U.S.C. §1988 expresses congressional intent to encourage all civil rights litigation, Section 1021.11 seeks to deter civil rights plaintiffs from bringing claims to vindicate their Second Amendment rights.

171.  Section 1021.11 is preempted.

## COUNT SEVEN
### (First Amendment)

172.  Plaintiff re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

COMPLAINT - 74

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

173.   The First Amendment provides in relevant part that "Congress shall make no law … abridging the freedom of speech … or the right of the people … to petition the government for a redress of grievances."  U.S. Const. amend. I; *see Gitlow v. New York*, 268 U.S. 652, 666 (1925) (The First Amendment is applicable against the States).

174.   Section 1021.11 violates both the Speech Clause and the Petition Clause of the First Amendment, as it uses a fee-shifting penalty as "a weapon of oppression" to "freeze out of existence" firearms-rights litigation brought by those seeking to vindicate an "unpopular cause."  *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 434-36 (1963).

175.   The Supreme Court has long held that government actors may not "handicap[]" "the right to petition the court" through indirect regulation that "infringe[s] in any way the right of individuals and the public to be fairly represented in lawsuits authorized by Congress to effectuate a basic public interest."  *Bhd. of R.R. Trainmen v. Virginia ex rel. Va. State Bar*, 377 U.S. 1, 7 (1964); *see also United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n*, 389 U.S. 217, 222-23 (1967) (government cannot "erode [the Constitution's] guarantees by indirect restraints" on citizens' ability to assert their legal rights).

COMPLAINT - 75

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

176.   Yet that is exactly what §1021.11 does.  Erasing litigants' entitlement to attorneys' fees will make it harder to secure "represent[ation] in lawsuits authorized by Congress [under 42 U.S.C. §1983] to effectuate a basic public interest," namely, enforcing a fundamental constitutional right.  *Bhd. of R.R. Trainmen*, 377 U.S. at 7.  And making attorneys jointly and severally liable for fees *even when the plaintiff substantively prevails* only makes matters worse.

177.   What is more, §1021.11's evident purpose is to give state and local governments in California a free hand to regulate firearms by suppressing litigation over firearm regulations.  And that is the effect that the statute will have absent a federal-court injunction.  But "[t]he Constitution does not permit" a state to "insulate [its] interpretation of the Constitution from judicial challenge."  *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 548-49 (2001).

178.  Section 1021.11's fee-shifting regime further violates the First Amendment because it is content-based and viewpoint-discriminatory:  The statute imposes a unique burden on those who seek to vindicate their civil rights through firearms litigation while favoring all other sorts of constitutional and statutory civil rights claims.  Indeed, "the violation of the First Amendment is … blatant," as California has "target[ed] … particular views taken by speakers on a subject" and based the availability of prevailing party fees on the "motivating ideology … of the

COMPLAINT - 76

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

speaker." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995).  A party who sues under 42 U.S.C. §1983 seeking to vindicate Second Amendment rights is entitled to nothing; a party who sues under 42 U.S.C. §1983 seeking to vindicate Eighth Amendment rights is entitled to her ordinary fees under Section 1988.  That is textbook content and viewpoint discrimination.

179.    Section 1021.11 falls far outside the history and tradition of the First Amendment.  *See Stevens*, 559 U.S. at 468-71 (placing the burden on the government to show that a type of speech belongs to one of the "historic and traditional categories" of constitutionally unprotected speech).  It also fails under any means-end scrutiny, for the simple reason that there is no valid state interest for targeting a particular type of civil rights litigant for unfavorable treatment when exercising the fundamental right to assert constitutional claims.

180.    Indeed, even if California could somehow identify a valid interest supporting the statute, §1021.11 would still fail.  Section 1021.11 does not promote any compelling government interest.  And there are far less restrictive alternatives that would serve the government's interests (assuming they are valid) without imposing such severe burdens on core protected rights.  *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000).  That dooms the statute under any form

COMPLAINT - 77

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

of heightened scrutiny, including intermediate scrutiny. *See McCullen v. Coakley*, 573 U.S. 464, 494 (2014).

181.    In fact, Section 1021.11 is not even rationally related to any legitimate government interest and would fail even rational basis review.  As noted above, the statute was adopted in retaliation for two Supreme Court decisions: the decision in *Jackson* not invalidating all of Texas's SB 8; and the later decision in *Bruen* making clear that the Second Amendment right to keep and bear arms means what it says. Retaliation is not a rational justification for the classifications in this case and, indeed, is an utterly impermissible justification.  "[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest."  *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973) (striking down statutory classification designed to discriminate against "hippies" and those who lived in "hippie communes"); *see also Rinaldi v. Yeager*, 384 U.S. 305 (1966) (striking down state statute that only demanded reimbursement of appellate transcript costs from unsuccessful appellants who were imprisoned).

182.    Section 1021.11 violates the First Amendment.

COMPLAINT - 78

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

1

**PRAYER FOR RELIEF**

Plaintiff prays for the following relief from the Court:

1.     a declaration, pursuant to 28 U.S.C. §2202, that AB 1594 violates the United States Constitution and is preempted, and is therefore void and unenforceable on its face, or, in the alternative, that it is invalid as applied to NSSF and its members;

2.     a declaration, pursuant to 28 U.S.C. §2202, that Code Civ. Proc. §1021.11 violates the United States Constitution and is preempted, and is therefore void and unenforceable on its face, or, in the alternative, that it is invalid as applied to NSSF and its members;

3.     a preliminary and permanent injunction enjoining Attorney General Bonta, as well as all officers, agents, and employees subject to his supervision, direction, and/or control, from enforcing or otherwise bringing suit against NSSF and its members under AB 1594;

4.     a preliminary and permanent injunction enjoining Attorney General Bonta, as well as all officers, agents, and employees subject to his supervision, direction, and/or control, from enforcing or otherwise bringing suit against NSSF and its members under Code Civ. Proc. §1021.11;

5.     nominal damages;

6.     such costs and reasonable attorneys' fees to which NSSF may be entitled by law; and

COMPLAINT - 79

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

7.     any further relief Court deems just and proper.

Respectfully submitted,


s/Matthew D. Rowen
PAUL D. CLEMENT*
ERIN E. MURPHY*
MATTHEW D. ROWEN (Cal. Bar # 292292)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
matthew.rowen@clementmurphy.com

*application for admission *pro hac vice forthcoming*

May 23, 2023                              Attorneys for Plaintiff

COMPLAINT - 80                           CLEMENT & MURPHY, PLLC
                                         706 Duke Street
                                         Alexandria, VA 22314
                                         (202) 742-8900