PAUL D. CLEMENT*
ERIN E. MURPHY*
MATTHEW D. ROWEN (Cal. Bar # 292292)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
matthew.rowen@clementmurphy.com

*admitted *pro hac vice*

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| National Shooting Sports Foundation, <br><br> *Plaintiff,* <br><br><br><br><br> v. <br><br><br><br> Rob Bonta, Attorney General of California, <br><br> *Defendant*. | Case No. 3:23-cv-00945 <br><br> **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** <br><br> Date: August 11, 2023 <br> Time: 3:30 p.m. <br> Courtroom 5C <br> Hon. Andrew G. Schopler |

PLAINTIFF'S MEMORANDUM OF
POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... iii

INTRODUCTION ................................................................................. 1

BACKGROUND ................................................................................... 3

ARGUMENT ........................................................................................ 9

I.      NSSF Is Likely To Succeed On The Merits With Respect To Both
        AB 1594 And §1021.11 .............................................................. 9

        A.      AB 1594 Violates the Second Amendment ......................... 9

        B.      The PLCAA Preempts AB 1594 ...................................... 12

        C.      AB 1594 Violates the First Amendment ........................... 16

        D.      AB 1594 Is Void for Vagueness ..................................... 18

        E.      AB 1594 Exceeds the Constitution's Limits on Extraterritorial
                State Regulation ......................................................... 19

        F.      Section 1021.11 Is Unconstitutional and Preempted ......... 22

II.     The Remaining Factors All Favor Injunctive Relief .................... 24

CONCLUSION .................................................................................. 25

# TABLE OF AUTHORITIES

## Cases

*44 Liquormart, Inc. v. Rhode Island*,
    517 U.S. 484 (1996)...................................................................................17

*A.S. Goldmen & Co. v. N.J. Bureau of Sec.*,
    163 F.3d 780 (3d Cir. 1999)........................................................................21

*AK Futures LLC v. Boyd St. Distro, LLC*,
    35 F.4th 682 (9th Cir. 2022).........................................................................9

*Andrews v. State*,
    50 Tenn. 165 (1871).....................................................................................9

*Ashcroft v. Free Speech Coalition*,
    535 U.S. 234 (2002)....................................................................................18

*Baldwin v. G.A.F. Seelig, Inc.*,
    294 U.S. 511 (1935)....................................................................................20

*Bank of Am. Corp. v. City of Miami*,
    581 U.S. 189 (2017)....................................................................................15

*Bhd. of R.R. Trainmen v. Virginia ex rel. Va. State Bar*,
    377 U.S. 1 (1964)................................................................................. 22, 23

*Broadrick v. Oklahoma*,
    413 U.S. 601 (1973)....................................................................................18

*Brown v. Entm't Merchants Ass'n*,
    564 U.S. 786 (2011)............................................................................. 16, 17

*Caetano v. Massachusetts*,
    577 U.S. 411 (2016)....................................................................................11

*Cal. Pharmacists Ass'n v. Maxwell-Jolly*,
    563 F.3d 847 (9th Cir. 2009).......................................................................25

*Camden Cnty. Bd. of Chosen Freeholders v. Beretta*,
    273 F.3d 536 (3d Cir. 2001)........................................................................12

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
  447 U.S. 557 (1980)..................................................................................16

*City of N.Y. v. Beretta*,
  524 F.3d 384 (2d. Cir. 2008) ............................................... 12, 13, 14

*Comptroller of Treasury of Md. v. Wynne*,
  575 U.S. 542 (2015)..................................................................................21

*Connally v. Gen. Constr. Co.*,
  269 U.S. 385 (1926)..................................................................................18

*Craig v. Boren*,
  429 U.S. 190 (1976)..................................................................................25

*Daniels Sharpsmart, Inc. v. Smith*,
  889 F.3d 608 (9th Cir. 2018) ..............................................................21

*District of Columbia v. Beretta U.S.A. Corp.*,
  940 A.2d 163 (D.C. 2008)........................................................................4

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)..................................................................5, 10, 11

*Duncan v. Bonta*,
  19 F.4th 1087 (9th Cir. 2021) .................................................... 11, 17

*Edgar v. MITE Corp.*,
  457 U.S. 624 (1982) .......................................................................... 21, 22

*Elrod v. Burns*,
  427 U.S. 347 (1976).......................................................................... 24, 25

*Fox v. Vice*,
  563 U.S. 826 (2011)..................................................................................23

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972)..................................................................................18

*Hernandez v. Sessions*,
  872 F.3d 976 (9th Cir. 2017) ...............................................................9

*Holmes v. Secs. Inv. Prot. Corp.*,
   503 U.S. 258 (1992)............................................................................15

*Ileto v. Glock, Inc.*,
   565 F.3d 1126 (9th Cir. 2009) ............................................ 1, 12, 13, 15

*In re Acad., Ltd.*,
   625 S.W.3d 19 (Tex. 2021) ...................................................................4

*Johnson v. United States*,
   576 U.S. 591 (2015)............................................................................19

*Jones v. Rath Packing Co.*,
   430 U.S. 519 (1977)............................................................................24

*Lorillard Tobacco Co. v. Reilly*,
   533 U.S. 525 (2001)............................................................................16

*Maryland Shall Issue, Inc. v. Hogan*,
   971 F.3d 199 (4th Cir. 2020).............................................................25

*McCullen v. Coakley*,
   573 U.S. 464 (2014)............................................................................23

*Medtronic, Inc. v. Lohr*,
   518 U.S. 470 (1996)............................................................................14

*Miller v. Bonta*,
   2022 WL 17811114 (S.D. Cal. Dec. 19, 2022)........................... 1, 3, 24

*Mitchell v. Forsyth*,
   472 U.S. 511 (1985)............................................................................24

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   142 S.Ct. 2111, 2128 (2022) .................................................... *passim*

*NAACP v. Button*,
   371 U.S. 415 (1963)..................................................................... 18, 22

*Nat'l Pork Producers Council v. Ross*,
   143 S.Ct. 1142 (2023) ............................................................ 19, 20, 21

*Nken v. Holder*,
  556 U.S. 418 (2009)..................................................................................25

*NSSF v. Platkin*,
  2023 WL 1380388 (D.N.J. Jan. 31, 2023)............................................. 13, 14, 16

*Peregrine Semiconductor Corp. v. RF Micro Devices, Inc.*,
  2014 WL 67509 (S.D. Cal. Jan. 8, 2014)..........................................................9

*Pike v. Bruce Church, Inc.*,
  397 U.S. 137 (1970)..................................................................................21

*Reno v. ACLU*,
  521 U.S. 844 (1997)............................................................................. 17, 18

*Riley's Am. Heritage Farms v. Elsasser*,
  32 F.4th 707 (9th Cir. 2022).........................................................................25

*Rodriguez v. Robbins*,
  715 F.3d 1127 (9th Cir. 2013)........................................................................25

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995)..................................................................................23

*Sam Francis Found. v. Christies, Inc.*,
  784 F.3d 1320 (9th Cir. 2015).......................................................................20

*Shelby Cnty. v. Holder*,
  570 U.S. 529 (2013)..................................................................................19

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011)............................................................................. 16, 17

