AMY K. VAN ZANT (SBN 197426)
avanzant@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025
Telephone:   (650) 614-7400
Facsimile:   (650) 614-7401

AMANDA H. SCHWARTZ (SBN 349625)
aschwartz@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105
Telephone:   (415) 773-5700
Facsimile:   (415) 773-5759

THOMAS M. BONDY (SBN 121785)
tbondy@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1152 15th Street NW
Washington, DC 20005
Telephone:   (202) 339-8400
Facsimile:   (202) 339-8500

MELANIE R. HALLUMS (WV SBN 13781)
mhallums@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
2121 Main Street
Wheeling, WV 26003
Telephone:   (304) 231-2500
Facsimile:   (304) 231-2801

*Attorneys for Amici Curiae Brady Center to Prevent
Gun Violence and Everytown for Gun Safety
Support Fund*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATIONAL SHOOTING SPORTS FOUNDATION, <br><br> *Plaintiff* <br><br> vs. <br><br> ROB BONTA, Attorney General of California <br><br> *Defendant.* | Case No. 3:23-cv-00945-AGS-KSC <br><br> **BRIEF OF GUN VIOLENCE PREVENTION GROUPS AS AMICI CURIAE IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** <br><br> Date: August 11, 2023 <br> Time: 3:30 p.m. <br> Courtroom: 5C <br> Judge: Hon. Andrew G. Schopler |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

CORPORATE DISCLOSURE STATEMENTS ........................................................... iii

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................... 1

I.  AB 1594 IMPOSES LIABILITY ON BAD ACTORS IN THE GUN INDUSTRY FOR THEIR OWN IRRESPONSIBLE PRACTICES IN FACILITATING GUN VIOLENCE IN CALIFORNIA. ............................................................................................................ 2

    A.   Preventing unlawful sales. ......................................................................... 3

    B.   Preventing irresponsible marketing. ............................................................ 5

II.  WHAT CONSTITUTES LAWFUL AND REASONABLE CONDUCT UNDER AB 1594 IS WELL UNDERSTOOD BY GUN INDUSTRY ACTORS. ............................ 7

    A.   NSSF and USDOJ advocate similar "reasonable" precautions. ................... 8

    B.   Researchers and industry have identified effective precautions. ................ 10

    C.   NSSF clearly understands responsible marketing practices. ....................... 13

CONCLUSION ............................................................................................................... 14

1
2

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

3
4

*Barclays Bank PLC v. Franchise Tax Bd. of Cal.*,
   512 U.S. 298 (1994) ................................................................. 7

5
6

*City of Gary v. Smith & Wesson Corp.*,
   126 N.E.3d 813 (Ind. Ct. App. 2019) .................................... 1

7
8

*In re LuckyGunner, LLC*,
   No. 14-21-00194-CV, 2021 WL 1904703 (Tex. App. May 12,
   2021) ................................................................................. 1, 5

9
10

*NAACP v. AcuSport, Inc.*,
   271 F. Supp. 2d 435 (E.D.N.Y. 2003) ........................... 5, 9, 10

11
12

*People v. Linwood*,
   105 Cal. App. 4th 59 (2003) ................................................. 7

13
14

*Soto v. Bushmaster Firearms Int'l, LLC*,
   202 A.3d 262 (Conn. 2019) .................................................. 6

15
16

*Tretta v. Osman*,
   No. 20STCV48910, 2020 WL 13527322 (Cal. Super. Dec. 22,
   2020) ................................................................................... 5

17
18
19

*Tretta v. Osman*,
   No. 20STCV48910, 2021 WL 9273931 (Cal. Super. Ct. June 28,
   2021) ................................................................................. 1, 5

20
21

*Williams v. Beemiller, Inc.*,
   100 A.D.3d 143 (N.Y. App. Div. 2012) ................................. 1

22
23

*Wm. Penn Parking Garage, Inc. v. City of Pittsburgh*,
   346 A.2d 269 (Pa. 1975) ...................................................... 7

**Statutes**

24
25
26

Assembly Bill 1594, 2022 Cal. Laws ch. 98, codified at Cal. Civ. Code
   § 3273.50-55 ................................................................. *passim*

27

Cal. Civ. Code § 3273.50(g) ....................................................... 2, 3, 8

28

Cal. Civ. Code § 3273.51(b) ........................................................ 2, 8

**Other Authorities**

@DanielDefense, Twitter (Mar. 2, 2022, 1:59 PM),
https://tinyurl.com/mwppny2z (last visited July 27, 2023)...................................6

ATF, *Fact Sheet – National Tracing Center* (Apr. 2023),
https://tinyurl.com/ymys9zsd ...................................................................... 12

ATF, *How Guns Flow from Legal to Illegal Commerce* (June 14,
2018), https://tinyurl.com/2dmvymnc)....................................................... 3

ATF, *National Firearms Commerce and Trafficking Assessment
(NFCTA): Crime Guns - Volume Two* (2023),
https://tinyurl.com/ydvc7fz7 ...................................................................... 3

