UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

NATIONAL SHOOTING SPORTS
FOUNDATION,

Plaintiff,

v.

Rob BONTA, Attorney General of
California,

Defendant.

Case No.:  23-cv-0945-AGS-KSC

**ORDER GRANTING IN PART
PLAINTIFF'S PRELIMINARY-
INJUNCTION MOTION (ECF 14)**

Under a new regulatory scheme, California restricts "abnormally dangerous" guns and sets other industry standards. A firearm-trade group seeks to preliminarily enjoin this law's enforcement.

## BACKGROUND

As of last summer, California's Firearm Industry Responsibility Act—"AB 1594" in legislative parlance—compels industry members to: (1) implement "reasonable controls" regarding gun safety; (2) not "manufacture, market, import," or sell any "firearm-related product that is abnormally dangerous and likely to create an unreasonable risk of harm . . . in California"; and (3) not "engage in any conduct" that infringes several unfair-business-practices laws. Cal. Civ. Code § 3273.51; *id*. § 3273.55. The Firearm Act's enforcement mechanism is diffuse. California's Attorney General may sue firearm-industry members for transgressions, as can the state's cities and counties, as well as any "person who has suffered harm in California." *Id*. § 3273.52(b), (c).

Plaintiff National Shooting Sports Foundation—a trade association of gun makers, sellers, and industry participants—fears that this new law puts its membership in legal jeopardy. Before any member could be sued, the Foundation brought this action. It claims that these regulations violate the First and Second Amendments, the dormant Commerce Clause, and other constitutional protections. Now it moves for a preliminary injunction.

## DISCUSSION

Before turning to that motion, this Court must ensure it has jurisdiction.

1

# I.

## JUSTICIABILITY

Article III of the Constitution empowers federal courts to decide only "Cases" and "Controversies." U.S. Const. art. III, § 2. In other words, an "actual controversy must exist . . . through all stages of the litigation." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90–91 (2013) (cleaned up). From this bedrock constitutional principle, two related justiciability doctrines flow. First, plaintiffs must have "standing"—a "personal stake" in the litigation. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). In lay terms, they must adequately answer the question: "What's it to you?" *Id*. Second, the case must be "ripe" and not based on "contingent future events that . . . may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998). California's Attorney General insists that this pre-enforcement suit must be tossed for failing both these constitutional prerequisites, as well as the kindred, judge-made doctrine of "prudential" ripeness.

## A.     Standing

Plaintiffs have the burden to establish standing for "each claim" and "each form of relief." *Davis v. Federal Election Comm'n*, 554 U.S. 724, 734 (2008). That task is somewhat complicated for this trade group: the Foundation's *members* may be sued under the Firearm Act, but the Foundation cannot. *See* Cal. Civ. Code § 3273.50(f) (defining "Firearm industry member"); *id*. § 3273.51(a) (applying regulations to such members). So, it must instead pursue "representational or organizational standing" on its constituents' behalf. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023).

To invoke organizational standing, the Foundation must show that: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* The last two conditions are undisputed. (*See* ECF 1, at 6–7 (describing the Foundation's mission); *id*. at 79 (asking for equitable relief and only "nominal damages")); *see also Columbia Basin*

*Apartment Assn. v. City of Pasco,* 268 F.3d 791, 799 (9th Cir. 2001) (finding third prong satisfied when plaintiffs sought "only injunctive and declaratory relief," which "do not require individualized proof"). The only remaining question is whether the members could sue on their own.

Thus, the Foundation must demonstrate that its members satisfy the traditional test for individual standing: "(1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014) (cleaned up). Once again, the latter two requirements are met: The alleged harm "is directly traceable" to the defendant (Attorney General Bonta), who is the main official "responsible for enforcement" of this gun-control bill, and the members' "injury would be redressed by a remedy that the district court could provide them, namely, an injunction against enforcement." *See Teter v. Lopez*, 76 F.4th 938, 946 (9th Cir. 2023).

The Foundation's standing boils down, then, to whether its members have suffered an "injury in fact." Such an injury must be "concrete and particularized" as well as "actual or imminent, not 'conjectural' or 'hypothetical.'" *Driehaus*, 573 U.S. at 158. Plaintiff alleges both actual and imminent injuries.