*Teixeira v. Cnty. Of Alameda*,
  873 F.3d 670 (9th Cir. 2017)..........................................................................9

*Twitter, Inc. v. Taamneh*,
  143 S.Ct. 1206 (2023)................................................................................15

*United States v. Oakland Cannabis Buyers' Coop.*,
  532 U.S. 483 (2001)..................................................................................25

*United States v. Playboy Ent. Grp., Inc.*,
    529 U.S. 803 (2000)...........................................................................23

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
    455 U.S. 489 (1982)...........................................................................18

*Watson v. Emps. Liab. Assurance Corp.*,
    348 U.S. 66 (1954)............................................................................21

**Constitutional Provisions**

U.S. Const. art. I, §8, cl. 3...................................................................19

U.S. Const. art. I, §10..........................................................................19

U.S. Const. art. IV, §1.........................................................................19

U.S. Const. art. IV, §2, cl. 1.................................................................19

U.S. Const. amend. X...........................................................................19

U.S. Const. amend. XIV, §1, cl. 2........................................................ 19

**Statutes**

15 U.S.C. §7901....................................................................................12

15 U.S.C. §7901(a)(4)........................................................................... 14

15 U.S.C. §7901(a)(5)............................................................................14

15 U.S.C. §7901(a)(6)................................................................ 15, 19, 22

15 U.S.C. §7901(a)(7)................................................................. 4, 12, 15

15 U.S.C. §7901(b)(1)......................................................................4, 15

15 U.S.C. §7902(a) .........................................................................4, 12

15 U.S.C. §7903(2)-(6) ........................................................................4

15 U.S.C. §7903(5)(A).................................................... 4, 12, 13, 15

42 U.S.C. §1988(b) ............................................................................ 23

Cal. Bus. & Prof. Code §22949.80(a)(3) .................................................................17

Cal. Civ. Code §3273.50(f) ..............................................................................5

Cal. Civ. Code §3273.50(g) .................................................................... *passim*

Cal. Civ. Code §3273.50(g)(1) .........................................................................6

Cal. Civ. Code §3273.50(g)(3) .............................................................. 2, 16, 17

Cal. Civ. Code §3273.51(a) ...............................................................................5

Cal. Civ. Code §3273.51(b) .................................................................. 2, 16, 17

Cal. Civ. Code §3273.51(b)(1) ............................................................. 2, 13, 14

Cal. Civ. Code §3273.51(b)(2) ............................................................. 6, 14, 19

Cal. Civ. Code §3273.51(c) ..................................................................... *passim*

Cal. Civ. Code §3273.51(c)(2) ................................................................ *passim*

Cal. Civ. Code §3723.51(d) ............................................................................ 7

Cal. Civ. Code §3273.52(a) ...............................................................................8

Cal. Civ. Code §3273.52(b) ...............................................................................8

Cal. Civ. Code §3273.52(b)-(d) .......................................................................1

Cal. Civ. Code §3273.52(c) ...................................................................... 8, 13

Cal. Civ. Code §3273.52(d) ...................................................................... 8, 19

Cal. Civ. Code §3273.52(d)(1) ......................................................................21

Cal. Civ. Code §3273.52(e)(1) ...................................................................6, 7

Cal. Civ. Code §3273.52(e)(2) ...................................................................6, 7

Cal. Civ. Code §3273.52(f) .................................................... 1, 8, 15, 18

Cal. Civ. Pro. §1021.11(a)................................................................................8, 9

Cal. Civ. Pro. §1021.11(b) ..............................................................................8, 24

Cal. Civ. Pro. §1021.11(c)..................................................................8

Cal. Civ. Pro. §1021.11(d)(3)..........................................................24

Cal. Civ. Pro. §1021.11(e)...........................................................8, 24

Pub. L. No. 109-92, 119 Stat. 2095 (2005)....................................3

Cal. Civ. Code §3723.51(d) ...........................................................7

**Rule**

Fed. R. Civ. P. 65(a) .......................................................................9

**Other Authorities**

Recent Legislation, *Protection of Lawful Commerce in Arms Act*,
      119 Harv. L. Rev. 1939 (2006) ...............................................3

Sharon Walsh, *Gun Industry Views Accord as Dangerous Crack in Its
      Unity*, Wash. Post (Mar. 18, 2000), https://wapo.st/2Zcp5KS.............................3

**INTRODUCTION**

California Assembly Bill 1594 and Code of Civil Procedure §1021.11 defy the Constitution and Acts of Congress in multiple respects.  The latter has already been tried and found wanting by a judge in this District.  *See Miller v. Bonta*, 2022 WL 17811114, at *8 (S.D. Cal. Dec. 19, 2022) (Benitez, J.).  The former should meet the same fate.

First, AB 1594 violates the Second Amendment.  As the Supreme Court just made clear, "the Second Amendment protects the possession and use of weapons that are 'in common use,'" so the only arms a state may ban consistent with our nation's "historical tradition of firearm regulation" are those not "in common use today," *i.e.*, those that are "highly unusual in society at large." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111, 2128, 2143 (2022) (quotation marks omitted).  Yet AB 1594 bans the manufacture, sale, and marketing of firearms that California deems "abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety in California," Cal. Civ. Code §3273.51(c),[1] *regardless of whether they are common*.  California may not prohibit what the Supreme Court has held the Second Amendment protects.

AB 1594 also defies the federal Protection of Lawful Commerce in Arms Act. Congress passed the PLCAA to stamp out lawsuits that seek to empower judges and juries to deploy nebulous state-law "reasonableness" standards to make licensed manufacturers and sellers of firearms pay for harms caused by criminals who misuse their products. *See Ileto v. Glock, Inc.*, 565 F.3d 1126 (9th Cir. 2009).  Yet AB 1594 empowers state officials and private parties to do just that:  bring "civil action[s]" against "firearm industry member[s]" for injuries resulting from the "criminal misuse of a firearm[ or] related product" by a third party.  §3273.52(b)-(d), (f).

---

[1] References to AB 1594 are to sections of the California Civil Code.

Because it authorizes California and its citizens to use the court system to punish law-abiding firearms companies for others' crimes, AB 1594 is preempted by the PLCAA.

AB 1594 fares just as poorly under the First Amendment. AB 1594 imposes liability on firearm industry members based on their "market[ing]" if a California court decides that a marketed product is "abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety in California." §3273.51(c). The statute provides that a firearm-related product is "abnormally dangerous" if (among other things) it is "most suitable for assaultive purposes," §3273.51(c)(2)(A), but what that means is anyone's guess—and that is not the half of it. A manufacturer can be liable under AB 1594 for failing to impose "reasonable controls" on its "marketing," §§3273.50(g)(3), 3273.51(b), whatever that means. And AB 1594 prohibits the marketing of products "targeted at minors" *even as to products that minors may lawfully use in California*. §3273.51(c)(2)(C). Despite this extreme breadth, AB 1594 says nothing about myriad forms of speech that could lead *directly* to criminal gun violence, and it imposes no liability on such speakers. Such radical over- and under-inclusiveness cannot be squared with the First Amendment, and the same flaws render AB 1594 void for vagueness, too.