Letter from U.S. Senator Richard A. Blumenthal et al. to Fed. Trade
Comm'n Chair Linda Khan (Sept. 12, 2022),
https://tinyurl.com/53fr7zka ...................................................................... 5

Anthony A. Braga et al., *Underground Gun Markets and the Flow of
Illegal Guns into the Bronx and Brooklyn: A Mixed Methods
Analysis*, 98 J. Urban Health 596 (2020),
https://tinyurl.com/m8vbn9ef ...................................................................... 4

Indictment, *United States v. Marquez*,
No. 5:15-cr-93-JGB (C.D. Cal. Dec. 30, 2015) (Dkt. 12)....................................4

*Master Settlement Agreement etween Settling States and Participating
Manufacturers* (Nov. 23, 1998), https://tinyurl.com/4hv7wtv3....................... 13

NRA-ILA, *Smith & Wesson Settlement Agreement* (Mar. 17, 2000),
https://tinyurl.com/muf3cj8v ...................................................................12, 13

NSSF, *NSSF, ATF Jointly Launch Operation Secure Store* (Jan. 23,
2018), https://tinyurl.com/2rrmvy4h ...................................................................... 8

NSSF, *NSSF Welcomes Bipartisan U.S. House FFL Protection Act Bill*
(Apr. 26, 2023), https://tinyurl.com/5he7pvke....................................................9

Cornelia Pechmann et al., *Impulsive and Self-Conscious: Adolescents'
Vulnerability to Advertising and Promotion*, J. Pub. Pol'y & Mktg.,
202 (2005), https://tinyurl.com/ymfpkbfb.........................................................6

Avi Selk, *A gunmaker once tried to reform itself. The NRA nearly destroyed it.*, Wash. Post. (Feb. 27, 2018), https://tinyurl.com/5665e3w7 ................................................................. 12

Daniel Semenza & Richard Stansfield, *Curbing the Illicit Market: Enhancing Firearm Regulations to Reduce Gun Violence*, Rockefeller Inst. of Gov't (May 24, 2023), https://tinyurl.com/ymjzw76z ................................................................. 3

*Smith & Wesson Brands, Inc.*, SEC Staff No-Action Letter, 2020 WL 3266557 (June 15, 2020) ................................................................. 12

Glenn Thrush & Katie Benner, *6 Gun Shops, 11,000 'Crime Guns': A Rare Peek at the Pipeline*, N.Y. Times (Apr. 28, 2022) ...................... 3

Letter from Eric Tirschwell et al., Everytown Law, to Samuel Levine, Dir., Bureau of Consumer Prot., Fed. Trade Comm'n (July 15, 2022), https://tinyurl.com/378sv85t ...................................................... 6

Press Release, U.S. Attorney's Office, *Local Gun Dealer Convicted of Illegally Trafficking Firearms and Conducting Straw Purchases* (Sept. 9, 2022), https://tinyurl.com/mryru7ne ...................................... 4

U.S. Dep't of Justice, *Gun Violence Reduction: National Integrated Firearms Violence Reduction Strategy*, https://tinyurl.com/2p8f2v26 (last visited July 21, 2023) .................... 9

Verdict Form, *United States v. Tilotta*, No. 3:19-cr-4768-GPC-3 (S.D. Cal. Sept. 8, 2022) (Dkt. 324) .......................... 4

Jeff Wagner, *How is a Gun Retailer Supposed to Stop Straw Purchases?*, WCCO CBS News Minn. (Oct. 17, 2022), https://tinyurl.com/2p9d4kkz ................................................................. 10

Walmart, *Walmart Policies and Guidelines: Firearms and Ammunition Guidelines*, https://tinyurl.com/2zxa5zd9 (last visited July 24, 2023) .............. 10

Daniel W. Webster & Jon S. Vernick, *Spurring Responsible Firearms Sales Practices Through Litigation: The Impact of New York City's Lawsuits Against Gun Dealers on Interstate Gun Trafficking* (2013), https://tinyurl.com/3mvjmcfk ............................................... 11

Daniel W. Webster et al., *Effects of a Gun Dealer's Change in Sales Practices on the Supply of Guns to Criminals*, 83 J. Urban Health 778 (2006), https://tinyurl.com/3j948b9n ................................................. 10, 11

The White House, *Fact Sheet: President Biden Announces New Actions to Reduce Gun Violence and Make Our Communities Safer* (Mar. 14, 2023), https://tinyurl.com/yz6kstph ..................................................... 5

Garen J. Wintemute et al., *Risk Factors Among Handgun Retailers for Frequent and Disproportionate Sales of Guns Used in Violent and Firearm Related Crimes*, 11 Inj. Prevention 357 (2005), https://tinyurl.com/456f39e6 ............................................................................. 4

## CORPORATE DISCLOSURE STATEMENTS

Brady Center to Prevent Gun Violence ("Brady") is a nonprofit organization. It has no parent corporations. It has no stock, and therefore no publicly held company owns 10% or more of its stock.