### 1. Actual Injury

The Foundation suggests that the Firearm Act has caused its members direct financial loss. An "actual, ongoing harm" constitutes an injury in fact. *Teter*, 76 F.4th at 944 n.2 (cleaned up). This includes "tangible economic injury." *National Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 855 (9th Cir. 2002). The problem is that plaintiff has identified only theoretical harms, not actual ones. First, the Foundation contends that the "only way" its members can adhere to the Firearm Act "would be by ceasing to manufacture, market, and sell their lawful products altogether." (ECF 30, at 1.) Yet no member businesses have shuttered. Second, plaintiff predicts that the new law will constrict "the market for lawful firearms," but it offers no such evidence. (*See* ECF 29, at 21 (cleaned up).) Finally, according to plaintiff, the Attorney General "recognizes that

industry members must incur at least some costs" to comply with the law's "reasonable controls" requirement. (ECF 29, at 7.) At oral argument, however, the Court asked if any members had "changed their marketing, manufacturing, design, or other practices" due to the Firearm Act. (ECF 40, at 5.) Plaintiff's counsel conceded they had not. (*Id*. at 8.)

This wait-and-see approach may be sensible, but it is not actual injury. These facts fall short of the tangible harms that confer standing. *See, e.g.*, *Isaacson v. Mayes*, 84 F.4th 1089, 1097, 1101 (9th Cir. 2023) (holding that doctors had standing to dispute regulations that "forbid them from providing medical services they would otherwise provide," because they "lost money" due to the law); *Teter*, 76 F.4th at 943–44 (concluding that plaintiffs had standing to contest knife ban that compelled them to "dispose of their butterfly knives"); *Davis*, 307 F.3d at 843, 855–56 (ruling that trappers had standing to sue over law that forced them to "stop[] using leghold traps," resulting in "direct financial loss"). As the Foundation has not identified any actual injury—such as ceasing business, discarding inventory, or altering operations—it must instead prove that such harm is fast approaching.

## 2. Imminent Injury

Plaintiffs who have not yet been injured "must show that the potential harm is sufficiently imminent to qualify as an injury in fact." *Isaacson*, 84 F.4th at 1098. In a pre-enforcement action, like this one, plaintiffs may satisfy this requirement by alleging they intend "to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Driehaus*, 573 U.S. at 159. The firearm industry's practices have an arguable constitutional dimension. No one suggests otherwise. The real battleground is over the likelihood of enforcement and, to a lesser extent, whether some of plaintiff's members' conduct is in fact forbidden.

In assessing a "credible threat of prosecution," the Court considers: (a) "whether the plaintiffs have articulated a concrete plan to violate the law in question," (b) "whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings," and (c) "the history of past prosecution or enforcement under the challenged

4

statute." *Unified Data Servs., LLC v. FTC*, 39 F.4th 1200, 1210 (9th Cir. 2022). These three "factors must be considered as a whole, in light of the totality of the circumstances, and not as a mandatory checklist." *Teter*, 76 F.4th at 946. But when the "statute is new, as here, the history of past enforcement carries little, if any weight." *Arizona v. Yellen*, 34 F.4th 841, 850 (9th Cir. 2022). The Court analyzes each gun-related rule separately.

### (a) *Abnormally Dangerous Firearms, Section 3273.51(c)*

First, the Foundation has standing to challenge the Firearm Act's ban on selling, manufacturing, importing, or marketing certain "abnormally dangerous" firearm-related products. *See* Cal. Civ. Code § 3273.51(c). A gun is presumptively forbidden under this section if, for instance, it is "designed . . . in a manner that is targeted at minors." *Id*. § 3273.51(c)(2)(C). Many Foundation members make and sell weapons that are targeted at juveniles, such as "'youth-model firearms,' which are 'smaller size and lighter weight' than standard models." (ECF 29, at 7.) As these "members have demonstrated that their policies are presently in conflict" with this provision, they have established a "concrete plan" to violate it. *See California Trucking Assn. v. Bonta*, 996 F.3d 644, 653 (9th Cir. 2021).