AB 1594 also directly regulates conduct that takes place entirely outside the state, in violation of the Constitution's limits on extraterritorial state regulation. Even if a manufacturer operating solely in (say) Missouri complies with all federal and Missouri laws, it still could be held be liable under AB 1594 if one of its firearms later found its way into the hands of someone who used it to commit a crime in California, so long as a court later deems the manufacturer's out-of-state marketing or theft-protection controls "[un]reasonable." §3273.51(b)(1); §3273.50(g). California cannot use tort law to govern other states as if they were its colonies.

For its part, §1021.11 undermines Congress' fee-shifting regime designed to

vindicate civil rights.  Its discriminatory assault on civil rights is unconstitutional and preempted.  *Miller*, 2022 WL 17811114, at *7-*8 (enjoining §1021.11).

NSSF is thus more than likely to succeed on the merits of its claims.  And the remaining factors equally favor injunctive relief.  Subjecting NSSF and its members to unconstitutional statutes inflicts irreparable harm as a matter of law—especially when the statutes restrict and chill constitutionally protected speech.  By contrast, enforcement of unconstitutional statutes is always contrary to the equities and public interest.  The Court should enjoin enforcement of AB 1594 and §1021.11.

## BACKGROUND

1. In the 1990s, state and local governments initiated a series of lawsuits in response to concerns about violent crimes involving firearms.  Yet rather than train their sights on the criminals responsible for those violent crimes, they invoked unprecedented theories of tort liability and sued federally licensed manufacturers and distributors of legal firearms that were lawfully manufactured and sold and had no defect.  Many suits failed, but winning in court was not the only objective.  Recognizing that "[t]he legal fees" needed to defend against a rising tide of similar suits "alone" would have been "enough to bankrupt the industry," Sharon Walsh, *Gun Industry Views Accord as Dangerous Crack in Its Unity*, Wash. Post (Mar. 18, 2000), https://wapo.st/2Zcp5KS, state and local governments "pressed on" with their novel tort suits, "regardless of their chance of success, spending taxpayers' money in a war of attrition against the firearms industry," Recent Legislation, *Protection of Lawful Commerce in Arms Act*, 119 Harv. L. Rev. 1939, 1940 (2006).

2. Congress passed the PLCAA to end those efforts.  Pub. L. No. 109-92, 119 Stat. 2095 (2005) (codified at 15 U.S.C. §§7901-7903).  The PLCAA's first enumerated "purpose[]" is to "prohibit causes of action against manufacturers, distributors, dealers, and importers of firearms or ammunition products, and their trade associations" for harm "caused by the criminal or unlawful misuse of firearm

products" by third parties.  15 U.S.C. §7901(b)(1).  To that end, the PLCAA broadly prohibits "any person," "including any governmental entity," from bringing any civil action against any federally licensed "manufacturer or seller" of firearms or related products for "relief[] resulting from the criminal or unlawful misuse of a qualified product by … a third party."  15 U.S.C. §§7902(a), 7903(2)-(6).  That is not just a defense to liability; the PLCAA confers a substantive "immunity" from covered suits altogether.  *In re Acad., Ltd.*, 625 S.W.3d 19, 33-34 (Tex. 2021).

That immunity from suit is subject to only a handful of exceptions.  As relevant here, the PLCAA does not preempt actions in which a federally licensed firearm manufacturer or seller is alleged to have "knowingly violated a State or Federal statute applicable to the sale or marketing of [a firearm or related] product" where "the violation was a proximate cause of the harm for which relief is sought."  15 U.S.C. §7903(5)(A)(iii).  This provision is now known as the "predicate exception" because, "to take effect, it requires that the manufacturer or seller have committed an underlying (or predicate) statutory violation."  *District of Columbia v. Beretta U.S.A. Corp.*, 940 A.2d 163, 168 (D.C. 2008).  But it covers only those actions that require a "knowing[]" violation of law that was "a proximate cause" of the plaintiff's injury.  15 U.S.C. §7903(5)(A)(iii).  And none of the PLCAA's exceptions preserves state laws that invite judges and juries to use nebulous "reasonableness" standards to impose liability on firearm industry members for harms more directly caused by the criminal conduct of third parties; rather, such laws are exactly what the PLCAA was enacted to stamp out.  *Id.* §7901(a)(7).

3. Last year, the Supreme Court's decision in *Bruen* confirmed that the right "to keep and bear Arms" means just that.  142 S.Ct. at 2134-35.  And it is no "second-class right" subject to some special set of rules or available to only those with "some special need" to exercise it.  *Id.* at 2156.  Accordingly, when evaluating government burdens on the Second Amendment's "unqualified command," courts must assess

"this Nation's historical tradition" of regulating firearms.  *Id.* at 2126.  Applying that test, the Court invalidated a New York law requiring law-abiding citizens to show a special need to carry a firearm outside the home.  *Id.* at 2134-56.  And, in doing so, *Bruen* explained that our nation's historical tradition is to protect arms that are "in common use today."  *Id.* at 2134.  So, under *Bruen*, only those arms that are *both* abnormally dangerous *and* "highly unusual in society at large" may be prohibited. *Id.* at 2143 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008)).

*Bruen* should have led states to reconsider their laws to make them more protective of Second Amendment rights; sadly, some have had the opposite reaction.

4. On July 12, 2022, Governor Newsom signed AB 1594 into law.  AB 1594 applies only to "firearm industry member[s]."  *See* §3273.50(f) (defining term). AB 1594's operative section, §3273.51, creates a new, four-pronged "standard of conduct" for "firearm industry member[s]."  §3273.51(a).

First, under Civil Code §3273.51(b)(1), firearm industry members "shall … [e]stablish, implement, and enforce reasonable controls."  The statute does not identify what "controls" are "reasonable."  It instead defines "reasonable controls" in terms of goals they should accomplish—namely, "reasonable procedures, acts, or practices that are designed, implemented, and enforced" to do the following:

> (1) Prevent the sale or distribution of a firearm-related product to a straw purchaser, a firearm trafficker, a person prohibited from possessing a firearm under state or federal law, or a person who the firearm industry member has reasonable cause to believe is at substantial risk of using a firearm-related product to harm themselves or another or of possessing or using a firearm-related product unlawfully.
>
> (2) Prevent the loss or theft of a firearm-related product from the firearm industry member.
>
> (3) Ensure that the firearm industry member complies with all provisions of California and federal law and does not otherwise promote the unlawful manufacture, sale, possession, marketing, or use

of a firearm-related product.

§3273.50(g).

California thus requires industry members to have in place, among other things, procedures designed to screen for customers who appear "at substantial risk of using a firearm-related product to harm … another," §3273.50(g)(1), which describes most individuals with a heightened need to lawfully possess and lawfully carry a lawful firearm for self-defense. And the law reaches far beyond California. A federally licensed manufacturer must employ all these unidentified "reasonable controls" even if it manufactures its products, completes its retail sales, and carries out its wholesale transactions with distributors *entirely outside California*.

The statute also creates "a rebuttable presumption that [a] firearm industry member failed to implement reasonable controls," §3273.52(e)(1), and thus violated §3723.51(b)(1), if "(A) [t]he firearm industry member's action or failure to act created a reasonably foreseeable risk that the harm alleged by the claimant would occur," and "(B) [t]he firearm industry member could have established, implemented, and enforced reasonable controls to prevent or substantially mitigate the risk that the harm would occur." §3273.52(e)(1). "If th[is] rebuttable presumption … is established, the firearm industry member has the burden of proving by a preponderance of the evidence that [it] established, implemented, and enforced reasonable controls." §3273.52(e)(2).