Everytown for Gun Safety Support Fund ("Everytown") is a nonprofit organization. It has no parent corporations. It has no stock, and therefore no publicly held company owns 10% or more of its stock.

**INTRODUCTION**

Amici Everytown for Gun Safety Support Fund ("Everytown") and Brady Center to Prevent Gun Violence ("Brady") (together, "Amici") are national gun violence prevention organizations with decades of experience researching the causes of and contributors to gun violence, including the diversion of firearms into the criminal market, and the role the gun industry can play in reducing such violence. Everytown and Brady are well-positioned to assist the Court in understanding how irresponsible conduct by the gun industry undermines public safety, and the common-sense tools available to reduce the magnitude of the problem. Everytown and Brady also have extensive experience litigating cases involving the gun industry, including cases involving the Protection of Lawful Commerce in Arms Act. *See, e.g.*, *City of Gary v. Smith & Wesson Corp.*, 126 N.E.3d 813 (Ind. Ct. App. 2019) (Brady serving as plaintiff's counsel in case involving interpretation of PLCAA); *Williams v. Beemiller, Inc.*, 100 A.D.3d 143 (N.Y. App. Div. 2012), *amended by* 103 A.D.3d 1191 (N.Y. App. Div. 2013) (same); *In re LuckyGunner, LLC*, No. 14-21-00194-CV, 2021 WL 1904703 (Tex. App. May 12, 2021) (Everytown serving as plaintiff's counsel in case involving interpretation of PLCAA), *further mandamus review denied*, No. 21-0463 (Tex. Feb. 18, 2022); *Tretta v. Osman*, No. 20STCV48910, 2021 WL 9273931 (Cal. Super. Ct. June 28, 2021) (same).

**ARGUMENT**

Plaintiff National Shooting Sports Foundation ("NSSF") has asserted a facial challenge to Assembly Bill 1594, 2022 Cal. Laws ch. 98 ("AB 1594" or "the Statute"), codified at Cal. Civ. Code § 3273.50-55. AB 1594 subjects gun industry actors to civil liability when they violate firearm industry standards of conduct as defined by the Statute. As Defendant's brief demonstrates, NSSF's challenge is flawed and should be rejected.

Amici write to address two of NSSF's arguments, about which Amici have particular expertise. *First*, AB 1594 is not designed "to make licensed manufacturers

and sellers of firearms pay for harms caused by criminals," as NSSF contends. NSSF Br. at 1 (ECF No. 14). Instead, the Statute imposes liability on reckless gun industry actors *for their own dangerous actions*. That is logical, because irresponsible and unlawful conduct by gun industry actors directly facilitates gun violence. *Second*, NSSF is wrong that AB 1594's reasonableness standard makes it impossible for gun industry actors to determine what type of conduct runs afoul of the Statute.[1] *Id.* at 13-14, 19. There is a wealth of available information regarding reasonable practices and controls that gun industry actors can take—and that many responsible actors in the industry already *do* take—to prevent and reduce the diversion of firearms to the criminal market and otherwise mitigate the public health crisis of gun violence.

## I.   AB 1594 IMPOSES LIABILITY ON BAD ACTORS IN THE GUN INDUSTRY FOR THEIR OWN IRRESPONSIBLE PRACTICES IN FACILITATING GUN VIOLENCE IN CALIFORNIA.

AB 1594 holds irresponsible gun industry actors accountable for unreasonable actions *they take* in connection with supplying guns to the criminal gun market and facilitating illegal use of guns. As the California legislature recognized, many firearm industry members already "take reasonable precautions to protect human life and well-being." AB 1594 § 2(h). AB 1594 is directed at the other contingent—those that have "continued to develop dangerous business practices and to manufacture, sell, distribute, and market increasingly dangerous new products designed to circumvent and undermine" California's sensible gun laws. *Id.* § 2(d).

The connection between unreasonable behavior by some gun industry actors and the proliferation of gun violence, which AB 1594 addresses, is well established. Gundlach Decl. ¶¶ 12, 16-19 (attached to Defendant's Preliminary Injunction

---

[1] The primary focus of this brief is on AB 1594's reasonableness standards, codified at California Civil Code §§ 3273.50(g) (defining "reasonable controls") and 3273.51(b) (requiring "reasonable controls" and "reasonable precautions").

Opposition).[2] Guns frequently end up in the hands of criminals through distribution and sales practices of bad actors in the gun industry that result in firearms being sold to straw purchasers (purchasers buying guns for someone else), prohibited purchasers (individuals precluded by law from having guns), and gun traffickers, or through lax and inadequate security at the dealer level that enables theft from these entities. Gundlach Decl. ¶¶ 10-13; ATF, *National Firearms Commerce and Trafficking Assessment (NFCTA): Crime Guns – Volume Two*, Part III at 41 (2023) ("NFCTA 2023"), https://tinyurl.com/ydvc7fz7. Indeed, most guns used in a crime or suspected of having been used in a crime are sourced originally from the legal market. Gundlach Decl. ¶ 14; NFCTA 2023 at 41.