As for a "warning or threat," the Ninth Circuit takes a "broad view of this factor" and does not require "an explicit warning." *Isaacson*, 84 F.4th at 1100. That is especially true when plaintiffs may reasonably fear prosecution from many quarters. The Firearm Act's litigation right extends not just to the Attorney General, but to every "city attorney" and "county counsel" representing California's 58 counties and hundreds of municipalities. *See* Cal. Civ. Code § 3273.52(c). It even stretches, most importantly, to any "person who has suffered harm in California because of a firearm industry member's conduct." *See id*. § 3273.52(b). A "private right of action . . . is enough to create a credible threat of future private enforcement." *See Isaacson*, 84 F.4th at 1101.

Even if there were no risk of private lawsuits, the State's "refusal to disavow enforcement . . . during this litigation" is also "strong evidence that the state intends to enforce the law" and that plaintiff's "members face a credible threat." *California Trucking*, 996 F.3d at 653. In fact, when the "concrete plan" factor is compelling like in this case, a

refusal to disavow is often determinative in the credible-threat analysis. *See, e.g.*, *United States v. Supreme Ct. of New Mexico*, 839 F.3d 888, 901 (10th Cir. 2016) ("The threat of prosecution is generally credible where a challenged provision on its face proscribes the conduct in which a plaintiff wishes to engage, and the state has not disavowed any intention of invoking the provision against the plaintiff." (cleaned up)).

The Attorney General has two rejoinders. First, the State promises not to prosecute any violations "premised solely on *marketing* lawful firearms to minors so long as *Junior Sports Magazines* remains binding circuit precedent." (ECF 41, at 10 n.5 (emphasis added) (citing *Junior Sports Mags. Inc. v. Bonta*, 80 F.4th 1109 (9th Cir. 2023)).) But marketing is only one way to contravene this law. The Attorney General has not foresworn suits based on, say, *selling* guns targeted at minors.

Second, the State insists that its "failure to disavow enforcement . . . after the filing of the lawsuit" is irrelevant, because "standing is determined at the time the action commences." (ECF 46, at 2 (citing, among others, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 570 n.5 (1992)).) Yet, in appraising threats, the Ninth Circuit has repeatedly turned to such post-filing proof. *See, e.g.*, *Isaacson*, 84 F.4th at 1095, 1100–01 (considering after-lawsuit statements by "county attorneys" and "health agencies" that indicated a credible "threat of enforcement"); *California Trucking*, 996 F.3d at 653 (relying on "refusal to disavow . . . during this litigation"). And even if the State is right—and this Court's review is confined to pre-filing evidence—*Isaacson* would still dictate standing here. Stripped of post-lawsuit facts, the *Isaacson* court's "warning or threat" finding rests on little more than Arizona's civil "private right of action," which it held was "enough to create a credible threat" by itself. 84 F.4th at 1101. If a private litigation right was "enough" in Arizona, it also is in "the country's most populous state," "California." *See De La Fuente v. Padilla*, 930 F.3d 1101, 1103 (9th Cir. 2019).

Thus, the first two credible-threat factors—"concrete plan" and "warning or threat"—favor standing. As the final factor carries little weight, the Foundation has met its burden. It may litigate the "abnormally dangerous" gun ban.

6

**(b)** *Reasonable Controls, Section 3273.51(b)*

Turning to the Firearm Act's "reasonable controls" proviso, this Court has more difficulty discerning the basis for standing. The statute obliges industry members to "enforce reasonable controls"—and to take "reasonable precautions" with a "downstream distributor or retailer"—to comply with gun regulations and to prevent firearms from falling into the wrong hands, such as by loss, theft, or straw purchases. *See* Cal. Civ. Code § 3273.51(b); *see also id.* § 3273.50(h). If Foundation members mean to violate this law at all, their "plan" is abstract at best.

A "concrete plan need not be 'cast in stone,'" and "feared future injury" may be "sufficiently realistic and credible to confer standing." *Yellen*, 34 F.4th at 850–51. But the plan must be "more than a hypothetical intent to violate the law." *Id.* at 850. At oral argument, plaintiff's counsel emphasized that its members "have already been sued under very similar statutes in other states" for ongoing practices. (ECF 40, at 13.) In particular, industry members faced "reasonable controls" lawsuits because they allegedly: (a) "manufactured and sold more firearms than . . . the legal market can reasonably bear"; (b) "attract[ed] criminals" to their guns by touting "lawful features like concealability and capacity"; and (c) failed to "offer training to downstream retailers in things like how to prevent straw purchases." (*Id.* at 13–15.)