Second and relatedly, under Civil Code §3273.51(b)(2), firearm industry members "shall … [t]ake reasonable precautions to ensure that [they] do[] not sell, distribute, or provide a firearm-related product to a downstream distributor or retailer of firearm-related products who fails to establish, implement, and enforce reasonable controls." Under AB 1594, a federally licensed manufacturer of firearms or related products thus must implement "reasonable controls" itself *and* must refrain from selling to distributors unless it has assured itself that both the distributors and any

retailers to whom the distributors may sell have "reasonable controls" in place, too.

Third, under Civil Code §3273.51(c), AB 1594 effectively bans outright an unknown—and unknowable—set of firearms:  Firearm industry members "shall not manufacture, market, import, offer for wholesale sale, or offer for retail sale a firearm-related product that is abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety in California."  Instead of employing *Bruen*'s common-use test (i.e., the law of the land), Section 3273.51(c) creates California's own, substantially *less* protective test for determining what arms people may keep and bear.  Under AB 1594, "[t]here shall be a presumption that a firearm-related product is abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety if any of the following is true":

> (A) The firearm-related product's features render the product most suitable for assaultive purposes instead of lawful self-defense, hunting, or other legitimate sport and recreational activities.

> (B) The firearm-related product is designed, sold, or marketed in a manner that foreseeably promotes conversion of legal firearm-related products into illegal firearm-related products.

> (C) The firearm-related product is designed, sold, or marketed in a manner that is targeted at minors or other individuals who are legally prohibited from accessing firearms.

§3273.51(c)(2).  Unlike other presumptions in the statute, AB 1594's "abnormally dangerous" presumption does not appear to be rebuttable.  *Compare* §3273.51(c)(2), *with* §3273.52(e)(1) & (2) (describing another presumption as "rebuttable").

Fourth, under Civil Code §3723.51(d), "[a] firearm industry member shall not engage in any conduct related to the sale or marketing of firearm-related products" that violates California's general statutory prohibitions on unfair methods of competition, deceptive acts, and false or misleading advertising.  Failure to "comply with any requirement of [§3723.51]" "shall be a violation" of California law,

§3723.51(a), which "shall be actionable under [§3723.52]," §3273.52(a).

To enforce the new standard of conduct it imposes, AB 1594 creates a "civil action" against firearm industry members.  Those who can bring suit include any "person who has suffered harm in California because of a firearm industry member's [violation of §3273.51]," along with "[t]he Attorney General," "city attorney[s]," and "county counsel."  §3273.52(b), (c).  Courts can award injunctive relief, damages, attorney's fees, and "any other appropriate relief necessary" to enforce AB 1594 and "remedy the harm [a violation] caused."  §3273.52(d).  Ordinary proximate cause does not apply, as "[a]n intervening act by a third party, *including, but not limited to, criminal misuse of a firearm-related product*, shall not preclude a firearm industry member from liability under this section."  §3273.52(f) (emphasis added).

5. Shortly after signing into law AB 1594, Governor Newsom also signed into law Senate Bill 1327, which eliminates successful plaintiffs' federal-law right to attorneys' fees in Second Amendment cases.[2]  SB 1327 establishes Code of Civil Procedure §1021.11, under which a "prevailing party" *cannot* be a plaintiff who seeks declaratory or injunctive relief regarding a state or local firearm regulation, even if the plaintiff receives all the relief it sought.  §1021.11(e).  Conversely, a government defendant is deemed a "prevailing party" under §1021.11(b) if the court (1) "[d]ismisses any claim or cause of action" in the case, "regardless of the reason for the dismissal," or (2) "[e]nters judgment in favor of the [government] party" "on any claim or cause of action."  §1021.11(b).  Notably, the plaintiff's attorneys are also on the hook for the government's fees.  §1021.11(a).  Section 1021.11(c) gives "prevailing party" defendants a three-year window to sue to recover fees.  And

---

[2] Most of SB 1327 is devoted to creating a private right of action to enforce state laws relating to the unlawful manufacture, distribution, or sale of specified firearms. *See* 2022 Cal. Stat. ch.146 (adding Cal. Bus. & Prof. Code §§22949.60-.71).  NSSF does not challenge those provisions here.

§1021.11(a) applies "[n]otwithstanding any other law," including 42 U.S.C. §1988, which entitles a prevailing party in a §1983 suit to attorneys' fees.

## ARGUMENT

"Pursuant to Rule 65 of the Federal Rules of Civil Procedure, a court may grant preliminary injunctive relief in order to prevent irreparable injury." *Peregrine Semiconductor Corp. v. RF Micro Devices, Inc.*, 2014 WL 67509, at *2 (S.D. Cal. Jan. 8, 2014) (citing Fed. R. Civ. P. 65(a)). The party seeking an injunction must show a likelihood of success on the merits, irreparable harm absent preliminary relief, and that the balance of the equities and public interest favor an injunction. *AK Futures LLC v. Boyd St. Distro, LLC*, 35 F.4th 682, 688 (9th Cir. 2022). Courts in this circuit use a "sliding scale" approach "so that a stronger showing of one element may offset a weaker showing of another"; likelihood of success on the merits matters most. *Hernandez v. Sessions*, 872 F.3d 976, 990 (9th Cir. 2017).

## I. NSSF Is Likely To Succeed On The Merits With Respect To Both AB 1594 And §1021.11.

### A. AB 1594 Violates the Second Amendment.

"[T]he Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense." *Bruen*, 142 S.Ct. at 2125. As the Ninth Circuit has recognized, "the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms." *Teixeira v. Cnty. Of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017); *see also, e.g., Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right to purchase them."). Laws that restrict commerce in arms thus restrict conduct that is "presumptively protect[ed]" by the Second Amendment, meaning the state bears the burden of proving that such a law "is consistent with this Nation's historical tradition." *Bruen*, 142 S.Ct. at 2126. AB 1594 is not remotely consistent with that tradition, as it not only effectively bans protected arms, but subjects industry members to an amorphous form of liability with no historical pedigree whatsoever.

AB 1594 forbids firearm industry members from manufacturing, making, importing, or selling any "firearm-related product that is abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety in California." §3273.51(c). On top of that, it creates an apparently non-rebuttable presumption that a firearm is "abnormally dangerous"—and thus per se unlawful to manufacture, market, or sell—if it is "most suitable for assaultive purposes" or "designed, sold, or marketed in a manner that foreseeably promotes conversion of legal firearm-related products into illegal firearm-related products" or "is targeted at minors or other individuals who are legally prohibited from accessing firearms." §3273.51(c)(2). That is a blatant end-run around *Bruen*. The Supreme Court has already articulated what our nation's historical tradition is when it comes to what arms are (and are not) protected: "[T]he Second Amendment protects … weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'" *Bruen*, 142 S.Ct. at 2143 (quoting *Heller*, 554 U.S. at 627). There is no exception for common arms that a state considers too "dangerous," or better suited "for assaultive purposes," or sold or marketed in a particular manner. If arms are "in common use today," then they cannot be banned, period. *Id*. California cannot displace that historical tradition with a test more to its liking.