AB 1594's reasonableness standards tackle the problem of "dangerous business practices" that "endanger[] and harm[] the public in California" by imposing liability on gun industry actors that fail to adopt three types of practices: (i) practices to prevent unlawful sales; (ii) practices to prevent loss or theft of firearms; and (iii) practices to ensure compliance with existing laws. AB 1594 §§ 2(a), (d), Cal. Civ. Code § 3273.50(g). Each type of business practice relates to actions gun industry actors themselves can (and sometimes already do) take to reduce illicit gun possession and use.

### A.   <u>Preventing unlawful sales</u>.

Taking one example, AB 1594 imposes liability on a "firearm industry member" (*e.g.*, a retail gun store) that fails to use reasonable procedures to prevent the sale of a firearm to a straw purchaser. *Id.* § 2(f)-(g). Straw purchases are a common pathway for diversion of guns into the illicit market. NFCTA 2023 at 41.

---

[2] *See* Daniel Semenza & Richard Stansfield, C*urbing the Illicit Market: Enhancing Firearm Regulations to Reduce Gun Violence,* Rockefeller Inst. of Gov't, at 1-3 (May 24, 2023), https://tinyurl.com/ymjzw76z (citing ATF, *How Guns Flow from Legal to Illegal Commerce* (June 14, 2018), https://tinyurl.com/2dmvymnc); *see also* Glenn Thrush & Katie Benner, *6 Gun Shops, 11,000 'Crime Guns': A Rare Peek at the Pipeline*, N.Y. Times (Apr. 28, 2022), https://tinyurl.com/548ym9ru.

Research has long shown that a substantial number of federally licensed gun dealers facilitate firearms diversion through straw purchasing. Gundlach Decl. ¶¶ 10-17.[3] By attaching civil liability for firearm industry members' failure to use reasonable business practices to prevent straw purchases, AB 1594 incentivizes responsible and lawful behavior by those actors—separate and apart from the criminal legal consequences imposed on straw purchasers themselves.

Notably, straw purchasing plagues California. For instance, the assault rifles used in the December 2015 terrorist attack in San Bernardino, California—an attack that killed fourteen people—were acquired for the attackers by a straw purchaser. Indictment at 3-4, *United States v. Marquez*, No. 5:15-cr-93-JGB (C.D. Cal. Dec. 30, 2015) (Dkt. 12). Irresponsible and dangerous gun industry conduct contributes to this problem. For example, the U.S. Department of Justice secured felony convictions against a San Diego County firearms retailer who conspired with local law enforcement officers to accept false records for straw purchases and to falsify firearms transfer records to conceal his sale of handguns and rifles, including tactical assault weapons. Verdict Form, *United States v. Tilotta,* No. 3:19-cr-4768-GPC-3 (S.D. Cal. Sept. 8, 2022) (Dkt. 324); Press Release, U.S. Attorney's Office, *Local Gun Dealer Convicted of Illegally Trafficking Firearms and Conducting Straw Purchases* (Sept. 9, 2022), https://tinyurl.com/mryru7ne. Had AB 1594 been in effect prior to these sales, retailers such as these would have been strongly incentivized to adopt reasonable controls against straw purchasing.

AB 1594 also targets irresponsible and dangerous gun industry conduct involving online sales practices. One such example of dangerous conduct led to the

---

[3] *See also* Anthony A. Braga et al., *Underground Gun Markets and the Flow of Illegal Guns into the Bronx and Brooklyn: A Mixed Methods Analysis*, 98 J. Urban Health 596, 598 (2020), https://tinyurl.com/m8vbn9ef; Garen J. Wintemute et al., *Risk Factors Among Handgun Retailers for Frequent and Disproportionate Sales of Guns Used in Violent and Firearm Related Crimes*, 11 Inj. Prevention 357, 357 (2005), https://tinyurl.com/456f39e6.

tragic shooting at Saugus High School in Santa Clarita, California on November 14, 2019. There, a 16-year-old student used his father's "ghost gun," which the father was able to purchase online without any background check, despite the fact that he was prohibited from possessing firearms. *See* Complaint ¶¶ 18-26, *Tretta v. Osman*, No. 20STCV48910, 2020 WL 13527322 (Cal. Super. Dec. 22, 2020); *Tretta v. Osman*, No. 20STCV48910, 2021 WL 9273931 (Cal. Super. June 28, 2021). In a case litigated in Texas, an online ammunition seller failed to require any proof that its customers were of legal age, resulting in the unlawful sale of handgun ammunition to a 17-year-old who used it to murder ten of his classmates and teachers. *See In re LuckyGunner, LLC*, No. 14-21-00194, 2021 WL 1904703 (Tex. App. May 12, 2021). Such unreasonable business practices and failures to implement obvious, simple, and low-cost precautions, if directed at residents of California, may be actionable under AB 1594 and demonstrate that the statute is intended to hold members of the gun industry accountable for their own reckless conduct.