It is challenging to evaluate these out-of-state precedents without more details, such as the full allegations and the exact regulatory language at issue. More to the point, these suits are only instructive if the Foundation shows that its past, litigation-spawning practices persist in like form now. For the first two examples, the record is silent on crucial issues: How do current gun sales compare to those in prior lawsuits about oversaturated markets? Do Foundation members still market firearm "concealability" and "capacity" in the same manner as before? Do they advertise these features at all? Such unanswered questions represent deep, unstable cracks in any "concrete plan."

As for the final example—about training retailers—counsel averred: "My clients don't do that." (ECF 40, at 14.) Yet it is unclear whether failing to do so breaks those other

states' laws, let alone the Firearm Act here. The Attorney General maintains that California's "reasonable controls" regulation merely places "an affirmative obligation for [the Foundation's members] to do those things that they were already doing voluntarily." (ECF 40, at 36; *see also* ECF 23-1, at 21–23 (detailing the Foundation's "programs . . . for safeguarding against firearm diversion and the misuse of firearms"); ECF 23-2, at 6–11 (same).) In any event, at the last oral argument, the Court tried to clarify how Foundation members were defying the "reasonable controls" rule. Plaintiff's counsel confessed that he could not give "a great answer" due to that provision's vagueness. (*See* ECF 43.)

In sum, it's uncertain whether plaintiff's members will disobey the "reasonable controls" mandate—far too uncertain to meet Article III's high bar for pre-enforcement review. *See National Shooting Sports Found. v. Attorney Gen. of N.J.*, 80 F.4th 215, 221 (3d Cir. 2023) (denying standing in a "reasonable controls" case, in part, because "the Foundation never explains how simply making, marketing, or selling guns will inevitably trigger this Law").

This conclusion muddies the analysis of the next factor: threat of prosecution. That risk increases when, as here, the law gives "private citizens a right of action" and the Attorney General refuses "to stipulate that California will not enforce the statute." *See Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1173 (9th Cir. 2018). But if it's "murky" whether the "intended conduct is arguably forbidden," this underlying doubt "undermine[s] the threat of enforcement." *Attorney Gen. of N.J.*, 80 F.4th at 220. So too does the law's "purely civil nature," as the "lack of criminal penalties" tends to "lower the temperature" of any litigation risk. *Id*. at 222–23. In the end, the peril of future lawsuits is not so clear or so imminent as to overcome the scant evidence of a concrete plan. Plaintiff has not proved standing to oppose the "reasonable controls" regulation.

### (c) *Unlawful Business Practices, Section 3273.51(d)*

The Foundation's credible-threat arguments focused almost exclusively on the Firearm Act's "abnormally dangerous" and "reasonable controls" sections. Plaintiff offers little reason to think its members will breach the Act's prohibition on firearm-related "sale

or marketing" that counts as unfair competition or false advertising. *See* Cal. Civ. Code § 3273.51(d). Nor that they face looming litigation over it. Plaintiffs need not "explicitly confess" an intent to flout the questioned law, *Yellen*, 34 F.4th at 849–50, but they "must give us something to go on," *Attorney Gen. of N.J.*, 80 F.4th at 221. The Foundation has not. It thus lacks standing to contest this aspect of the statute.

**B.    Ripeness**

The ripeness doctrine's "basic rationale" is to avoid "premature adjudication" so that courts will not "entangl[e] themselves in abstract disagreements." *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1173 (9th Cir. 2022). The principle has both "constitutional and prudential components." *Id*. Constitutional ripeness is "synonymous with the injury-in-fact prong of the standing inquiry," which means the challenge to the "abnormally dangerous" firearm rule is constitutionally ripe for review. *See id*.