Making matters worse, AB 1594 does not even provide any guidance as to what suffices to make a firearm "most suitable for assaultive purposes," or what constitutes designing, selling, or marketing a firearm "in a manner that promotes conversion of legal firearm-related products into illegal firearm-related products" or "is targeted at minors or other individuals who are legally prohibited from accessing firearms." That is no minor oversight. Because of the nature of firearms and self-defense, characteristics that might make a weapon "suitable for assaultive purposes" (or attractive to people "legally prohibited from accessing firearms") are quite likely *the same characteristics* that many citizens prioritize in selecting a firearm for self-

defense.  *See Duncan v. Bonta*, 19 F.4th 1087, 1169 (9th Cir. 2021) (VanDyke, J., dissenting) ("[A]lmost every attribute of a weapon that makes it more effective for military purposes also makes it more effective for self-defense."), *cert. granted, judgment vacated*, 142 S.Ct. 2895 (2022).  More fundamentally, the nature of the Second Amendment right is such that "dangerousness" alone cannot be dispositive.  After all, a firearm's dangerousness is precisely what provides its utility as a tool for self-defense.  That is why our nation's historical tradition does not focus on dangerousness in isolation, but rather permits the prohibition only of those weapons that are both "dangerous *and unusual*."  *Bruen*, 142 S.Ct. at 2128, 2143 (emphasis added) (quoting *Heller*, 554 U.S. at 627).  Hence, "firearms cannot be categorically prohibited just because they are dangerous."  *Caetano v. Massachusetts*, 577 U.S. 411, 418 (2016) (Alito, J., concurring in the judgment).  Asking only whether a weapon is "abnormally dangerous," as AB 1594 does, thus defies both the Supreme Court's explicit teachings and the realities of armed self-defense.

Nor is there some free-floating Second Amendment exception for firearms "designed, sold, or marketed in a manner that is targeted at minors." §3273.51(c)(2)(C).  Many citizens wish to introduce their children to hunting or shooting sports, which is entirely lawful to do in California, and value a firearm designed for minors precisely because it is safer and easier for a minor to use for those lawful purposes.  But California has reached the puzzling conclusion that any firearm "designed … in a manner that is targeted at minors" is abnormally dangerous and thus unlawful.  That, too, cannot be reconciled with the Second Amendment (or common sense).  *See Heller*, 554 U.S. at 624-25 (Second Amendment protects firearms "typically possessed by law-abiding citizens for lawful purposes").

AB 1594's efforts to saddle licensed industry members with the costs of harms created by criminals are also inconsistent with historical tradition.  Indeed, as the Third Circuit explained just two decades ago, "[t]o extend public nuisance law to

embrace the manufacture of handguns would be unprecedented." *Camden Cnty. Bd. of Chosen Freeholders v. Beretta*, 273 F.3d 536, 540-41 (3d Cir. 2001). Congress patently agreed. *See* 15 U.S.C. §7901; *see also Ileto*, 565 F.3d at 1135 (interpreting the PLCAA in light of Congress' finding that such "liability actions … are based on theories without foundation in hundreds of years of the common law and jurisprudence of the United States" (quoting 15 U.S.C. §7901(a)(7)). California thus cannot come close to "demonstrating that [AB 1594] is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S.Ct. at 2130.

### B.    The PLCAA Preempts AB 1594.

Under the PLCAA, a "civil liability action … against a manufacturer or seller of [firearms and related products]" that seeks "damages … or other relief, resulting from the criminal or unlawful misuse of a qualified product by … a third party" "may not be brought in any Federal or State court."  15 U.S.C. §§7902(a), 7903(5)(A). Yet AB 1594 empowers state actors to sue licensed manufacturers and sellers of firearms for harms caused by third parties who misuse their products. That unabashed effort to circumvent the PLCAA cannot withstand scrutiny.

California presumably will argue that AB 1594 is saved from preemption by the PLCAA's "predicate exception," which exempts certain lawsuits involving violations of federal or state law. *See id.* §7903(5)(A)(iii). But the Ninth Circuit has already rejected the argument that the predicate exception covers state statutes that merely codify the same common-law causes of action that Congress enacted the PLCAA to inter. *See Ileto*, 565 F.3d at 1134. Of course it did; any other conclusion "would allow the predicate exception to swallow the statute." *City of N.Y. v. Beretta*, 524 F.3d 384, 403 (2d. Cir. 2008). In reality, the exception treats as "predicate statutes" only laws that impose the kinds of clear rules that industry members can knowingly violate (or not) in real time, not laws that just invite the same "'judicial evolution' [that] was precisely the target of the PLCAA." *Ileto*, 565 F.3d at 1136.

The text itself proves the point.  The predicate exception saves "an action" from preemption only to the extent the action alleges that "a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought."  15 U.S.C. §7903(5)(A)(iii).  That language presumes some requirement or obligation sufficiently concrete that an industry member can actually knowingly violate it at the time of manufacture or sale—as a district court judge in New Jersey recently concluded when confronted with a similar effort to end-run the PLCAA.  *See NSSF v. Platkin*, 2023 WL 1380388, at *6 (D.N.J. Jan. 31, 2023) ("The knowingly requirement of the predicate exception necessitates the actor to have a sufficiently concrete duty to have knowingly violated a relevant statute.").

The illustrative examples Congress supplied in the predicate exception itself further confirm the point, as they both involve violations of clear legal obligations or prohibitions.  *See* 15 U.S.C. §7903(5)(A)(iii)(I) (record-keeping violations); *id.* §7903(5)(A)(iii)(II) (conspiring with or aiding and abetting someone in a straw purchase).  Under basic principles of interpretation, the general "applicable to" language in §7903(5)(A)(iii) must be "construed to embrace only objects similar to those enumerated by" those two specific examples.  *Beretta*, 524 F.3d at 402; *accord Platkin*, 2023 WL 1380388, at *6.  "Indeed, if *any* statute that 'could be applied' to the sales and manufacturing of firearms qualified as a predicate statute, there would be no need to list examples at all."  *Ileto*, 565 F.3d at 1134.  And both of Congress' examples look nothing like AB 1594, which effectively just commands NSSF's members to employ "reasonable controls," and then leaves it to judges and juries to decide, after the fact, which controls were (or were not) sufficiently "reasonable."  Such vague commands make it impossible to *know* in real time what "procedures, acts, or practices" are "unreasonable" means of "prevent[ing]" others' wrongdoing or "ensur[ing]" AB 1594's abstract goals.  §§3273.50(g), 3273.51(b)(1), (c).

The PLCAA's expressly enumerated findings reinforce the conclusion that the predicate exception does not cover statutes that merely codify common-law duties of care. Congress said right there in the statute that the PLCAA aims to foreclose efforts to hold those engaged in "the lawful design, manufacture, marketing, distribution, importation, or sale to the public of firearms or ammunition products" "liable for the harm caused by those who criminally or unlawfully misuse firearm products or ammunition products that function as designed and intended." 15 U.S.C. §7901(a)(5). And "lawful" is best understood to mean "activities having been done in compliance with statutes like those described in" the immediately preceding finding: "the Gun Control Act of 1968, the National Firearms Act, and the Arms [Export] Control Act." *Beretta*, 524 F.3d at 402-03; *see* 15 U.S.C. §7901(a)(4). Those regulatory regimes impose concrete obligations with which industry members can ensure compliance. The predicate exception is thus best understood as encompassing only laws that likewise *clearly* define the line between permitted and prohibited. *See Platkin*, 2023 WL 1380388, at *6.