### B.   Preventing irresponsible marketing.

AB 1594 also addresses the recognized problem of irresponsible and dangerous marketing by gun industry actors and its role in encouraging gun violence.[4] AB 1594 § 2(d). NSSF itself has suggested that depictions of firearms and violence in other media (*e.g.*, violent video games) "may actually encourage criminal gun violence," NSSF Br. at 17, without explaining how the use of similar tactics by

---

[4] *See, e.g.*, *NAACP v. AcuSport, Inc.*, 271 F. Supp. 2d 435, 510 (E.D.N.Y. 2003) (noting that "proposals for changes in the marketing and distribution of firearms would reduce the illegal market in firearms and the injuries to the NAACP, its members, and potential members"); Letter from U.S. Senator Richard A. Blumenthal et al. to Fed. Trade Comm'n Chair Linda Khan (Sept. 12, 2022), https://tinyurl.com/53fr7zka; The White House, *Fact Sheet: President Biden Announces New Actions to Reduce Gun Violence and Make Our Communities Safer* (Mar. 14, 2023), https://tinyurl.com/yz6kstph (discussing executive order urging the Federal Trade Commission to analyze how gun manufacturers market firearms to minors and civilians).

industry companies is any different.[5] Given data showing that adolescent and young adult men are highly susceptible to advertisements depicting impulsive, thrill-seeking behavior, it makes perfect sense to require gun industry actors to market their products in a responsible and reasonable manner, especially where minors are concerned. *See Soto v. Bushmaster Firearms Int'l, LLC*, 202 A.3d 262, 285 (Conn. 2019) (holding "that a party directly injured by conduct resulting from [unscrupulous and illegal] advertising can bring an action pursuant to [the Connecticut Unfair Trade Practices Act] even in the absence of a business relationship with the defendant"); Cornelia Pechmann et al., *Impulsive and Self-Conscious: Adolescents' Vulnerability to Advertising and Promotion*, J. Pub. Pol'y & Mktg., 202, 206-09 (2005), https://tinyurl.com/ymfpkbfb. It is also fair and consistent with historical precedent to hold gun industry actors accountable for unreasonable marketing as other industries have analogously been held accountable. Gundlach Decl. ¶¶ 108-117; Busse Decl. ¶¶ 23, 45-52, 55 (attached to Defendant's Preliminary Injunction Opposition).

It is simply untrue, notwithstanding NSSF's claims, that AB 1594 imposes liability on rule-following gun industry actors for "the behavior of third-party actors outside [of the firearm industry member's] control." Reid Decl. ¶ 16 (ECF No. 14-1). To the contrary, the Statute is directed at unreasonable, irresponsible, and

---

[5] Gun industry marketing often references popular video games like Call of Duty and Grand Theft Auto and suggests violent or militaristic uses of guns even when marketing to civilians. For example, firearm manufacturer Daniel Defense's social media include images of a rifle scope focused on a minivan parked along a city street with the caption "Rooftop ready, even at midnight!" to invoke an urban combat cosplay fantasy that is illegal and inappropriate for civilians. @DanielDefense, Twitter (Mar. 2, 2022, 1:59 PM), https://tinyurl.com/mwppny2z (last visited July 27, 2023). This type of firearms marketing fetishizes an "aggressive, hypermasculine, and militaristic fantasy" utterly detached from the discipline and self-sacrifice of actual military service. *See* Letter from Eric Tirschwell et al., Everytown Law, to Samuel Levine, Dir., Bureau of Consumer Prot., Fed. Trade Comm'n at 3 (July 15, 2022), https://tinyurl.com/378sv85t.

unlawful conduct committed by gun industry actors themselves. Such conduct unquestionably leads to "foreseeable and grave public harms," which AB 1594 is designed to reduce. AB 1594 § 2(g).

## II.   WHAT CONSTITUTES LAWFUL AND REASONABLE CONDUCT UNDER AB 1594 IS WELL UNDERSTOOD BY GUN INDUSTRY ACTORS.

NSSF's claim that AB 1594 is too vague for gun industry participants to figure out how to comply is similarly unfounded. NSSF Br. at 18-19. As a threshold matter, there is nothing unusual or confusing about requiring parties to act "reasonably"— judges and juries in a variety of settings are regularly asked to determine whether a defendant acted reasonably under the circumstances. *See e.g.*, *Barclays Bank PLC v. Franchise Tax Bd. of Cal.*, 512 U.S. 298, 315 (1994) ("'[R]easonableness' is a guide admitting effective judicial review in myriad settings, from encounters between the police and the citizenry …. to the more closely analogous federal income tax context."); *People v. Linwood*, 105 Cal. App. 4th 59, 67 (2003) (statutory reasonableness standards are not impermissibly vague "provided their meaning can be … ascertained by reference to common experiences of mankind"); *Wm. Penn Parking Garage, Inc. v. City of Pittsburgh*, 346 A.2d 269, 292 (Pa. 1975) (upholding, as a constitutional delegation of power, a statutory provision authorizing state courts to invalidate local tax ordinances that they determine to be "'excessive or unreasonable'" and stating: "Many standards in the law are no more definite than a requirement of 'reasonableness.'").