"Unlike constitutional ripeness, prudential ripeness is a disfavored judge-made doctrine . . . ." *Fowler v. Guerin*, 899 F.3d 1112, 1116 n.1 (9th Cir. 2018). Courts have discretion to reject a case as unripe based on "two overarching" prudential concerns: (1) "the fitness of the issues for judicial decision" and (2) "the hardship to the parties of withholding court consideration." *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1141 (9th Cir. 2000). Both factors here favor prudential ripeness. First, the claims are fit for review, as they are "primarily legal, do not require further factual development, and the challenged action"—the Firearm Act's enactment—"is final." *See Wolfson v. Brammer*, 616 F.3d 1045, 1060 (9th Cir. 2010). Second, declining to adjudicate would work a hardship. For this prong, courts "consider whether the regulation requires an immediate and significant change in plaintiffs' conduct . . . with serious penalties attached to noncompliance." *Id.*. As discussed, Foundation members are currently making and selling guns that are presumptively prohibited. And they face a "credible threat of enforcement" for their ongoing defiance, as needed "to justify judicial review." *See Alaska Right to Life Pol. Action Comm. v. Feldman*, 504 F.3d 840, 851 (9th Cir. 2007). Even if this were a closer call, this Court would err on the side of prudential ripeness. A federal

9

court, after all, has a "virtually unflagging" constitutional duty to "hear and decide cases within its jurisdiction." *Driehaus*, 573 U.S. at 167 (cleaned up).

Accordingly, the Foundation's attack on the Firearm Act is justiciable, at least as to the "abnormally dangerous" gun rule.

## II.

### PRELIMINARY INJUNCTION

We now turn to the request to enjoin that rule. An "injunction is a drastic and extraordinary remedy." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). It may "only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Under the *Winter* preliminary-injunction test, plaintiffs must establish that: (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Id.* at 20.

### A.   Success on the Merits

Success on the merits "is the most important *Winter* factor." *Disney Enters. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (cleaned up). Plaintiffs must typically show a "likelihood"—or "probability"—of prevailing. *Coffman v. Queen of the Valley Med. Ctr.*, 895 F.3d 717, 725 (9th Cir. 2018). But under the Ninth Circuit's "sliding scale" approach, a plaintiff who merely raises "serious questions" about the merits is still entitled to preliminary relief if the other elements are met and the balance of equities "tips sharply in the plaintiff's favor." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 684 (9th Cir. 2023) (en banc). Plaintiffs who challenge a statute's constitutionality on its face, as in this case, normally must "establish that no set of circumstances exists under which the [law] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

### 1.   Dormant Commerce Clause

Plaintiff's surest march to victory is under the banner of the dormant Commerce

Clause. Our Constitution proclaims that Congress has the power to "regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. By "negative implication," then, the states do not—an inference known as the "dormant" Commerce Clause. *Department of Rev. v. Davis*, 553 U.S. 328, 337 (2008). This implied doctrine forbids states from, among other things, "directly" regulating commercial activity that "takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Sam Francis Foundation v. Christies, Inc.*, 784 F.3d 1320, 1323 (9th Cir. 2015) (en banc). "Direct regulation occurs when a state law directly affects transactions that take place entirely outside of the state's borders." *Id*. at 1323–24. "Such a statute is invalid per se," *id*. at 1324, and "can generally be struck down without further inquiry," *National Collegiate Athletic Assn. v. Miller*, 10 F.3d 633, 640 (9th Cir. 1993).

The Foundation attacks the "abnormally dangerous" firearm provision for regulating out-of-state commercial activities—that is, making, marketing, importing, and selling restricted guns involving "an unreasonable risk of harm . . . in California." *See* Cal. Civ. Code § 3273.51(c). It has a point.

By way of example, suppose a Tennessee manufacturer makes youth-model rifles and AR-style long guns that are legal in its state, but meet California's definition of "abnormally dangerous." Imagine also that the manufacturer ships these arms to Yuma, Arizona (where it is reasonably foreseeable they may somehow enter bordering California). One day an Arizona retailer sells these guns to an Arizona buyer. Hours later, a thief steals the firearms and drives into California to commit a gun crime. Although the commercial transactions were conducted entirely out of state—and the lawful participants never set foot in California—the Tennessee manufacturer and Arizona retailer could both be sued under the "abnormally dangerous" firearm provision. *See* Cal. Civ. Code § 3273.52(f) (clarifying that an "intervening act by a third party," including "criminal misuse" of a gun, does not "preclude . . . liability"). This story is not fanciful. "Most firearm industry members . . . do not have any physical presence in California," and some Foundation members don't "do any business in California, period." (ECF 1, at 48, 50; *see also* ECF 29, at 20.)