Yet AB 1594 does the exact opposite. By its terms, AB 1594 does not require a "knowing[]" violation of anything. It instead sets up a strict-liability offense based on any failure to "enforce reasonable controls" or "take reasonable precautions." §3273.51(b)(1)-(2); *see* §3273.50(g) (defining "[r]easonable controls"). That unbounded reasonableness regime leaves NSSF's members guessing what judges and juries will deem insufficient. It is totally "contrary to the PLCAA to hold an industry member liable who complies with all laws but did not know that it failed to employ 'reasonable procedures, safeguards, and business practices[.]'" *Platkin*, 2023 WL 1380388, at *6. So, reading AB 1594 "as being applicable to the sale or marketing of the product would directly conflict with the intention of Congress." *Id.* at *7. That should end the matter, as Congress' intention is always "the ultimate touchstone" in preemption. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).

AB 1594 goes further still, discarding proximate cause even though the predicate exception explicitly permits only actions where a defendant's knowing violation of a law "was a proximate cause of the harm for which relief is sought." 15 U.S.C. §7903(5)(A)(iii). Under AB 1594, "[a]n intervening act by a third party, including … *criminal misuse of a firearm-related produc*t, shall not preclude a firearm industry member from liability under this section." §3273.52(f) (emphasis added). That is flatly inconsistent with the PLCAA. The PLCAA's whole point is to prevent states from using tort law to make industry members pay for harms caused by "criminal or unlawful misuse of" firearms by "third part[ies]." 15 U.S.C. §7903(5)(A). That is why Congress made proximate cause non-negotiable. And under *true* proximate cause, "foreseeability alone is not sufficient," *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 201 (2017); there must be a "direct relation between the injury asserted and the injurious conduct alleged," *Holmes v. Secs. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992). In stark contrast, AB 1594 embraces a view of causation that the Supreme Court recently offered as a *reductio ad absurdum. See Twitter, Inc. v. Taamneh*, 143 S.Ct. 1206, 1221 (2023) (rejecting idea that "ordinary merchants could become liable for any misuse of their goods and services, *no matter how attenuated their relationship with the wrongdoer*" (emphasis added)).

In short, "the text and purpose of the PLCAA show[] that Congress intended to preempt general tort theories of liability even in jurisdictions … that have codified such causes of action." *Ileto*, 565 F.3d at 1136. For good reason: The problem Congress had with the suits it enacted the PLCAA to stamp out is that they sought to "expand civil liability in a manner never contemplated by the framers of the Constitution, by Congress, or by the legislatures of the several States" and constituted an "abuse of the legal system." 15 U.S.C. §7901(a)(6)-(a)(7). Congress thus opted "[t]o prohibit [such] causes of action" entirely, *id.* §7901(b)(1), regardless of whether the cause of action was statutory. Accordingly, "[t]o read [AB 1594 as

fitting within the predicate exception would run afoul of the goals of the PLCAA and would, in fact, 'gut the PLCAA.'" *Platkin*, 2023 WL 1380388, at *7.

### C.    AB 1594 Violates the First Amendment.

AB 1594 regulates—indeed, allows courts to enjoin—constitutionally protected speech.  "A firearm industry member" may be held liable under AB 1594 if it "market[s]" a product later deemed "likely to create an unreasonable risk of harm to public health and safety in California," §3273.51(c), if its marketing is "targeted at minors," §3273.51(c)(2)(C), or if it fails to impose "reasonable controls" on its "marketing" (whatever that means), §§3273.50(g)(3), 3273.51(b).  In myriad ways, these speech-restricting provisions violate the First Amendment.

First, AB 1594 undoubtedly regulates speech based on its content.  The statute applies only to the marketing of firearm-related products—nothing else.  And the statute fixates on gun-related speech by gun-related actors because their speech is uniquely likely to communicate a *viewpoint* that California apparently disfavors.  *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564 (2011).  Yet the topics and views California has singled out do not fall into any of the "well-defined and narrowly limited classes of speech" that are unprotected by the First Amendment.  *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 791 (2011).  Of course, the First Amendment does not preclude liability for false, deceptive, or otherwise "misleading" commercial speech.  *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 (1980).  But under AB 1594, advertisements with entirely accurate specifications of lawful products may trigger liability if the marketed product is eventually deemed "abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety in California," §3273.51(c), apparently regardless of truthfulness.   But truthful speech promoting lawful products enjoys full constitutional protection, even if the products have deleterious health effects.  *See, e.g.*, *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (tobacco); *44*

*Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 489 (1996) (plurality op.) (liquor). Put simply, "the State may not seek to remove a popular but disfavored product from the marketplace by prohibiting truthful, nonmisleading advertisements" just because it "finds expression too persuasive." *Sorrell*, 564 U.S. at 577-78. That is true *a fortiori* when the disfavored product is not just lawful but constitutionally protected.

California therefore must affirmatively prove that AB 1594 satisfies heightened scrutiny. That, it cannot do. Despite ostensibly being motivated by a desire to address gun violence, AB 1594 does nothing to police the conduct of violent criminals or regulate vast swaths of speech—violent video games, direct incitements to violence, etc.—that may actually encourage criminal gun violence. AB 1594 is thus "wildly underinclusive." *Brown*, 564 U.S. at 801-02.

It is also radically overbroad: AB 1594 imposes sweeping liability for *any* firearms marketing that could later be thought to involve a product "likely to create an unreasonable risk of harm to public health and safety in California," §3273.51(c), or if a company failed to impose "reasonable controls" on its "marketing," §§3273.50(g)(3), 3273.51(b). That is so even if the speech is entirely truthful and non-misleading. And that is to say nothing of AB 1594's prohibition on *any* marketing "targeted at minors," §3273.51(c)(2)(C), which prohibits marketing for conduct *that California has expressly declared to be fully lawful*. *See* Cal. Bus. & Prof. Code §22949.80(a)(3) ("youth hunting program[s]" are "lawful hunting activ[ities]"). Such sweeping provisions cannot survive heightened scrutiny.

AB 1594's speech restrictions also suffer from a fatal vagueness problem. Vagueness "raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno v. ACLU*, 521 U.S. 844, 871-72 (1997). Yet AB 1594 gives no guidance on what makes a firearm suitable for "assaultive purposes." That is no minor omission; most any firearm can be used for "defensive" *and* "offensive" purposes. *See Duncan*, 19 F.4th at 1151 (Bumatay, J., dissenting). NSSF's members

are thus left with no guidance as to which firearms they "presumptively" cannot market at all.  Those intractable vagueness problems leave regulated parties with no real choice but to err on the side of refraining from speech.  *See* Cupero Decl. ¶10; Reid Decl. ¶9.  AB 1594 is bound to "provoke uncertainty among speakers," *Reno*, 521 U.S. at 871, as the statute's subjective abstractions do not articulate *at all*—let alone with "narrow specificity," *NAACP v. Button*, 371 U.S. 415, 433 (1963)—what speech may cause liability.  And nixing proximate cause makes matters worse, as marketing may lead to liability despite the actions of an "intervening … third-party." §3273.52(f).  Because any advertisement for a lawful product can create liability, any "legitimate" sweep of the marketing provisions is miniscule.  In short, those provisions "prohibit or chill" protected expression, *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002), and destroy the "breathing space" "the First Amendment needs," *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973).