Moreover, NSSF and responsible actors within the gun industry are well aware of reasonable measures they can take to reduce the risk of firearms diversion and illegal use; as discussed below, some have already implemented them. Far from imposing an incomprehensible standard, AB 1594 aligns with decades of evidence and experience that illuminate the contours of responsible gun industry conduct.

Contrary to NSSF's claim, AB 1594 does *not* require gun industry members to "adopt *any and all* '[r]easonable controls' *to achieve various goals*." NSSF Br. at 19

(emphasis added). In fact, it requires reasonable controls targeted at three specific goals. Cal. Civ. Code §§ 3273.50(g), 3273.51(b). "Reasonable controls" are defined to mean "reasonable procedures, acts or practices" designed to prevent prohibited sales, to prevent loss or theft of firearms, and to promote compliance with existing state and federal law. Cal. Civ. Code § 3273.50(g).

NSSF complains that gun industry members have no way of knowing what "controls" will be deemed reasonable under this framework. *See* NSSF Br. at 13-14, 19. But NSSF's own actions, governmental agency guidance, industry participant findings, and suggested manufacturer and distributor protocols, taken together, reveal that NSSF is simply conjuring up imaginary confusion for litigation purposes.

### A.  <u>NSSF and USDOJ advocate similar "reasonable" precautions</u>.

First, NSSF's own efforts over the last two decades show that its confusion is feigned. NSSF has boasted about its efforts to promote responsible gun industry behavior in numerous areas, including the three "reasonable controls" identified in AB 1594 (*i.e.*, business practices designed to prevent unlawful sales, firearm loss and theft, and non-compliance with applicable laws). Gundlach Decl. ¶¶ 48-53. NSSF even partners with the federal Bureau of Alcohol, Tobacco and Firearms (ATF) in an educational program called "Don't Lie for the Other Guy," which "assist[s] firearm retailers in detecting and preventing straw purchases" by providing education and videos about how dealers can flag suspicious purchasers. *Id.* ¶ 49. And NSSF promotes a joint initiative with ATF called "Operation Secure Store" to help gun stores "mitigate risks and protect [themselves] against firearm thefts and burglaries." *Id.* ¶¶ 52-53. When this training program launched, the federal government stated that it "welcome[d] the opportunity to collaborate with the NSSF to educate and inform [federal firearms licensed] retailers" on how to mitigate the "serious threat to public safety" from firearms stolen from federally licensed retailers—a fact the NSSF publicly noted. NSSF, *NSSF, ATF Jointly Launch Operation Secure Store* (Jan. 23, 2018), https://tinyurl.com/2rrmvy4h. NSSF also recently promoted several "firearm

industry safety initiatives," including efforts to "address robbery and burglary of firearms" via "conduct[ing] retailer store security seminars, assist[ing] retailers with store security audits of their premises and endors[ing] and promot[ing] the use of security products like smash resistant display cases." NSSF, *NSSF Welcomes Bipartisan U.S. House FFL Protection Act Bill* (Apr. 26, 2023), https://tinyurl.com/5he7pvke. Such initiatives represent just a few examples of the "reasonable controls" available to industry members—with which NSSF is unquestionably familiar.

Beyond NSSF's own communications to its members regarding reasonable controls, the U.S. Department of Justice also has identified reasonable behavior that is expected from gun industry actors. In 2001, it developed specific, reasonable safeguards that industry actors should pursue to prevent the diversion of firearms, including "identify[ing] and refus[ing] to supply dealers and distributors that have a pattern of selling guns to criminals and straw purchasers," and developing a "training program for dealers and distributors covering compliance with firearms laws, identifying straw purchase scenarios and securing inventory." U.S. Dep't of Justice, *Gun Violence Reduction: National Integrated Firearms Violence Reduction Strategy*, https://tinyurl.com/2p8f2v26 (last visited July 21, 2023); *see also NAACP*, 271 F. Supp. 2d at 446 (evidence presented at trial established that firearms manufacturers and distributors "could—voluntarily and through easily implemented changes in marketing and more discriminating control of the sales practices of those to whom they sell their guns—substantially reduce the harm occasioned by the diversion of guns to the illegal market and by the criminal possession and use of those guns").[6]

---

[6] The *NAACP* court found, for example, that diversion into the illegal market would "substantially decrease if manufacturers and distributors insisted that retail dealers who sell their guns be responsible—*e.g.*, that they not sell at gun shows, but sell from the equivalent of a store front with a supply of stocked guns; that they not sell under a variety of names; that they protect against theft; that they train and supervise employees to prevent straw sales (which are often notoriously obvious to