23-cv-0945-AGS-KSC

When a state law like this completely bans—or even just "directly affects"—commercial "transactions that take place entirely outside of the state's borders," it plainly contravenes the dormant Commerce Clause. *See Sam Francis*, 784 F.3d at 1323–24. This is so even if the regulated "commerce has effects within the State" of California. *See id.* at 1323. In fact, the Ninth Circuit has struck down extraterritorial regulations with tighter connections to the legislating state. In *Sam Francis*, a California law charged fine-art sellers a 5% royalty on any sales if "the seller resides in California." *Id.* at 1322. As these sales had "no necessary connection with the state other than the residency of the seller," the court "easily conclude[d]" that this statute "facially violates the 'dormant' Commerce Clause." *Id.* at 1322–23. At least the *Sam Francis* law required one Californian to be involved in the sale. *None* of the commercial parties here need a direct California connection. Under the Firearm Act, an out-of-state industry member—who does no business in California—may be liable for transactions that involve no California parties or destinations. The only in-state link concerns the "abnormally dangerous" gun itself. The statute demands, at a minimum, that the firearm: (1) is "*likely* to create an unreasonable *risk* of harm . . . in California," Cal. Civ. Code § 3273.51(a), (c) (emphasis added), and (2) "is or *was* possessed in California" and "it was reasonably foreseeable that" it would be possessed there, *id.* § 3273.50(d)(3) (emphasis added). *See also id.* § 3273.50(d)(1)–(2) (listing alternate state-nexus criteria, including that the gun is "sold, made, or distributed in California" or "*intended* to be sold or distributed" there (emphasis added)).

Because the "abnormally dangerous" firearm rule reaches beyond California's borders and directly regulates out-of-state commercial transactions, it likely runs afoul of the dormant Commerce Clause.[1]

---

[1] The Attorney General hints that plaintiff's dormant Commerce Clause theory may be foreclosed by *National Pork Producers Council v. Ross*, 598 U.S. 356 (2023). It is not. *Ross* did not disturb the constitutional bar on state laws that "*directly* regulate[] out-of-state transactions by those with *no* connection to the State." *Id.* at 376 n.1.

23-cv-0945-AGS-KSC

### 2. *Salerno*'s Facial-Challenge Standard

Even if the law is unconstitutional, the Foundation must still satisfy *Salerno*'s "no set of circumstances" rule. Simply put, the Foundation must show that "the law is unconstitutional in all of its applications." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) (citing *Salerno*, 481 U.S. at 745). In dormant Commerce Clause cases, this means courts "construe the [law] narrowly and resolve any ambiguities in favor of the interpretation that most clearly supports constitutionality." *Rosenblatt v. City of Santa Monica*, 940 F.3d 439, 444 (9th Cir. 2019). No matter how narrow the reading, though, this provision is a prohibited extraterritorial regulation. As it "fails the relevant constitutional test," "it can no longer be constitutionally applied to anyone—and thus there is 'no set of circumstances' in which the statute would be valid." *See Bruni v. City of Pittsburgh*, 824 F.3d 353, 363 (3d Cir. 2016).

The State nonetheless asserts, without elaboration, that this provision has "constitutional applications" under the "dormant Commerce Clause." (ECF 41, at 3.) The Attorney General presumably believes that *Salerno* dooms a facial challenge because this statute *could* be applied to purely in-state commercial transactions, which a state may constitutionally regulate. But by that logic, a state law policing economic activity *everywhere in the world*—including within the state—would be immune to facial attack. That is not how *Salerno* works. It is not enough to cherry-pick a scenario that avoids the evils justifying a constitutional protection. So long as the statutory language *applied* to analyze that scenario—on its face—offends the Constitution, the law must fall. *See, e.g.*, *City of Los Angeles v. Patel*, 576 U.S. 409, 412, 417–18 (2015) (invalidating administrative-search ordinance on its face for omitting "any opportunity for precompliance review" under the Fourth Amendment, even though some searches—such as those justified by "consent[]," "emergency," or a "court-ordered warrant"—do not require such review); *Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 789 (9th Cir. 2014) (en banc) (striking down categorical-bail-denial statute on its face for lacking the "individualized determination" that due process demanded, though some defendants

13

"would be detained" anyway under a "different categorical statute" or due to unique circumstances).