### D.     AB 1594 Is Void for Vagueness.

For many of the same reasons that AB 1594 is unconstitutionally vague with respect to speech, it is also unconstitutionally vague under the Due Process Clause with respect to all the conduct it polices.  A law that forbids an act "in terms so vague that men of common intelligence must necessarily guess at its meaning … violates the first essential of due process," *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926), as do laws so malleable that they authorize "arbitrary [or] discriminatory enforcement," *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  And a more "stringent" vagueness test applies for statutes that "threaten[] to inhibit the exercise of constitutionally protected rights," or impose "quasi-criminal" penalties.  *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).  AB 1594 directly restricts both speech and other activities of those engaged in the lawful business of selling arms protected by the Second Amendment.  And it authorizes damages, injunctive relief, and anything else a court deems necessary to prevent

further violations or otherwise remedy harm.  *See* §3273.52(d).  AB 1594 thus ushers in the "possibility of imposing liability on an entire industry," which, among other things, "threatens the diminution of a basic constitutional right" enabled by that industry—namely, the right to keep and bear arms.  15 U.S.C §7901(a)(6).  The most "stringent" vagueness test in law therefore applies here several times over.

AB 1594 flunks that test.  The statute's attempt to supply a definition for "reasonable controls" only compounds the confusion:  AB 1594 issues a sweeping command that industry members adopt any and all "[r]easonable controls" to achieve various goals including, *e.g.*, preventing the loss or theft of firearms. §3273.50(g).  And, again, it gives no guidance on what renders a product "most suitable for assaultive purposes," §3273.51(c)(2), or on what constitutes a "reasonable precaution" to ensure that products are not sold to non-compliant *downstream* distributors or retailers, §3273.51(b)(2), leaving industry members no way to know whether their precautions will be deemed sufficiently "reasonable." Simply put, AB 1594 is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015).  Due process demands far more.

## E.   AB 1594 Exceeds the Constitution's Limits on Extraterritorial State Regulation.

The Constitution restricts the power of states to directly regulate out-of-state conduct.  The principle of states' equal sovereignty inheres in the very plan of the Convention.  *See Nat'l Pork Producers Council v. Ross*, 143 S.Ct. 1142, 1156-58 & n.1 (2023); *id.* at 1172-76 (Kavanaugh, J., concurring and dissenting in part); *Shelby Cnty. v. Holder*, 570 U.S. 529, 535 (2013) ("all States enjoy equal sovereignty"). Myriad constitutional provisions presuppose and reinforce that principle.  *See* U.S. Const. art. I, §8, cl. 3; art. I, §10; art. IV, §1; art. IV, §2, cl. 1; amend. X; amend. XIV, §1, cl. 2.  Hence "the territorial limits of state authority under the Constitution's horizontal separation of powers" are grounded not just in particular provisions, but

in the "original and historical understandings of the Constitution's structure and the principles of 'sovereignty and comity' it embraces." *Ross*, 143 S.Ct. at 1156, 1157 n.1. Those principles mean, simply, that a state cannot directly regulate conduct that neither occurs nor is directed within its borders.

AB 1594 flouts that rule, as it subjects NSSF members to liability in California courts for conduct that occurred entirely out of state and was entirely lawful where and when it took place. For instance, if firearm produced by a manufacturer in Ohio is one day criminally misused in California, a California judge could hold that Ohio-based manufacturer liable for using too lax of security measures at its Ohio plants—even if the manufacturer never sold the firearm to anyone in California, and even if it employed every security measure that Ohio and Congress imposed. *See* Cupero Decl. ¶7 ("Smith & Wesson does not have any manufacturing operations in California" and "does not sell directly to any civilian in California."); Reid Decl. ¶7 (Sturm, Ruger & Company, Inc. has no manufacturing operations in California). And AB 1594 goes further still, requiring industry members to "[t]ake reasonable precautions to ensure that [they] do[] not sell, distribute, or provide a firearm-related product to *a downstream distributor or retailer* of firearm-related products who fails to establish, implement, and enforce reasonable controls." §3273.51(b)(2) (emphasis added). The Constitution does not permit this sort of extraterritorial regulation just because a product eventually finds its way into California. *See Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 521-23 (1935); *Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1323 (9th Cir. 2015) (en banc) (California law requiring art sellers to pay royalties to the artist "violate[d] the dormant Commerce Clause" "as applied to out-of-state sales by California residents"). "If the transaction to be regulated occurs 'wholly outside' the boundaries of the state, the regulation is unconstitutional," even if the actor resides in or does some other business in the regulating state. *A.S. Goldmen & Co. v. N.J. Bureau of Sec.*, 163 F.3d 780, 786 (3d

Cir. 1999); *Daniels Sharpsmart, Inc. v. Smith*, 889 F.3d 608, 612-16 (9th Cir. 2018) (enjoining California law purporting to "dictate the method by which" companies treated medical waste "outside of California").

Compounding that problem, AB 1594 allows "[i]njunctive relief sufficient to prevent the firearm industry member and any other defendant from further violating the law." §3273.52(d)(1).  That will inevitably result in extraterritorial regulation, as most firearm industry members do not reside in California.  Indeed, for many companies, such relief would mean de facto nationwide injunctions.  Such sweeping regulation is far beyond California's power.  *See Watson v. Emps. Liab. Assurance Corp.*, 348 U.S. 66, 70 (1954) (recognizing "the due process principle that a state is without power to exercise 'extra territorial jurisdiction,' that is, to regulate and control activities wholly beyond its boundaries"); *cf. Edgar v. MITE Corp.*, 457 U.S. 624, 643 (1982) (plurality op.) (the "most obvious burden … impose[d] on interstate commerce arises from the statute's previously described nationwide reach").

Furthermore, the Commerce Clause "prohibit[s] States from discriminating against or imposing excessive burdens on interstate commerce" within their borders. *Comptroller of Treasury of Md. v. Wynne*, 575 U.S. 542, 549 (2015); *see also Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970); *Ross*, 143 S.Ct. at 1158-59. AB 1594 does that too.  Because it imposes liability for commercial transactions occurring in other states by inviting civil actions in California, AB 1594 unlawfully discriminates against out-of-state commercial interests within the state.  And the extreme burdens it imposes on interstate commerce outweigh any benefits, especially since the local interest in reducing crime within California could be achieved by other means with a lesser impact on interstate commerce.