**B.**   **Researchers and industry have identified effective precautions.**

Further, researchers and industry participants themselves have, through decades of study and experience, identified a range of clear, manageable procedures that reduce the risk of firearms diversion. For instance, the owner of a licensed dealer in Minnesota recently spoke about his store's capacity to reduce and prevent straw purchases, including by recognizing red flags of straw purchases such as (i) buyer nervousness; (ii) a buyer showing a picture of the gun they want to buy but having little knowledge about the gun; and (iii) a buyer talking or texting on their phone during a transaction.[7] Walmart, one of the largest gun dealers in the country, has published guidelines for responsible firearms sales, which include practices like videotaping the point of sale, performing inventory audits, and conducting regular training for firearms sales associates.[8]

Research also provides insights into additional practices and procedures that gun industry members can take to reduce diversion. As one example, researchers studied a Milwaukee dealer that stopped selling "junk guns"—inexpensive and easily concealable handguns known to be attractive to criminal buyers—in the wake of negative press attention.[9] Previously, the dealer had been linked to 65% of guns that law enforcement recovered in Milwaukee within a year after retail sale.[10] After the dealer's change in sale practices, data showed reductions in Milwaukee crime guns

---

the seller); and that they take other appropriate and available protective action." 271 F. Supp. 2d at 450. The court ultimately dismissed the case on other grounds, concluding that the plaintiff failed to demonstrate that it "suffered harm different in kind from that suffered by the public at large in the state of New York." *Id.* at 446.

[7] Jeff Wagner, *How is a Gun Retailer Supposed to Stop Straw Purchases?*, WCCO CBS News Minn. (Oct. 17, 2022), https://tinyurl.com/2p9d4kkz.

[8] Walmart, *Walmart Policies and Guidelines: Firearms and Ammunition Guidelines*, https://tinyurl.com/2zxa5zd9 (last visited July 24, 2023).

[9] Daniel W. Webster et al., *Effects of a Gun Dealer's Change in Sales Practices on the Supply of Guns to Criminals*, 83 J. Urban Health 778, 778, 785 (2006), https://tinyurl.com/3j948b9n.

[10] *Id.* at 781.

recoveries along several metrics: the number of junk guns sold by the dealer and recovered within one year decreased by 96%; the number of other likely trafficked guns sold by the dealer and recovered within a year decreased by 42%; and, notably, the *overall* number of likely trafficked guns recovered within a year of retail sale decreased by 44%.[11] That research showed that "a single gun dealer's sales practices had a profound impact on the local illicit gun market in Milwaukee."[12]

A similar result was observed by researchers in New York City. In 2006, the City sued over two dozen dealers that were top sources of guns recovered by the New York Police Department ("NYPD"). Many of the dealers agreed to settlements and appointment of a special master to monitor their practices.[13] Researchers evaluated data related to ten of these dealers and determined that, after the start of the litigation, it became 84% less likely that guns they sold were among those the NYPD recovered.[14] Finally, processes already available to manufacturers and distributors— not just dealers—can reduce diversion. These practices include: (i) monitoring downstream actors for risky sales patterns; (ii) refusing to supply bad-actor dealers that have a record of frequently and disproportionately selling guns involved in crimes; (iii) requiring downstream dealers to conduct anti-straw-purchasing trainings; and (iv) monitoring downstream dealers through visitation and other regular contact. Gundlach Decl. ¶¶ 24-37, 54-62. Looking to established practices, manufacturers and distributors may, for example, monitor downstream actors for risky sales patterns based on the "trace" requests that they receive from the federal government. *Id.* ¶ 61 (noting that Sturm, Ruger & Company has used this approach).

---

[11] *Id.* at 782-83.

[12] *Id.* at 784.

[13] Daniel W. Webster & Jon S. Vernick, *Spurring Responsible Firearms Sales Practices Through Litigation*: *The Impact of New York City's Lawsuits Against Gun Dealers on Interstate Gun Trafficking* 123, 126 (2013), https://tinyurl.com/3mvjmcfk.

[14] *Id.* at 128.

When a law enforcement agency recovers a gun in connection with a crime, the agency can request that the federal government "trace" the firearm's path through the chain of distribution, from manufacturer through the first retail sale. ATF, *Fact Sheet – National Tracing Center* (Apr. 2023), https://tinyurl.com/ymys9zsd. By monitoring these requests, gun manufacturers can identify disproportionate diversion patterns, require downstream distributor and retailer reporting of trace requests, and take appropriate corrective action.