In short, *Salerno* is no obstacle to the dormant Commerce Clause claim, which the Foundation seems likely to win. The Court need not address the remaining causes of action. At this stage, of course, the Court's task is merely "to assess probabilities." *Tenorio-Serrano v. Driscoll*, 324 F. Supp. 3d 1053, 1060 (D. Ariz. 2018). A final merits decision "must await a more complete record and more thorough briefing." *Id*.

## B.    Other *Winter* Factors

When plaintiffs demonstrate "likelihood of success on the merits of a constitutional claim," "the remaining *Winter* factors favor enjoining the likely unconstitutional law." *Junior Sports Mags.*, 80 F.4th at 1120. Preliminary injunctive relief is therefore warranted.

### III.

### INJUNCTION'S SCOPE

Finally, the Court must determine the scope of relief and proper security amount. *See* Fed. R. Civ. P. 65(c), (d). An injunction must be "narrowly tailored to remedy the specific harm shown." *East Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019). The Court sees no way for the "abnormally dangerous" gun regulation to pass constitutional muster by severing or enjoining only portions of it. Nor has the State suggested how to do so. (*See* ECF 41, at 10.) Thus, the Court enters the following order:

1. **Definitions**. For this order's purposes:

   a. The "Attorney General" refers to California's Attorney General as well as his officers, agents, and employees.

   b. The "Foundation" refers to plaintiff National Shooting Sports Foundation and all its members as of this case's filing date.

2. **Preliminary Injunction**. During this case, the Attorney General is enjoined from bringing suit against the Foundation based on California Civil Code section 3273.51(c) and from otherwise enforcing that provision against the Foundation.

14

The Attorney General does not argue for an injunction bond, and this Court will not set one. As a government defendant, the Attorney General is unlikely to sustain any "costs or damages" from complying with this order, so "no sum or amount" of security is needed. *See Hurwitt v. City of Oakland*, 247 F. Supp. 995, 1006 (N.D. Cal. 1965).

## CONCLUSION

The Foundation's motion is **GRANTED IN PART**. As set forth above, the Attorney General is preliminarily enjoined from enforcing the Firearm Act's "abnormally dangerous" restriction. *See* Cal. Civ. Code § 3273.51(c). Plaintiff's request for preliminary relief is otherwise **DENIED**.[2] Due to a lack of standing, the claims concerning California Civil Code sections 3273.51(b) and (d)—the "reasonable controls" and unfair-business-practices provisions—are **DISMISSED** with leave to amend. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) (explaining that a court "must dismiss" when "it lacks subject-matter jurisdiction"); *Fleck & Assocs., Inc. v. City of Phoenix*, 471 F.3d 1100, 1106 n.4 (9th Cir. 2006) (noting that "standing is an aspect of subject matter jurisdiction").

By March 13, 2024, the Foundation may file an amended complaint setting out any additional facts to establish standing over the "reasonable controls" and unfair-business-practices provisions. Plaintiff may not otherwise amend. By March 27, 2024, the Attorney General must respond to the operative complaint.

Dated:  February 21, 2024

_____

Hon. Andrew G. Schopler
United States District Judge

---

[2] The Foundation's claims against California's firearm-suit fee-shifting system, Cal. Civ. Proc. Code § 1021.11—as well as the motion to enjoin it—are moot. That statute has already been declared "unconstitutional" and is "permanently" enjoined. *Miller v. Bonta*, 646 F. Supp. 3d 1218, 1232 (S.D. Cal. 2022); (*see also* ECF 40, at 26 (plaintiff conceding mootness)). The section 1021.11 claims are **DISMISSED**.

15