Indeed, Congress itself recognized in the PLCAA that the kind of litigation AB 1594 invites would impose an "unreasonable burden on interstate and foreign commerce of the United States." 15 U.S.C. §7901(a)(6).  And rightly so, for to allow

states to subject the firearms industry to sweeping lawsuits seeking to blame them for the actions of third parties over whom they have no control would render the Second Amendment a dead-letter.  *See Edgar*, 457 U.S. at 642 (plurality op.) (considering, in Commerce Clause analysis, the effects on interstate commerce if other states enacted similar laws).  Making matters worse, since AB 1594 creates liability based on the criminal conduct of third parties outside their control, and without regard to whether the industry member engaged in any conduct in or even directed at California, NSSF's members can do very little to lessen their risk of liability.  Indeed, the only way to truly eliminate all risk of liability under AB 1594 would be to cease operations altogether.  *See* Cupero Decl. ¶14; Reid Decl. ¶16.  If that is not an undue burden on interstate commerce, it is difficult to imagine what is.

**F.     Section 1021.11 Is Unconstitutional and Preempted.**

Section 1021.11 violates the Speech and Petition Clauses of the First Amendment, as it uses a fee-shifting penalty as "a weapon of oppression" to "freeze out of existence" civil rights litigation brought by those seeking to vindicate an "unpopular cause."  *Button*, 371 U.S. at 434-36.[3]  Government actors may not "handicap[]" "the right to petition the court" through indirect regulation that "infringe[s] in any way the right of individuals and the public to be fairly represented in lawsuits authorized by Congress to effectuate a basic public interest."  *Bhd. of R.R. Trainmen v. Virginia ex rel. Va. State Bar*, 377 U.S. 1, 7 (1964).  Yet that is exactly what §1021.11 does.  Erasing litigants' entitlement to attorneys' fees will

---

[3] The Attorney General appears to be of the view that the injunction entered in *Miller* prevents him from enforcing §1021.11 against NSSF and its members.  *See* Dkt.9 at 3 (Attorney General's Objection to Notice of Related Case) (conceding permanent injunction "prevent the Attorney General or any other party from enforcing the provisions of section 1021.11").  Nevertheless, given the draconian costs to which §1021.11 exposes plaintiffs—and their counsel—NSSF brings its own claims against §1021.11 out of an abundance of caution.

make it harder to secure "represent[ation] in lawsuits authorized by Congress [under 42 U.S.C. §1983] to effectuate a basic public interest," *i.e.*, enforcing a fundamental right.  *Id.*  Section 1021.11 also imposes a unique burden on those who seek to vindicate their civil rights through firearms litigation while favoring all other civil rights claims.  Here, "the violation of the First Amendment is … blatant," as California has "target[ed] … particular views," basing the availability of prevailing-party fees on the "motivating ideology … of the speaker."  *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

The statute also fails under any means-end scrutiny, as there is no valid state interest in targeting a subset of civil-rights litigants.  The Second Amendment is not a second-class right, and those who would vindicate it are not second-class citizens.  Even if California could somehow identify a valid interest, §1021.11 would still fail, as far less restrictive alternatives would serve the state's interests (assuming they are valid) without severely burdening core protected rights.  *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000).  That dooms the statute under any form of heightened scrutiny.  *See McCullen v. Coakley*, 573 U.S. 464, 494 (2014).

Section 1021.11 is also preempted by 42 U.S.C. §1988.  Under §1988, in most federal civil rights litigation brought under 42 U.S.C. §1983, the court "may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs" of the case.  42 U.S.C. §1988(b).  And the Supreme Court has "made clear that plaintiffs may receive fees under §1988 even if they are not victorious on every claim," as a "civil rights plaintiff who obtains meaningful relief has corrected a violation of federal law."  *Fox v. Vice*, 563 U.S. 826, 834 (2011).  At every turn, California's new fee-shifting statute is diametrically opposed to that federal regime.  Citizens cannot be "prevailing part[ies]," and a government defendant is a "prevailing party" if the plaintiff loses on *any* of its claims—even, for instance, a dismissal on mootness grounds because the plaintiff won a dispositive judgment on

other claims.  *See* Cal. Civ. Pro. §1021.11(e), (b).  California's regime thus means that *the government defendant can be entitled to fees even though it has been found to have violated the Constitution*.  And under §1021.11(d)(3), California officials can sue to enforce §1021.11's fee-shifting penalty even when "[t]*he court in the underlying* [*federal Section 1983*] *action held that any provision of this section is invalid, unconstitutional, or preempted by federal law, notwithstanding the doctrines of issue or claim preclusion*."  (Emphasis added.)  If the Supremacy Clause means anything, it means §1021.11 is preempted.  Section 1021.11 also "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," and so "must give way" for that reason too.  *Jones v. Rath Packing Co.*, 430 U.S. 519, 526 (1977).  In sum, Section 1021.11's "lopsided, unorthodox attorney's fee-shifting scheme which ensures the citizen cannot win and may be forced to pay for the government's attorney's fees" imperils First Amendment rights and is preempted by 42 U.S.C. §1988.  *Miller*, 2022 WL 17811114, at *2, *6-7.

## II.   The Remaining Factors All Favor Injunctive Relief.

NSSF is likely to succeed on the merits of its claims as to both AB 1594 and §1021.11, and every other factor weighs in favor of injunctive relief.

For AB 1594, the constitutional injuries that statute inflicts amply satisfy the irreparable-injury factor, especially given its chilling effects on protected speech. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms … unquestionably constitutes irreparable injury.").  But AB 1594's harms go beyond that.  First, the PLCAA confers an immunity from suit, the loss of which cannot be undone.  *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  Likewise, the costs of trying to ascertain what AB 1594's vague terms mean and what steps industry could possibly take to mitigate risk will be considerable—and, because of the Eleventh Amendment, wholly unrecoverable.  *See Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 851-52 (9th Cir. 2009), *vacated on other grounds by*

*Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606 (2012). And AB 1594 will cause "the constriction of [the] market" for lawful firearms and related products—a textbook economic "injury." *Craig v. Boren*, 429 U.S. 190, 194 (1976); *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 205 (4th Cir. 2020) (applying *Craig*'s logic to firearm dealer's challenge to handgun licensing law).

The equities and the public interest favor an injunction as well. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (these factors "merge when the Government is the opposing party"). The Attorney General "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). And the public interest weighs in favor of enjoining AB 1594 because it encroaches on federal authority by defying the PLCAA, *see United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497-98 (2001) (the public interest favored enjoining state law which conflicted with "Congress' policy choice, articulated in a statute"), and tramples on First and Second Amendment rights and the privilege of pursuing a common calling, *see Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 731 (9th Cir. 2022) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."). All of the factors point in the same direction.

So too with §1021.11. Harms to First Amendment freedoms are irreparable, *Elrod*, 427 U.S. at 373, and the Attorney General will suffer no harm from being enjoined from enforcing an unconstitutional law, *Rodriguez*, 715 F.3d at 1145. The equities favor enjoining §1021.11, too, as it violates constitutional rights, *Riley's*, 32 F.4th at 731, and conflicts with §1988, *Oakland*, 532 U.S. at 497-98.

## CONCLUSION

The Court should preliminarily enjoin enforcement of AB 1594 and §1021.11.

Respectfully submitted,

s/Matthew D. Rowen
PAUL D. CLEMENT*
ERIN E. MURPHY*
MATTHEW D. ROWEN (Cal. Bar #292292)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
matthew.rowen@clementmurphy.com

* admitted *pro hac vice*

Attorneys for Plaintiff

June 13, 2023