These established practices are examples of industry participants' reasonable exercise of common sense. Bolstering this position, Smith & Wesson—one of the nation's largest gun manufacturers—once agreed as part of a settlement to implement a detailed protocol that included these and other distribution controls described above. NRA-ILA, *Smith & Wesson Settlement Agreement*, at Part II (Mar. 17, 2000), https://tinyurl.com/muf3cj8v. Among other procedures, Smith & Wesson agreed to require that sellers of their products: (i) track dealers that sold disproportionate numbers of guns ultimately recovered by law enforcement; (ii) limit multiple handgun purchases by the same individual within a short period; (iii) maintain an electronic firearms inventory; (iv) conduct monthly inventory audits; and (v) implement anti-theft security plans. *Id*. Even though this settlement was not ultimately enforced,[15] Smith & Wesson has nevertheless touted the "extensive processes" it has adopted to promote responsible behavior, including the use of contracts with dealers that sell Smith & Wesson products that require the dealers to support Smith & Wesson's "full compliance with all applicable laws," mandate that dealers train their employees to "follow all laws relating to the sale and distribution of firearms," and allow Smith & Wesson to terminate the relationship if the dealers engages in unlawful behavior. *Smith & Wesson Brands, Inc.*, SEC Staff No-Action Letter, 2020 WL 3266557, at \*4, \*9, \*19-20 (June 15, 2020) (explaining certain

---

[15] Avi Selk, *A gunmaker once tried to reform itself. The NRA nearly destroyed it.*, Wash. Post. (Feb. 27, 2018), https://tinyurl.com/5665e3w7.

measures it has taken to address "'legitimate public concern'" associated with the unlawful or improper use of firearms). The settlement and the "extensive processes" cited by Smith & Wesson to avoid liability from the SEC show that industry members do not lack the capacity to identify and adopt reasonable practices to reduce firearms diversion and other risk factors for gun violence; instead, they show that it can take the threat of potential liability by third parties for the industry to implement them.

### C.     NSSF clearly understands responsible marketing practices.

NSSF's claims of confusion regarding how to comply with AB 1594's marketing requirements are no more persuasive. NSSF Br. 10, 17-18. Reasonable marketing practices—including age-gating to prevent minors from viewing product ads for items they cannot lawfully purchase, incorporating risk and safety disclosures, and limiting the use of marketing that appeals to juveniles or criminals—have been adopted in analogous contexts, such as the sale of tobacco, e-cigarettes, gambling, and alcohol. *See, e.g., Master Settlement Agreement between Settling States and Participating Manufacturers* § III(b) (Nov. 23, 1998), https://tinyurl.com/4hv7wtv3 (prohibiting tobacco advertisements, promotions, packaging, or labeling that use cartoons). And, in any event, the groundwork for reasonable limitations in firearms marketing has already been laid. For example, in the 2000 Smith & Wesson settlement agreement discussed above, the company agreed to restrictions on marketing guns in ways that would make them "particularly appealing to juveniles or criminals, such as advertising a firearm as 'fingerprint resistant.'" NRA-ILA, *Smith & Wesson Settlement Agreement*, *supra*, Part II.D.2. The manufacturer also reaffirmed its commitment to avoiding advertisements near schools. *Id* at II.D.4.

In short, contrary to NSSF's claims, the gun industry understands that there are responsible marketing practices that its members can adopt. Many gun industry actors, however, simply choose not to implement them. AB 1594 is designed to change the calculus for those irresponsible actors.

*     *     *

1  Contrary to NSSF's assertions in this lawsuit, industry members are well-
2  positioned to identify and implement reasonable conduct on their part that could help
3  enhance public safety.

## CONCLUSION

5  For the foregoing reasons, the Court should deny Plaintiff's motion for a
6  preliminary injunction.

Dated: July 28, 2023

By:  */s/ Amy K. Van Zant*

AMY K. VAN ZANT (SBN 197426)
avanzant@orrick.com
ORRICK, HERRINGTON &
SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025
Telephone:  (650) 614-7400
Facsimile:   (650) 614-7401

AMANDA H. SCHWARTZ (SBN
349625)
aschwartz@orrick.com
ORRICK, HERRINGTON &
SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105
Telephone:  (415) 773-5700
Facsimile:   (415) 773-5759

THOMAS M. BONDY (SBN 121785)
tbondy@orrick.com
ORRICK, HERRINGTON &
SUTCLIFFE LLP
1152 15th Street NW
Washington, DC 20005
Telephone:  (202) 339-8400
Facsimile:   (202) 339-8500

MELANIE R. HALLUMS (WV SBN
13781)
mhallums@orrick.com
ORRICK, HERRINGTON &
SUTCLIFFE LLP
2121 Main Street
Wheeling, WV 26003
Telephone:  (304) 231-2500
Facsimile:   (304) 231-2801

*Counsel for Amici Curiae Brady Center to Prevent
Gun Violence and Everytown for Gun Safety Support Fund*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of July, 2023, I electronically filed the foregoing with the Court using the CM/ECF system, and thereby delivered the foregoing by electronic means to all counsel of record.


By:     /s/ Amy K. Van Zant
AMY K. VAN ZANT