Pages 1 - 66

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Before The Honorable Andrew G. Schopler, Judge

```
NATIONAL SHOOTING SPORTS          )
FOUNDATION,                       )
                                  )
            Plaintiff,            )
                                  )
  VS.                             )    NO. 23-CV-00945-AGS-KSC
                                  )
ROB BONTA,                        )
                                  )
            Defendant.            )
_____    )
```

San Diego, California
Wednesday, October 4, 2023

**TRANSCRIPT OF MOTION HEARING**


**APPEARANCES**:

For Plaintiff:

CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, Virginia 22314
**BY: MATTHEW ROWEN, ESQ.**

For Defendant:

OFFICE OF THE ATTORNEY GENERAL
State of California
455 Golden Gate Avenue, Room 11000
San Francisco, California 94102
**BY: SEAN CLINTON WOODS, ESQ.**

OFFICE OF THE ATTORNEY GENERAL
State of California
1300 I Street
Sacramento, California 95814
**BY: MATTHEW WISE, ESQ.**


Reported By:    James C. Pence-Aviles, RMR, CRR, CSR No. 13059
                Official Court Reporter

| | |
|---|---|
1 | **Wednesday - October 4, 2023** **2:00 p.m.**

2 | **P R O C E E D I N G S**

3 | **---000---**

4 | (The following proceedings were heard in chambers:)

5 | **THE COURT:** Okay. It is 2:00 o'clock p.m. Let's go

6 | on the record.

7 | All right. It is 2:00 o'clock p.m. on Wednesday,

8 | October 4th, 2023, and this is the case -- case of

9 | National Shooting Sports Foundation versus Bonta,

10 | Case Number 23-CV-0945.

11 | May I please have the appearances of the parties.

12 | **MR. ROWEN:** Good afternoon, Your Honor. This is

13 | Matthew Rowen on behalf of the plaintiff, NSSF.

14 | **THE COURT:** Good afternoon, Mr. Rowen.

15 | **MR. WOODS:** Good afternoon, Your Honor. Clint Woods

16 | on behalf of the defendant. I'm joined by my colleague,

17 | Matthew Wise.

18 | **THE COURT:** Good afternoon, Mr. Woods and Mr. Wise.

19 | All right. Well, I greatly appreciated the parties'

20 | supplemental briefing in this matter. I think it -- it helps

21 | clarify some of the issues.

22 | I did want to go ahead and dive into the additional

23 | arguments in light of the supplemental briefing. Why don't we

24 | have plaintiff go first on that.

25 | So --

1          **MR. ROWEN:**  Sure.

2          **THE COURT:**  -- Mr. Rowen --

3          **MR. ROWEN:**  Yeah.

4      Thank you, Your Honor.

5          **THE COURT:**  Mr. Rowen, you have the floor.

6          **MR. ROWEN:**  Thank you, Your Honor.

7      So we obviously structured the first part of our brief on

8  a theory-by-theory basis in light of the way that Your Honor

9  structured the question for Part 1, but I think it would be

10 helpful today if I broke down the analysis on a

11 provision-by-provision basis rather than by lumping all of the

12 provisions together under the heading of a single

13 constitutional theory.

14      So if that works, I'd like to start with

15 Section 3273.51(c), which is the ban on, quote/unquote,

16 "abnormally dangerous arms."  And I'd like to start

17 specifically with our Second Amendment challenge to that

18 provision both because winning under that theory would yield

19 the broadest relief on that provision for NSSF and because I

20 think it nicely illustrates why the State's understanding of

21 facial challenges is incorrect.

22      So as we briefed at length, the Supreme Court and the

23 Ninth Circuit have clearly held that a state may not ban any

24 class of arms unless the State first proves not only that the

25 arms are uniquely dangerous but also that they are unusual;

1    i.e., that they're not commonly owned for law-abiding -- by

2    law-abiding citizens for lawful purposes.

3         That's the constitutional decision rule that governs

4    NSSF's challenge, under the Second Amendment, to

5    Section 3273.51(c).  Subsection (c) plainly allows the State to

6    ban arms without showing that they're unusual.  So on its face,

7    Subsection (c), again, the -- the ban on abnormally dangerous

8    arms, violates the applicable constitutional decision rule and

9    thus is facially unconstitutional.

10        Now, I use that phrase "un-" -- "the constitutional

11   decision rule" to harken back to the Ninth Circuit's en banc

12   decision in *Lopez-Valenzuela*, which we discussed in our

13   supplemental brief.  And so, as we noted in our brief, that was

14   a due process challenge to a set of Arizona laws that forbade

15   courts from granting any form of pretrial release to

16   undocumented immigrants arrested for certain crimes.

17        And the Ninth Circuit there held that the Prop 100 laws

18   were facially unconstitutional because the relevant

19   constitutional decision rule said that you either need an

20   individualized determination or the State needs to define the

21   class of people who are categorically barred from obtaining

22   pretrial release in such a narrow way such that everyone is

23   going to be a flight -- fright -- flight risk, such as

24   death-penalty-eligible defendants.

25        And because the statute didn't do either, it was facially

1    unconstitutional.  And as the Court said at Page 789 of the

2    en banc opinion, the entire statute fails the decision rule,

3    and thus the entire statute is invalid in all of its

4    applications, even though lots of the people who would be

5    subject to the law could be denied bail under a different law

6    that considered individualized determinations or that was

7    narrowly tailored in a different way.

8        And the same is true here with respect to the abnormally

9    dangerous arms ban and the Second Amendment.  So as I said at

10   the outset, the relevant constitutional decision rule, under

11   *Bruen* and *Teter*, is that a state cannot ban arms unless the

12   State proves that the arms are both dangerous and unusual.

13       Subsection (c) allows the State to ban arms without ever

14   proving that they are unusual.  That provision thus fails.  It

15   violates the applicable constitutional decision rule, which

16   means, just like in *Lopez-Valenzuela*, it is unconstitutional in

17   all of its applications.

18       So, you know, put differently, in the language of

19   *Lopez-Valenzuela*, even though arms may be able to be banned and

20   even though arms that fall within Subsection (c) might be able

21   to constitutionally be banned under a different statute such as

22   one that, for instance, required the State to prove both

23   dangerousness and unusualness, those arms still cannot

24   constitutionally be banned under Subsection (c).  And as

25   *Lopez-Valenzuela* makes clear, that's what the *Salerno* "no set

1   of circumstances" standard means.

2       I think another helpful illustration of this, that we

3   pointed to in our brief, are the cases like *Lopez* and *Morrison*,

4   the Congress clause cases.  And so, you know, *Lopez*, I think,

5   is a great illustration of how facial challenges work in this

6   context.

7       So that was the Gun-Free School Zones Act, and the

8   constitutional deficiency there was that the statute didn't

9   contain what's called the jurisdictional hook and -- but, of

10  course, in nearly every actual application of that statute, the

11  gun would have moved in interstate commerce, and yet that

12  didn't save the statute from facial invalidation because the

13  relevant constitutional decision rule there required there to

14  be a jurisdictional hook in the text of the statute.

15      And while courts, of course, are supposed to construe

16  statutes in ways to avoid constitutional questions, courts also

17  are not authorized to rewrite laws to make sure that they pass

18  constitutional muster.

19      So -- and I just, you know, wanted to take a step back and

20  look at what the State says the standard is.  I mean, if the

21  State's theory of what *Salerno* means were correct, then -- I

22  mean, just to take one case, *Heller* would have come out the

23  other way.

24      So the DC laws in *Heller* made it unlawful for anyone to

25  possess an unregistered firearm within the district, and they

1    prohibited people from registering any firearm originally

2    designed to be fired by use of a single hand; i.e., handguns.

3    So -- but it effectively banned all handguns.

4         But for present purposes, the important thing is that some

5    handguns are fully automatic, like a MAC-10 that you may have

6    heard of, you know, in rap songs and, you know, other criminal

7    proceedings.

8         But if the State's view of facial challenges were correct,

9    then the fact that someone could constitutionally be denied a

10   permit to carry a MAC-10 would have defeated the plaintiff's

11   facial challenge in *Heller*.

12        But the reason that that's not what the Court said, and

13   the reason that the facial challenge did not fail, is that the

14   same substantive constitutional decision rule applies, whether

15   or not you're doing a facial or an as-applied challenge.

16        And the way the constitutional adjudication works is you

17   take the constitutional decision rule, and you apply it to the

18   universe of conduct as defined by the State.  And in *Heller*,

19   the universe of conduct was possession of handguns.  The fact

20   that some handguns could be prohibited under a different,

21   narrower statute did not mean that a facial challenge to the

22   statute, as DC had written it, failed.

23        So before I move on, I just want to run quickly through

24   the cases that the State cites.  They cite, I think, three

25   out-of- -- or in- -- in-circuit District Court cases that they

1    say are inconsistent with this.  And, respectfully, they

2    actually perfectly illustrate sort of how *Salerno* works and why

3    our understanding is correct.

4        So in *Doe v. Bonta* -- that was the disclosure law case --

5    what the appellate court held there was that the law didn't

6    regulate conduct covered by the plain text.  So every

7    as-applied challenge would have failed, too.  The distinction

8    between facial and as-applied made no difference.

9        In *Perez-Garcia*, that case is basically analytically

10   similar to *Lopez-Valenzuela*.  So that was the challenge to the

11   Standard Condition 4 about possession for pretrial release, and

12   the relevant constitutional decision rule there is that some

13   felons are not within the people whose rights the

14   Second Amendment protects.  But not all arrestees are within

15   that class.

16       And so if the law there had just said all people who are

17   arrested are prohibited from keeping or bearing arms, period,

18   then that law would have been facially unconstitutional, even

19   though some of those arrestees would have been violent felons

20   and otherwise prohibited.

21       But because the law there required individualized

22   determinations and required the Government to prove that the

23   person actually was not within the class of the people that the

24   Second Amendment protects, the Court said that it didn't --

25   that the facial challenge failed.

1    And so -- I mean, I think -- just sort of to -- to wrap

2  all this up -- oh.  And just -- on their third case, the

3  *City of Glendale* case -- so that's the sensitive places case,

4  and that was just a mismatch between the plaintiff's theory and

5  what they sought in terms of a remedy.

6    So the relevant constitutional decision rule there was

7  that, you know, governments can prohibit carrying firearms in

8  sensitive places, but not everything is a sensitive place.  And

9  the plaintiffs explicitly conceded that some of the places to

10  which that ordinance extended were sensitive places, but yet

11  they sought to invalidate the whole statute.

12    So there was just a mismatch between their theory and the

13  statute.  And, of course, you know, the Supreme Court has long

14  held that the appropriate scope of any injunction is dictated

15  by the extent of the violation established.  And so if they

16  themselves conceded that the violation was narrower, then they

17  couldn't strike down the whole statute.

18    So just sort of to wrap all this up, for our

19  Second Amendment challenge to the abnormally dangerous arms

20  ban, we would ask the Court to grant a declaratory judgment

21  that that provision, Subsection (c), is facially

22  unconstitutional and enjoin the store -- the State from

23  enforcing it against NSSF or its members.

24    So we obviously have -- or -- yes, Your Honor.

25        **THE COURT:**  Just to clarify, do plaintiffs --

 1   plaintiffs concede that the *Salerno* standard does govern here?

 2   It seemed like the arguments --

 3          **MR. ROWEN:**  So --

 4          **THE COURT:**  -- were pitched sort of -- you know,

 5   assumed arguendo.

 6          **MR. ROWEN:**  Yeah.

 7       So, I mean, I think the way that I would answer that

 8   question is if *Salerno* means what *Lopez-Valenzuela* says it

 9   means, then sure.  The only reason we have a little quibble in

10   our brief is, you know, there are lots of cases that suggest

11   that maybe *Salerno* doesn't mean that.

12          **THE COURT:**  Uh-huh.

13          **MR. ROWEN:**  But at least the en banc Ninth Circuit

14   agrees with us on what it clearly means.

15       And so, you know, if that's the standard that we're

16   applying, which I think this Court is bound to apply, then,

17   yes, we have, you know, no qualms with saying that *Salerno*

18   governs every facial constitutional challenge, regardless of

19   what it's under, just like it would have governed, you know, in

20   *Lopez* and *Morrison*.

21          **THE COURT:**  Uh-huh.

22       Okay.  One other point that's at least adjacent to this --

23   I wanted to follow up on something you said at the last

24   hearing.

25       You made a comment that, "My clients currently are doing

```
 1   things that are unlawful under the statute," and I wanted to
 2   clarify what you were referring to that.  I wasn't sure if that
 3   was a reference to Subsection (c), the abnormally dangerous
 4   firearms, or perhaps Subsection (b), the reasonable controls
 5   and precautions.
 6         MR. ROWEN:  So -- I mean, that's a helpful question.
 7      And so -- I mean, I know, to a moral certainty, that they
 8   are with respect to Subsection (c).
 9         THE COURT:  Uh-huh.
10         MR. ROWEN:  And the reason I know that is because they
11   manufacture and sell firearms that are separately banned under
12   the assault weapons ban --
13         THE COURT:  Uh-huh.
14         MR. ROWEN:  -- and they sell them in other states.
15      But the State here has taken the position that there's
16   nothing in the Constitution that prevents it from enforcing its
17   law out of state.  And they've taken the position in their
18   briefing that Subsection (c) covers everything that's on the
19   assault weapons ban statute.
20      So yes.  I mean, right now, it's a matter of public record
21   that my clients' members are just, dead-bang, in violation of
22   Subsection (c), assuming that the State's theory of how it
23   works is correct.
24      I mean, Subsection (b) -- it's obviously more difficult,
25   and there is essentially nothing that I can say to give you,
```

```
 1   like, a great answer in part because of the way "reasonable
 2   controls" is defined.  And as we talked about last time -- I
 3   mean, if you look at -- oh, I never know if it's a subparagraph
 4   or a paragraph, but I think it's Paragraph 3(e) of .50(g).
 5        You know, the way that I read that -- and I haven't heard
 6   the State say otherwise -- is that even complying with all
 7   state and federal laws, other than AB 1594, is not sufficient
 8   to be, you know, deemed to have implemented reasonable
 9   controls.
10        And so given that, like, you know, who knows?  You know,
11   my clients' members certainly think that they are currently
12   complying with all other state and federal laws that apply to
13   them.
14        But, you know, as the lawsuits that have been filed
15   against them in other states, under similar laws, show, these
16   sorts of reasonableness regimes -- people seem to think that
17   compliance with all, you know, concrete prohibitions and
18   obligations on them is not enough.
19            THE COURT:  Okay.  Continue with your argument.
20            MR. ROWEN:  Sure.
21        So turning back to Subsection (c) -- and then we'll get to
22   the reasonable controls and reasonable precautions provision in
23   a minute.  So, you know, if the Court agrees with us on the
24   Second Amendment, then I won't need to reach any other
25   challenge to Subsection (c).
```

 1          But just for the interest of completeness -- so our

 2     First Amendment challenge is obviously more limited because it

 3     would only apply to Subsection (c), to the extent that it

 4     regulates marketing, because the other -- the other ways that

 5     one could apply that statute would not implicate the

 6     First Amendment.  And so it's necessarily narrower, but the

 7     analysis works essentially the same way.

 8          So in our view, as we've argued, the correct standard

 9     should be strict scrutiny for all the reasons that

10     Judge Vandyke explained in his concurrence in *Junior Sports*

11     *Magazines*.  But, you know, put that aside for, you know,

12     another day.

13          And even under intermediate scrutiny and *Central Hudson*,

14     Subsection (c)'s marketing prohibition is still facially

15     unconstitutional for essentially the same three reasons the

16     Court held the prohibition in Junior Sports's marketing

17     facially unconstitutional.

18          And so, first, the -- Subsection (c)'s marketing

19     prohibition, just on its face, encompasses not only speech

20     directed at adults but non-misleading speech about *lawful*

21     products and all manner of speech that is not itself unlawful.

22     So, you know, that basically alone refutes the State's argument

23     that they've made here that the law inherently concerns only

24     unlawful activity.

25          So then we're squarely in the world of *Central Hudson*.

1   And as the Court explained in *Junior Sports Magazines*, in

2   *Central Hudson*, even if the State has a strong interest -- and,

3   of course, we don't dispute that protecting Californians from

4   unlawful gun violence is a substantial interest.

5        But the State has to come forward with evidence showing

6   that prohibiting truthful marketing of lawful products sub- --

7   is going to substantially further that interest, and the State

8   just hasn't come forward with anything other than basically

9   appeals to common sense.  And as the Ninth Circuit made very

10  clear there, common sense just doesn't work in this context.

11       And, you know, third, even if it did, even if you could

12  say that Subsection (c)'s broad marketing restrictions

13  significantly were -- would decrease gun violence, the

14  marketing restriction still flunks intermediate scrutiny's fit

15  requirement because it's not circumscribed to reach only

16  speech, you know, depicting unlawful possession or speech

17  encouraging prohibited persons to buy firearms.

18       So what that means is that, you know, putting aside the

19  Second Amendment, if the First Amendment were the only

20  challenge in which we prevailed against Subsection (c),

21  Subsection (c)'s marketing restriction, on its face, violates

22  the applicable constitutional decision rule, which, here, you

23  know, we're assuming is *Central Hudson*.

24       So if that's the only claim in which we prevailed, with

25  respect to Subsection (c), the State should be enjoined from

 1   enforcing Subsection (c)'s marketing restriction against NSSF

 2   and its members.  And just before I move on -- I mean, I think

 3   it's important to -- to, like, really sort of grapple with what

 4   the State is saying a facial challenge means.

 5        And so as I read the State's briefing, they say because

 6   this statute could be violated by running an ad that says,

 7   "Hey, violet felons, buy our guns" or "Hey, kids, buy our

 8   guns" -- that a facial challenge necessarily fails.  And I

 9   think that's not just wrong; it's dangerously wrong.

10        I mean, if you just sort of take one example -- I mean, if

11   that were right, then, putting aside vagueness problems, the

12   State could pass a law that says all marketing is illegal, and

13   that would survive a facial challenge because lots of marketing

14   can actually be prohibited.

15        Or to go at it like a -- you know, a less sort of

16   outlandish view, if that were right, then *Junior Sports*

17   *Magazines* would have come out the other way because, of course,

18   there -- and that was a facial challenge.  And, of course,

19   there, that statute covered things like directly encouraging

20   minors to unlawfully buy guns.

21        The Court explicitly said that the law covered that, and

22   yet that didn't render the facial challenge -- that did not

23   defeat the facial challenge because what it means for a law to

24   be unconstitutional in all of its applications is -- you know,

25   in the First Amendment context, is that the tailoring is --

1    fails on its face.

2         And as we pointed out in a footnote in our supplemental

3    brief, what the State basically misses is that the lack of

4    tailoring is categorical.  In the words of the Supreme Court in

5    the *Americans for Prosperity* case, the lack of tailoring is --

6    is present in every case.

7         And so if a law, on its face, fails *Central Hudson*, or if

8    it's strict scrutiny, then it is unconstitutional in all of its

9    applications, even though a narrower statute could

10   constitutionally reach some of the same conduct.

11        And so, you know -- but -- but, again, like, our

12   First Amendment challenge to Subsection (c) should -- should

13   hopefully be academic because, you know, we definitely think

14   that the Court should hold that Subsection (c) is facially

15   unconstitutional under the Second Amendment and enjoin the

16   State from enforcing it against NSSF or its members at all.

17        And so turning to Subsection (b), the -- you know, (b)(1)

18   and (b)(2), the reasonable controls and reasonable precautions

19   provisions -- so as I did with Subsection (c), I'd like to

20   start with our claim that would lead to the broadest relief,

21   which, here, is our vagueness challenge.

22        And so the analysis here works the same way as the Second

23   and First Amendment analyses that I just talked about.  So you

24   take the applicable constitutional rule of decision, you apply

25   it to the challenged provisions, and if the challenged

1    provisions violate that rule, then they're facially void for

2    vagueness.

3         So the first question, of course, is what's the relevant

4    constitutional decision rule, and the answer to that's easy.

5    It's the most stringent vagueness test known to our law.  As

6    we, you know, talked about last time and in our briefing, this

7    is not just an ordinary economic regulation.  It's a law that,

8    at the very least, implicates fundamental rights.

9         And for those types of laws, the test is:  Is it clear

10   what the law proscribes in the vast majority of its intended

11   applications?  That is the constitutional decision rule.

12        And so what that means -- sort of -- in other words, it's

13   that, like, a law that implicates constitutional rights, like

14   this one, is void for vagueness unless the regulated parties

15   know what it means in most of the situations to which it

16   applies.

17        But, here, the answer to that question is clearly "No."

18   You know, firearm industry members certainly know, like, about

19   the lowest common denominator cases.  You know, they certainly

20   know that not having any security is unreasonable, but that

21   does not render a facial challenge defeated.

22        And beyond that, there's essentially nothing in the law to

23   know what is good enough and what's not good enough, again,

24   because of Paragraph 3, which makes clear that compliance with

25   all applicable laws is not enough.  And on this point, I think

the Supreme Court's opinion in *Johnson v. United States* is
particularly helpful.

So that was the case about the residual clause to the
Armed Career Criminal Act, and the -- Justice Scalia, as the
majority, and the dissent had a long back-and-forth about what
it means for a statute to be facially void for vagueness.  And
Justice Scalia did not dispute that there were some cases that
obviously satisfied the residual clause, but he noted that that
doesn't defeat a facial challenge.

And he cited to a case from the Supreme Court called
*L. Cohen Grocery Co.*, which struck down, as facially void for
vagueness, a law that prohibited grocers from charging an
unjust or unreasonable rate.  And what the Court said in
*Johnson* about that case was it was obvious that, quote,
"charging someone a thousand dollars for a pound of sugar would
surely be unjust and unreasonable."

But that didn't defeat the facial challenge because the
substantive standard that governs is:  Do you know what it
means in the vast majority of its intended applications?  And
so even though you might know what it means in some
applications, that did not defeat a facial challenge.

The same thing in a case like *Coates against Cincinnati*,
which was law that prohibited people from conducting themselves
in a manner annoying to persons passing by while on the
sidewalk.  And as the Court explained in *Johnson*, they said,

1    "Yeah, everybody knows that spitting in someone's face is

2    annoying."  But that didn't defeat the facial challenge in

3    *Coates v. Cincinnati*.

4         And so the same is true here.  The -- you know, the

5    existence of some clearly unreasonable rates did not save the

6    law in *L. Cohen Grocery*.  By the same token, the existence of

7    some clearly unreasonable practices does not save

8    Subsection (b).

9         So that's vagueness with respect to the reasonable

10   controls and reasonable precautions provisions, and just

11   quickly on our other claims on these provisions -- so the

12   analysis on our First Amendment challenge works in exactly the

13   same way as it did when we talked about it above.

14        So, you know, like with our challenge to Subsection (c),

15   if the First Amendment were all that we won on here, the relief

16   to which we would be entitled would be an injunction that

17   prohibits the Attorney General from enforcing

18   Subsections (b)(1) and (b)(2) against NSSF and its members as

19   to their marketing.

20        The Second Amendment analysis here is a little bit more

21   complicated, but the basic controversies are still fairly

22   straightforward.  So, you know, assuming that you're with us on

23   the threshold textual question, the basic question is:  Has the

24   State come forward with evidence, with historic evidence,

25   showing that the type of liability that these provisions

1  authorize is consistent with our historical tradition of

2  firearm regulation?

3      And on that question, the answer is just clearly "No."

4  The State has not come forward with any historical support for

5  the idea that a licensed manufacturer of firearms can be held

6  to violate state law, even if it complies with all applicable,

7  concrete obligations that state and federal law imposes.

8      So for that reason, just, again, looking at the

9  Second Amendment, our position is that NSSF should be entitled

10 to an injunction preventing the State from bringing a civil

11 action, under AB 1594, against NSSF members under those

12 provisions at all.  That just leaves our extraterritoriality

13 and preemption challenges.  And on the former, I can be pretty

14 quick hopefully.

15     So all we're asking for here is basically what the

16 Ninth Circuit did in the en banc *Sam Francis* case, which is

17 holding that this California law cannot be applied

18 extraterritorially so as to directly regulate out-of-state,

19 here, manufacturing, marketing, and selling.

20     And, you know, if the Court wants an example of sort of

21 what that sort of injunction looks like, I would point the

22 Court to 2022 Westlaw 463313 at Page 8.  That's *Association for*

23 *Accessible Medicines v. Bonta*, another challenge to a

24 California law with which both I and the Attorney General's

25 Office are familiar.

1     And that was a challenge to a California law that

2 regulated patent settlement agreements, and the plaintiff

3 brought a number of challenges to the law but won only on its

4 extraterritoriality claim.

5     And the injunction that Judge Nunley, in the

6 Eastern District, entered barred the Attorney General from

7 implementing or enforcing the challenged statute against the

8 plaintiff as applied to their out-state conduct.

9     He actually worded it in the negative.  So he said that

10 the Attorney General was prohibited from enforcing it with the

11 exception of conduct within California's borders, but, you

12 know, six of one, half dozen of the other.

13     So that's essentially, you know, the same relief that we

14 are seeking on that claim.  Again, if you rule for us on our

15 vagueness claim or our Second Amendment claim, then there's no

16 need to reach that.

17     And so, you know, that leaves our preemption claim, which

18 is obviously different than the types of claims that we've been

19 talking about up to now.  And, you know, as we pointed out in

20 our papers, well, we're certainly bringing a pre-enforcement

21 challenge.  Our preemption claim is not a facial challenge.

22 It's a pre-enforcement as-applied challenge that seeks an

23 injunction barring the Attorney General from enforcing AB 1594

24 in a preemptive manner.

25     And, you know, the State complains that there's something

1    odd about saying, "No, we want an injunction that only goes so

2    far as the preemption," but -- I mean, the scope of injunctive

3    relief is always, as I said before, dictated by the extent of

4    the violation established.

5        And the fact that we are only asking for an injunction on

6    this claim, to the extent of the violation established, should

7    be something that's celebrated, not condemned.  And so just in

8    terms of how would this work in practice -- so the simplest way

9    to say it would be that the State would be enjoined from

10   bringing qualified civil liability actions, as defined in the

11   PLCAA, pursuant to AB 1594.

12       And so, in more concrete terms, that would mean an

13   injunction that prohibited the State from bringing a civil

14   action against NSSF or an NSSF member pursuant to

15   Section 3273.52(c)(1), which is the provision of AB 1594 that

16   authorizes the Attorney General to sue.

17       So the AG would be prohibited from bringing that sort of

18   suit, to the extent that it sought damages or other relief

19   resulting from the unlawful misuse of a firearm, unless the

20   suit alleged:

21       1.  That the defendant violated some other law such that

22   AB 1594 was not itself the predicate statute.

23       2.  The defendant knowingly violated that other law; and

24       3.  The harms for which redress is sought satisfy

25   traditional proximate cause consistent with the text of the

1    predicate exception.

2        And I just want to be clear.  Like, that's sort of a lot

3    of words.  And so I just want to be clear on exactly why that's

4    the scope of relief that we're asking for.  So, again, the

5    scope of relief to which a plaintiff is entitled is dictated by

6    the extent of the violation.

7        And the PLCAA, which is the only federal law that we're

8    saying preempts the state law here -- it only preempts

9    qualified civil liability actions, and it defines "qualified

10   civil liability actions" in -- in Section 7903(5) of the PLCAA

11   as civil actions that seek damages or other relief resulting

12   from the criminal or unlawful misuse of a qualified product by

13   the plaintiff or a third party.

14       So if you look at AB 1594, and you go down to

15   Section 3273.52(d), it authorizes the Attorney General to sue

16   for damages but also injunctive relief sufficient to prevent

17   firearm industry members from any other -- from further

18   violating the law.

19       And if that's all an action sought under this statute,

20   putting aside our constitutional claims -- but if that's all an

21   action sought, it wouldn't be preempted because, by definition,

22   an action that seeks only injunctive relief does not seek

23   damages or other relief resulting from the unlawful misuse of a

24   firearm, which means that that sort of action would not be a

25   qualified civil liability action under the PLCAA, by

1    definition.

2        So, you know, just one final point on this.  So the State

3    has made the argument that the Court doesn't need to get into

4    any of this because, basically, their view seems to be that

5    there's no such thing as an as-applied preemption challenge.

6    And they cite one case for this, which is *Sprint v. San Diego*.

7    But that case not only clearly doesn't say that, it actually

8    sort of says exactly the opposite.

9        So that was a case that involved a challenge to a

10   San Diego ordinance that regulated, like, wireless telecom

11   facilities.  And Sprint said that it was preempted by

12   47, U.S.C., Section 253, which says that state and local

13   governments can't, quote, "prohibit or have the effect of

14   prohibiting," unquote, telecom services to operate.

15       And so Sprint's argument had to be, in order for it to be

16   preempted, that the statute either prohibited it from operating

17   or had the effect of prohibiting it.  But Sprint's argument

18   wasn't that anything in the face of the ordinance did that or

19   had that effect.  Their argument was it gave the County

20   Commission discretion that the County Commission could exercise

21   in a way that would have the effect under certain

22   circumstances.

23       And what the Court said there is, like, "Yeah, maybe

24   you've got an as-applied claim, but if even you don't see

25   anything wrong on the face of the statute, then you can't bring

a facial claim."  This is the exact opposite.  On the face of this statute, AB 1594 clearly authorizes liability that is in the teeth of the PLCAA and that would clearly qualify as a qualified civil liability action.

And so, you know, that's essentially all that we're asking for here, is an injunction that would bar the Attorney General from bringing qualified civil liability actions in violation of the PLCAA.

And, you know, the State has one last argument, which is that that sort of an injunction is just improper under Rule 65 because they say it's nothing more than an "obey the law" injunction.  But, you know, putting aside that the Ninth Circuit has never specifically rejected "obey the law" injunctions -- I mean, every preliminary injunction is an "obey the law" injunction in that sense.

So what you do, in a preliminary injunction, is you take the relevant rule of decision, you apply it to the thing that's being challenged, and if the thing that's being challenged violates the relevant rule of decision, then the injunction tells the defendant, "Don't do that thing because it would be unlawful."

And the fact that, here, it's sort of complicated to figure out what would be unlawful because the statute that has the preemptive force has some exceptions, which reserves authority to the State, that doesn't mean that we can't get an

1    injunction.  It just means that the injunction has to be

2    tailored.

3        And, you know, we cited a case in our supplemental brief

4    that did exactly that, which is sort of -- you know, it had an

5    injunction that said, "You can't enforce this law in a

6    preemptive way," and it had an opinion attached to the

7    injunction that explained what that would mean for compliance

8    with Rule 65 purposes.

9        So I've been talking for a long time about, you know,

10   Questions 1 and 3, and so I'm happy to answer any of

11   Your Honor's questions or to move on to the cause of action

12   issue, however Your Honor would like to proceed.

13           **THE COURT:**  Okay.  Let's move on to the cause of

14   action issue, and then I do want to give the Attorney General's

15   Office a chance to respond.

16           **MR. ROWEN:**  Sure.

17       So as we argued in our briefs and in our supplemental

18   brief, Section 1983 does not just create a cause of action to

19   enforce federal rights.  It also creates a cause of action to

20   enforce federal immunities, and the Supreme Court has been very

21   clear about that.

22       And "federal immunities" means that this is an exceedingly

23   easy case because *Ileto*, as I mentioned last time, squarely

24   held that the PLCAA does not impose a procedural limitation.

25   Rather, it creates a substantive rule of law granting immunity

1    to certain parties against certain types of claims.  That's at

2    Page 1142 of *Ileto*, and that's crucial because that wasn't just

3    dicta.  That was necessary to *Ileto II*'s holding rejecting the

4    procedural due process challenge.

5        So the relevant procedural due process standard there --

6    it was essentially if something was only a procedural

7    limitation on one's ability to assert one's rights, then the

8    fact that the PLCAA comes in and says you can't even bring the

9    suit at all arguably would have been a procedural due process

10   problem.  But because the PLCAA created a new substantive

11   right -- a substantive immunity -- excuse me -- that meant that

12   it survived the procedural due process challenge.

13       So just to be clear about this, as a matter of binding

14   Ninth Circuit law, the PLCAA creates a substantive federal

15   immunity from certain types of claims.  And, again,

16   Section 1983 creates a cause of action that applies not only

17   to -- that allows parties not only to enforce federal rights

18   but also to enforce federal immunities.

19       So this has been our argument all along.  If you look at

20   the briefs we filed before, Your Honor -- you know, before the

21   first oral argument, this has been our argument.  The word

22   "immunity" doesn't appear in the Attorney General's

23   supplemental brief.  Neither does the word "*Ileto*."  And I

24   think that's pretty telling because the Attorney General just

25   can't have an answer for binding Ninth Circuit precedent and

 1    the text of Section 1983.

 2        And, you know, the -- the Attorney General -- even putting

 3    all of that aside, which, again, I think, just sort of is the

 4    whole ball game and ends basically any dispute about the cause

 5    of action issue -- even if you put all of that aside and you

 6    take the State's arguments on its own terms -- so the State's

 7    argument is essentially, "Well, the PLCAA says you only preempt

 8    actions.  So it can't be used offensively."

 9        But that sort of misunderstands what immunities are.

10    Immunities, unlike rights --

11            THE COURT:  Mr. Rowen -- Mr. Rowen, you froze --

12            MR. ROWEN:  Did -- did I --

13            THE COURT:  You froze for about four seconds there.

14    So --

15            MR. ROWEN:  Oh.  Okay.

16            THE COURT:  -- "Immunities, unlike rights" was the

17    last thing I heard.

18            MR. ROWEN:  Got it.

19        So yes.  So they're, by their nature, defensive.  And so

20    the fact that Congress specifically included federal immunities

21    in Section 1983, despite the fact that immunities are, by their

22    nature, defensive, strongly suggests that Congress intended

23    that, when you have a substantive federal immunity, as *Ileto*

24    held my clients' members do, as to certain types of claims,

25    then you can sue to force it -- to enforce it offensively

1  because, after all, there's no such thing as a defensive

2  Section 1983 claim.

3      So, you know, that's independently dispositive.  But just

4  sort of for belt-and-suspenders, you know, *Ex Parte Young* is

5  also available here.  You know, the general rule is the only

6  way that Congress can displace the availability of the *Young*

7  action is by creating a detailed remedial scheme or by setting

8  up a remedy that's just judicially inadministrable.

9      And as we've explained in our briefing, there's no

10 remedial scheme here at all.  There's just a prohibition, and

11 it's the most judicially administrable, you know, prohibition I

12 can think of because it's clearly directed at how lawsuits can

13 and can't be brought.

14      **THE COURT:**  All right.  Thank you, Mr. Rowen.

15      Let's give Mr. Woods or Mr. Wise an opportunity to respond

16 now.

17      **MR. WOODS:**  Thank you, Your Honor.

18      I'll start -- I'll go in the order that the briefing was,

19 if that's easier for Your Honor.  And if you have any

20 questions, feel free to jump in.  I will, of course, respond to

21 Mr. Rowen's points either along the way or at the end.

22      And I think -- first of all, I want to thank the Court for

23 the opportunity to submit supplemental briefs.  I think that it

24 was a helpful exercise for everybody involved, and I think

25 that, from our perspective, NSSF's supplemental brief

demonstrates how -- how thin on authority their position is.

NSSF cited to no authority in their brief for the proposition that *Salerno* does not apply to their preemption/due process/dormant commerce clause claims here.  In oral argument, Counsel conceded that *Salerno* does, in fact, apply in the Second Amendment context.  And I think that's interesting because it's somewhat contrary to some of the positions that -- that they've been taking previously, but I'll set that aside for now.

At most, they're -- they point -- NSSF points to an alternate test for their First Amendment claim, but as I'll talk about in a moment, that test is more than satisfied by AB 1594.

Plaintiff's argument as to the Second Amendment necessarily requires this Court to ignore persuasive authority applying *Salerno* in Second Amendment contests -- contexts to facial challenges seeking to invalidate all or most of a statute such as this facial challenge, including the *Glendale* case, including the case in this district, that all said that even though there may be potentially unconstitutional applications for a Second Amendment claim -- that the fact that this was a facial challenge doomed their cause of action, and a preliminary injunction could not be granted in those cases.

In the *City of Glendale* case -- and I'll get to this in a moment -- it was not just a mismatch between the claim and

 1   the -- the relief sought.  It was -- "We're saying that

 2   this" -- "this claim" -- "or this law, which invalidates the

 3   ability of people to carry" -- "conceal-carry in all contexts

 4   and in all" -- "in all sensitive spaces" -- "this law is

 5   facially unconstitutional," in the same way that plaintiffs

 6   here are saying that AB 1594 is facially unconstitutional.

 7          And in that case, they conceded that there were

 8   potentially some sensitive spaces which rendered their facial

 9   challenge inappropriate under *Salerno*.  The same thing has

10   happened here.

11          Counsel had -- or NSSF has conceded that there are

12   constitutional applications of AB 1594 or a statute identical

13   in the exact respect that -- excuse me -- the New Jersey

14   statute, which counsel for NSSF conceded could be applied

15   constitutionally, operates identically here.

16          There, the argument was, well, it was constitutional for

17   the New Jersey statute to be applied to people who facilitated

18   straw purchases or people who failed to do adequate record- --

19   recordkeeping.  Counsel for NSSF conceded that, that it would

20   be constitutional and fine to apply that statute to -- to those

21   types of claims.  Our statute operates identically for those

22   purposes.

23          So there's no dispute, in our mind, that our statute --

24   and the plaintiffs have to admit that our statute can be

25   applied constitutionally in at least certain circumstances.

 1    And I'll get to the Subsection (c) argument that Counsel made

 2    in -- in just a moment.

 3        Regardless, you know, in previous briefing, in the

 4    supplemental briefing, NSSF has taken the position that any

 5    time a statute is potentially less protective of rights than

 6    the constitutional standard -- that you have to go through a

 7    full *Bruen* history and text analysis.  And that position is not

 8    expressed in either *Bruen* or *Teter*, which they rely on heavily.

 9        That test also cannot be square with both *Heller*'s and

10    *Bruen*'s holdings regarding the presumptively constitutional

11    nature of restrictions on the sale and manufacture of weapons.

12    That text is -- or that -- the test that NSSF would like this

13    Court to adopt is well outside the mainstream of not just *Bruen*

14    and *Teter* but well outside the mainstream of all courts who

15    have been applying the *Bruen* test since its inception last

16    year.

17        So Counsel talked about the -- Subsection (c), and he

18    focused on the abnormally dangerous provision of

19    Subsection (c).  And I want to point out that Subsection (c)

20    does more than just ban abnormally dangerous weapons.  As we

21    talked about in the last -- in the last hearing, it creates a

22    rebuttable presumption.  If there is injury, if there is a case

23    brought pursuant to that subsection, it creates a rebuttable

24    presumption.

25        So it's -- we dispute that it operates as a ban.  We've

1    talked about that.  But as I said before, and as Counsel
2    mentioned, if you want to talk about certain abnormally
3    dangerous weapons that are fully automatic, those -- or that
4    are fully automatic or machine guns or, you know, ghost guns,
5    guns that are deemed to be abnormally dangerous pursuant to
6    law, as we -- so there are constitutional way -- or excuse me.
7        Those types of -- because those types of weapons fall
8    under that subsection, AB 1594 can be constitutionally applied
9    if an action is brought pursuant to this law.
10       The difference between AB 1594 and the
11   *Lopez-Valencia* [sic] case that Counsel cited earlier, the *Bruen*
12   case, the *Heller* case, is that those are cases where the
13   statute itself operated uniformly in all circumstances and
14   could not be applied constitutionally in all circumstances.
15   That's not the case here.  There are constitutional
16   applications of AB 1594.
17       Turning to NSSF's First Amendment claim, Counsel relied
18   primarily on the *Junior Sports* opinion.  And as we've pointed
19   our in our sup- -- supplemental brief, that case is
20   dramatically distinguishable.
21       First of all, on standing, in *Junior Sports*, there was a
22   concrete plan to place particular -- particularized
23   advertisements in a particular magazine that would undoubtedly
24   violate that statute, and standing was not contested.  Here, we
25   do contest standing, and we talked a lot about standing last

1    time.  I won't rehash all of that.

2        But as the Court made clear in *Junior Sports*, that case

3    turned on the fact that there isn't a prohibition on California

4    law for minors to use guns or for adults to buy guns for their

5    children's use under certain circumstances.  And so it was for

6    that reason that the Ninth Circuit said that it didn't meet the

7    *Central Hudson* test because there was a disconnect between the

8    ends and the means.

9        But, here, even if the Court reaches the merits of that

10   particular provision, other than the youth marketing provision,

11   there is no such disconnect between the ends and the means

12   because AB 1594 prohibits marketing of other products that are

13   plainly unlawful in other respects.

14       We talked about this previously.  It -- it does prohibit

15   marketing for ghost guns.  It prohibits marketing for people

16   who might want to skirt around or -- or encourage straw

17   purchasers, all sorts of applications.

18       And so, in a vacuum, without the benefit of -- of -- of

19   any specific allegation from NSSF to say, "We intend to market

20   this particular way," and without the benefit of the

21   Attorney General in -- or courts in California enforcing

22   AB 1594, in -- there is no disconnect between the means and the

23   ends under the *Central Hudson* test between AB 1594's non-youth

24   marketing provisions.

25           **THE COURT:**  Can you confirm the scope of your avowal

1  not to enforce the marketing provisions in light of

2  *Junior Sports Magazines*, like --

3        **MR. WOODS:**  So --

4        **THE COURT:**  -- with a little more specificity?

5        **MR. WOODS:**  Sure.

6     So as of now, *Junior Sports Magazines* is controlling, is

7  valid law.  I -- I can't make any representations as to -- to

8  what the Attorney General or any other party would be doing

9  next, but we intend to abide by the ruling of the Ninth Circuit

10 until -- unless and until there are future rulings that would

11 abrogate it.

12       **THE COURT:**  Uh-huh.

13       **MR. WOODS:**  Is that what Your Honor is asking for?

14       **THE COURT:**  Yeah.  I -- I wanted to make sure I was

15 clear on that.

16     To go back to your point about *Salerno* -- *Salerno*, if

17 *Salerno* applies in the manner that you say it does, how do you

18 think *Bruen* survives that analysis, or is it your position that

19 the Supreme Court simply never considered it, and so it's not

20 an issue?

21       **MR. WOODS:**  No, Your Honor.  Well, it wasn't an issue

22 because it wasn't raised as in *Bruen* --

23       **THE COURT:**  Right.

24       **MR. WOODS:**  -- but *Bruen* satisfies -- right.  *Bruen*

25 satisfies *Salerno* because that was -- the "may-issue"

1  formulation applied in all circumstances.  The "may-issue"

2  formulation, in order to get a concealed-carry permit in

3  New York, applied in all circumstances uniformly, which is why

4  I think, understandably, it wasn't an issue.

5      There -- yes, it was a facial challenge, but there was no

6  difference between a facial challenge and a future as-applied

7  challenge, in the same way that -- that *Heller* came out the

8  same way.  There's no disconnect between *Bruen*, *Heller*, and

9  *Salerno* because those are different laws that applied uniformly

10  in all circumstances.

11      That's not what we have here.  We have laws that -- we --

12  or we have a law that:

13      A.  Does a lot of different things, but

14      B.  Even those individual applications can be applied

15  constitutionally in certain circumstances.

16          **THE COURT:**  Okay.  I mean, I suspect that Mr. Rowen

17  would argue that there are ways that, in *Bruen* -- that it could

18  have been applied constitutionally as well.

19      What's your response to that?

20          **MR. WOODS:**  So -- so I -- I don't know that Mr. Rowen

21  would argue that, but it's possible -- but the "may-issue"

22  formulation -- the Supreme Court was very clear that the

23  "may-issue" formulation is unconstitutional in all respects,

24  even though some people might have been denied a

25  concealed-carry permit under a different formulation, under a

1   "shall-issue" formulation, in fact.

2        That is -- that is, in fact, the holding of -- of *Bruen* --

3        **THE COURT:**  Uh-huh.

4        **MR. WOODS:**  -- that, in a "shall-issue" formulation,

5   there are times -- there are certain people who still don't get

6   a concealed-carry permit.

7        It was the fact that the core right -- the -- the right --

8   the core right of self-defense, to keep and bear and arm for

9   personal self-defense, was essentially given to another third

10  party, and that third party was allowed to make an

11  individualized determination that ran afoul of the

12  Second Amendment.

13       It -- the -- so I don't think that the fact that some

14  people might have been denied -- might have been

15  constitutionally denied a concealed-carry permit under the

16  *Bruen* -- or under the "may-issue" law that *Bruen* struck down,

17  in any way, runs contrary to *Salerno* or the fact -- or the

18  application of AB 1594, which doesn't destroy the right of

19  anyone to own any particular lawful gun, you know, or certainly

20  doesn't destroy the right of any individual to use -- keep and

21  bear arms for the purpose of self-defense.

22            **THE COURT:**  Okay.  Please proceed, Mr. Woods.

23       **MR. WOODS:**  Sure.

24       **THE COURT:**  Yeah.

25       **MR. WOODS:**  So turning to the -- to the -- Point 2,

1    sort of the -- whether or not there is an affirmative cause of

2    action to be brought pursuant to Prop -- PLCAA, Counsel

3    mentioned that our supplemental brief didn't mention *Ileto*.

4    Our, you know, opposition certainly discussed *Ileto* at length.

5        But I do want to point out that NSS's -- NSSF's argument,

6    as to their ability to bring an affirmative claim under PLCAA,

7    necessarily ignores PLCAA's plain text disclaiming any private

8    right of action.  NSSF didn't mention this in any of their

9    briefs.  They didn't mention it in their motion, in their

10   reply, or their supplemental brief.

11       There's a provision, of which we pointed out in all of our

12   briefing, in PLCAA that states clearly that, quote, "No

13   provision of this chapter" -- and I want to highlight the word

14   "chapter," not "section" but "chapter," meaning the entirety of

15   PLCAA -- "shall be construed to create a public or private

16   cause of action or remedy."  And that provision is found at

17   15, U.S.C. Section 7903(5)(c).

18       Now, plaintiffs ignore this provision of PLCAA entirely,

19   and that's understandable because it is absolutely fatal to

20   their argument that Congress somehow intended to create a

21   private right of action under Section 1983 or *Ex Parte Young*.

22       At any rate, as -- as stated previously, as stated in the

23   argument last month, no authority exists whatsoever that finds

24   a cause of action in PLCAA, and the only authority that

25   previously existed was overturned in the Third Circuit case.

1          The simple fact is that Congress, in enacting PLCAA, did

2     not evidence an intent to create a federal right in clear and

3     unambiguous terms, which is required by the blessing in the

4     *Gonzaga University* Supreme Court cases in order to access

5     Section 1983.  And Congress has not evidenced an intent --

6     an -- an intent to allow an exception to sovereign immunity

7     under *Ex Parte Young*, and no valid case has held otherwise.

8          Counsel mentioned that, under Supreme -- under

9     Ninth Circuit authority, *Ileto* creates an immunity.  But just

10    because it creates an immunity does not, ipso facto, create a

11    clear and unambiguous cause of action under Section 1983

12    pursuant to controlling Supreme Court authority that we cited

13    in our brief.

14         So, again, NSSF is asking this Court to depart from the

15    judicial mainstream and to -- to create a cause of action that

16    has never been recognized, or, to the extent it has been

17    recognized, it is no longer validly recognized by any court in

18    this country to say, well, this is affirmatively preempted at

19    this case -- or at this stage of the game.

20         So turning to Point 3, I -- Counsel talked a lot about the

21    different types of injunctions that they're -- that they're

22    seeking now, or that they're apparently seeking, but I -- I

23    want to take a step back for a moment.  And let's not also

24    forget the wildly shifting positions that plaintiffs have taken

25    here.

1    In plaintiff's notice of motion, which the Court can find

2    at Docket 13, plaintiff asked for an injunction for the entire

3    statute without any limitation on its face, entire statute.

4    Now, at the last hearing, Counsel said that was because of page

5    limits.

6    But I don't entirely understand that argument because, in

7    a notice of motion, there's no page limits, or -- or a movant

8    can be as detailed as they want in that notice to lay out

9    exactly what they are seeking precisely from this Court.

10    Regardless, we file our opposition.  And in the meantime,

11    as we talked about earlier, counsel for plaintiff is forced to

12    make some rather dramatic concessions to the Third Circuit.

13    And we point out that the -- the *Salerno* issues that -- given

14    that admission, that there are some -- numerous constitutional

15    applications of the statute.

16    And so in order to get around that concession and the

17    requirements of *Salerno*, in the reply and in the previous

18    argument, they back off and say, "Well, okay.  *Salerno* doesn't

19    always apply in every particular circumstance, or it

20    doesn't" -- "it doesn't preclude injunctive relief here because

21    we're only seeking to enjoin certain aspects, and we can deal

22    with it in the remedies.  We can deal with it by tailoring the

23    injunction, by tailoring" -- "tailoring the remedies."

24    But then on the last page of their supplemental brief, if

25    you look at it, under the Second Amendment portion, they once

 1   again assert that they want a narrow injunction.  "But, also,

 2   if the Court finds that the rest of AB 1594 violates the

 3   Second Amendment, we would like an injunction against" --

 4   "against all of it."

 5       And I point that out because the shifting positions, I

 6   think, speak to the weaknesses of their claims here.  If

 7   AB 1594 were so obviously facially unconstitutional in all

 8   respects, which is what they ask for, they wouldn't need to

 9   back off their original argument, but -- but they did.

10       And I think that it also speaks -- as we talked about last

11   time, it also speaks to the lack of a concrete plan and the

12   failure of plaintiff to meet their initial burden to attain

13   this extraordinarily -- extraordinarily -- extraordinary relief

14   that they are seeking here.  Regardless, no amount of tailoring

15   of any provision can overcome the fact that NSSF has failed to

16   carry that burden.

17       Now, I want to hit on a couple of other points.  Counsel

18   mentioned the -- the void for vagueness and the standard being,

19   "Do you know what it means in the vast majority of

20   applications?"  A simple look at the statute will elucidate

21   what "reasonable controls" means.  It's defined, once again, in

22   the Third Circuit.  Counsel for plaintiff said, "Well, hey, if

23   they just define" -- "if they just list ten things as to what

24   reasonable controls are, that's no problem."

25       AB 1594 does that.  This is exactly the type of consumer

 1    protection statute that has been routinely upheld, and we have

 2    cited to authority showing that these types of consumer

 3    protection statutes have been upheld on due process standards

 4    previously.  Counsel has not cited to any authority to the

 5    contrary.

 6         So I -- I do also want to hit on -- turning back to the --

 7    to the Second Amendment question as to the liability provisions

 8    of AB 1594, Counsel -- do you -- Counsel remembered -- Counsel

 9    argued that, you know, those provisions run afoul of the

10    Second Amendment because there's no history and tradition of

11    those types of liability provisions.

12         But the Ninth Circuit law is very clear that whether or

13    not something falls into the plain text is plaintiff's burden,

14    not the defendant's burden.  And plaintiff has produced no

15    evidence whatsoever that the plain text of -- of those li- --

16    and we're just talking about those liability provisions, that

17    the plain text is affected by those liability provisions.

18         And so we don't have to go down this road as -- because

19    plaintiffs have failed to carry their burden.

20              **THE COURT:**  Hmm.

21              **MR. WOODS:**  Let's see.

22              **THE COURT:**  Do you have additional historical support

23    that, if plaintiffs had carried their burden -- that you would

24    bring to bear?

25              **MR. WOODS:**  Well -- and that's one of those things

 1    that -- again, first of all, it's not our -- our -- as we've --

 2    as I said, it's not our burden --

 3            **THE COURT:**  Uh-huh.

 4            **MR. WOODS:**  -- at this stage.  If the Court finds that

 5    the plain text is implicated, then we would certainly want to

 6    produce whatever historical evidence that we could find --

 7            **THE COURT:**  Uh-huh.

 8            **MR. WOODS:**  -- to meet that -- that.

 9        And, you know, given the -- the sort of liability

10    structure of American history has changed since the inception

11    or at least in some ways -- you know, that we could go down the

12    whether or not we need a historical twin or -- or an analogue.

13    But that's -- but we're not there yet.  We're --

14            **THE COURT:**  Uh-huh.

15            **MR. WOODS:**  And that sort of speaks to the inchoate

16    nature of plaintiff's claim.

17        And I want to point the Court -- I read this case this

18    morning.  We -- both sides cited in their brief the

19    *Washington State Grange v. Washington Republican Party*.  And

20    there's, I think, some really important language in there that

21    was written by Justice Thomas with regard to cases just like

22    this, where it's a pre-enforcement challenge, where the State

23    has not had an opportunity to implement or tailor the statute

24    to particular circumstances.

25        And if the Court looks -- looked -- I would welcome the

 1    Court reviewing that.  Justice Thomas said that the reason --
 2    "Exercising judicial restraint in a facial challenge frees the
 3    Court not only from necessarily" -- "from unnecessary
 4    pronouncement on constitutional issues but also from premature
 5    interpretations of statutes in areas where their constitutional
 6    application might be cloudy.  Claims of facial invalidity often
 7    rest on speculation" and that "Facial challenges run contrary
 8    to the fundamental principle of judicial restraint."
 9         And so we would ask this Court to -- to review that case
10    and to engage in those fundamental principles in this facial
11    challenge, which, by the plaintiff's own papers, seeks to
12    invalidate an -- the entirety of a statute that does several
13    different things and can be applied constitutionally in several
14    different ways.
15         I think -- does Your Honor have any questions about the
16    extraterritorial aspect -- extraterritoriality aspect?
17              THE COURT:  Nothing further.
18              MR. WOODS:  Okay.
19              THE COURT:  Yeah.
20              MR. WOODS:  Okay.  I'm just checking my notes, making
21    sure there isn't anything else that I wanted to hit.
22         Does Your Honor have any additional questions for me at
23    this time?
24              THE COURT:  Not at this time, but I appreciate the
25    argument, Mr. Woods.

1    Let's give Mr. Rowen a chance to jump back in.

2        **MR. ROWEN:**  So -- thank you, Your Honor, and I'll try

3    to be brief.

4        I'm trying to --

5        **THE COURT:**  Okay.  And you will get another chance,

6    Mr. Woods, after I hear from -- hear from Mr. Rowen.

7        **MR. ROWEN:**  So I'm trying to be calm about this, but,

8    you know, the State's free to describe the statute all they

9    want, but what they can't do is misrepresent arguments that

10   we've made in this court and other courts.

11       So the State said that we conceded in the Third Circuit

12   that the Third -- that the New Jersey law could

13   constitutionally be applied in certain applications.  What we

14   said is that the statute was not preempted in all of its

15   applications, and that's important because, as we've pointed

16   out, our preemption argument is not a facial preemption

17   challenge.

18       So, you know, maybe Mr. Woods misspoke, but -- I mean, I

19   do -- you know, a lot of sort of bad faith was ascribed to us

20   in Mr. Woods's argument, and I think it really boils down to

21   the State either is unwilling or unable to understand what

22   facial challenges are and what our arguments are.  So we have

23   not changed our position once.

24       So the reason why the notice of motion asks for the whole

25   enchilada is, if we win on every claim, we get the whole

1    enchilada.  If you add them all together, then the whole

2    statute falls.  But as I did last time in argument and in

3    response to Your Honor's questions, which were about specific

4    claims -- and Your Honor specifically asked us, in Question 3,

5    to go claim-by-claim.

6        So the fact that Mr. Woods is -- is ascribing bad faith to

7    us for answering Your Honor's questions -- I mean, I think it's

8    pretty unbecoming of somebody representing the State.

9        But even putting that aside, I just want to be very clear

10   that our argument has always been that, assuming that this

11   Court is going to follow what *Lopez-Valenzuela* correctly said

12   is what *Salerno* means, yes, that's the -- the standard that

13   governs all of our claims except for our preemption challenge,

14   which is not a facial challenge.

15       Now, extraterritoriality is a little bit quirky.  And as

16   we explained under, you know, cases like *Doe*, where the

17   Chief Justice said, when you have this sort of hybrid facial

18   as-applied challenge, you just have to sort of show that it's

19   unconstitutional to the extent of the violation alleged.

20   That's exactly what the Court did in -- the en banc

21   Ninth Circuit did in *Sam Francis*.

22       Our position has been consistent all along.  I mean, I

23   think it boils down to the State doesn't understand what the

24   case law requires.  Again, what the State wants to say is if a

25   law said, "Here are ten things that are banned," and the State

1    is allowed to ban one of them, then a facial challenge fails.

2    Now, the way that that would actually play out is if they

3    were severable, the facial challenge would win, and the

4    injunction would only apply to the "not."  But that doesn't

5    mean that the facial challenge would fail, and that's -- and

6    the reason you'd get to severability there is that, on the face

7    of the statute, it would be clear where the constitutional

8    decision rule took the Court.

9    But here, you know, if we start with, for instance,

10   Subsection (c), the constitutional decision rule is crystal

11   clear.  An element that the State needs to prove, before it can

12   ban a class of arms, is the State has to come forward and show

13   that the arm is not commonly owned.  In every application of

14   Subsection (c), the State never has to prove that.

15   That's what it means for Subsection (c) to violate the

16   Second Amendment in all of its applications.  The fact that a

17   different statute could prohibit some of the same arms doesn't

18   mean that this statute is -- survives facial review in the same

19   way that -- I mean, gosh, if the State's theory were right,

20   then, really, *Lopez* was wrong, and *Morrison* was wrong, and

21   those cases should have just said, "No, of course there are,

22   you know, applications where, in" -- you know, in *Lopez*, "where

23   the gun moved in interstate commerce."  But that's not how

24   facial challenges work.

25   You know, always and forever, under Subsection (c), the

 1    State is relieved of its burden to prove that the arms it wants

 2    to ban are unusual.  That's as uniform as it was in *Bruen*.

 3    That's as uniform as it was in *Heller*.  There is no distinction

 4    between the constitutional defect with Subsection (c) under the

 5    Second Amendment and the constitutional defect in those cases.

 6        You know, Mr. Woods mentioned the *Junior Sports Magazine*

 7    case, and he said that the singular distinction was that, you

 8    know, California law allows minors to use firearms.  This Court

 9    can read that decision for itself.

10        There are, you know -- that was one of the grounds on

11    which they said that the statute there did not only prohibit

12    unlawful marketing, and then it went on to do the

13    *Central Hudson* analysis.  And that worked exactly the way that

14    we explained in our briefs.

15        You know, on the private right of action, you know, one,

16    Mr. Woods still wouldn't say the word "immunities" until the

17    very end.  And, again, like, I don't think Mr. Woods quite

18    understands what *Blessing v. Freestone* asks courts to do.

19        So the question, under *Blessing* and *Talevski*, is:  Does

20    the statute at issue clearly create a right, immunity, or

21    privilege?  That's the question, and that's the question

22    because new statutes don't create causes of action under

23    *Ex Parte Young*.

24        New statutes don't create the cause of action under the

25    PLCAA or under Section 1983.  Section 1983 and *Ex Parte Young*

already create the cause of action, and so the question that

cases like *Blessing* and *Talevski* ask is, "Okay.  We have a

federal statute.  Does that clearly create a right, privilege,

or immunity that can be enforced?"

And *Ileto* answered that question.  It said that it is a

substantive federal immunity for certain classes of parties in

certain types of claims, and that's exactly the type of

language that you would expect to see under the *Blessing*

analysis, where the first question is:  Does it -- you know, is

it clearly intended to benefit a certain type of party?

Yes.  It's very clear.  It's license, manufacturers, and

sellers of firearms and related products.  Does it create a

binding obligation?  Yes.  Don't bring qualified civil

liability actions.  And is it beyond the competence of the

Court?  No.  It's clearly directed at the Court.

So that's what *Blessing* and *Talevski* ask courts to do.

It's to figure out whether the statute at issue creates a

right, privilege, or immunity.  *Ileto* already answered that

question.  We are not arguing that the PLCAA creates a cause of

action.

So I just want to be very clear about that because

Mr. Woods said four times that our argument is that the PLCAA

creates a cause of action.  We are not arguing that the PLCAA

creates a cause of action.  What we are arguing is that, under

*Ileto*, the PLCAA creates an immunity that we can enforce under

1    Section 1983 and *Ex Parte Young*.

2    And I think that the provision that Mr. Woods cited is

3    actually incredibly unhelpful to their provision -- to their

4    position because what it says is that the PLCAA itself doesn't

5    create a cause of action or a remedy.  And the fact that it

6    says "doesn't create a cause of action or remedy," one, shows

7    that it doesn't displace the *Young* action because you need a

8    comprehensive remedial scheme to do that.

9    And, two, you know, if we were saying that the PLCAA was

10   what actually created this cause of action, sure, that would

11   mean that we lost, but that's not our argument.  And the fact

12   that Congress went out of its way to make clear that people

13   can't use this to sue manufacturers does not at all detract

14   from the fact that it created an immunity that can be enforced

15   under Section 1983.

16   So, you know, the -- the last thing that I think that I

17   want to say is, you know, on -- on *Washington State Grange*, in

18   particular -- you know, I think that's actually a great case to

19   sort of explain how facial challenges work.

20   So, you know, that was a challenge to Washington's blanket

21   primary system, and the way that worked was candidates for

22   office were to be identified on the ballot by their

23   self-identified party preference, but the law allowed voters to

24   vote for any candidate that they wanted.  And then the top two

25   vote-getters, regardless of party preference, would go to the

1    general.

2        And what the Court there said was that statute, on its

3    face, does not impose a severe burden on associational rights.

4    And it specifically distinguished the Washington case from

5    *California Democratic Party v. Jones*, where the Court struck

6    down California's blanket primary because what it said is that

7    the California law forced the parties to allow nonmembers to

8    participate in the parties' nomination process.

9        So the California law forced the Democrats to allow

10   non-Democrats to vote for the Democratic nominee, same for

11   Republicans.  And what the Court said there is that triggers

12   strict scrutiny because that's a severe burden on the parties'

13   associational rights.  So that was the constitutional rule of

14   decision.

15       And what the Court said in *Washington State Grange* was, on

16   its face, Washington Initiative 872 doesn't do that because,

17   unlike the California law, Initiative 872 in Washington does

18   not, by its terms, choose parties' nominees.  The top two

19   candidates proceed to the general, regardless of their party

20   preferences.

21       And so while it might be very annoying to one party, it

22   doesn't require them to identify with someone that they don't

23   want to identify with and therefore didn't trigger district

24   scrutiny.

25       And so what the Court went on to say, after doing that

1    rule of decision analysis -- it said, "Okay.  So then the only

2    way that this could be essentially unconstitutional is if we,"

3    in the words of the Court, "adopted factual assumptions about

4    voter confusion that can be evaluated only in the context of an

5    as-applied challenge."

6        And that's where the Court went on to say, "Look, there

7    are, you know, good reasons why we don't have those sorts of

8    facial challenges, why those are disfavored, why you want, you

9    know, to allow states to narrow things."

10        But it notably didn't have any of those things to say in

11    the California case because the California case, on its face,

12    was inconsistent with the relevant constitutional decision

13    rule.  And when a statute, on its face, is inconsistent with

14    the relevant constitutional decision rule, then the statute is

15    facially invalid, and it doesn't rest on speculation.

16        I think that's all that -- that I have.

17            **THE COURT:**  All right.  Thank you, Mr. Rowen.

18        Mr. Woods?

19            **MR. WOODS:**  Yes, Your Honor.  Thank you.

20        And very quickly, I want to be very clear.  I'm not

21    ascribing bad faith to Mr. Rowen at all or plaintiffs.  I am

22    simply reciting plaintiff's positions as I understand them.

23        Counsel talked about Subsection (c).  And, of course,

24    Subsection (c) has to be applied consistent with *Bruen*.  Laws

25    are presumed to be applied in a constitutional fashion, but

1    that doesn't mean that the law has to include plaintiff's

2    particular interpretation of the *Bruen* unusual formulation.

3    What -- it simply has -- what it means is that courts, when

4    applying Subsection (c), will apply it in a manner consistent

5    with the Constitution.

6        Counsel mentioned *Washington State's Grange* --

7    *Washington State Grange* about the sort of factual assumptions,

8    the wording made here.  But these are the exact factual

9    assumptions that plaintiff is -- plaintiff is necessarily

10   making in making their facial challenge to AB 1594 here.

11       So, you know, I -- I disagree -- you know, I don't know

12   what to make -- or I personally -- and perhaps it's -- it's my

13   fault.  I don't understand the argument that -- with regard to

14   we needed -- that if every single provision -- excuse me --

15   that "If we win on everything," that every single provision

16   fails.

17       I haven't heard any argument, for example, about

18   Subsection (d) either in the papers or in the briefing.  But

19   setting that aside, I -- you know, I do want to touch on -- you

20   know, Counsel mentioned *Lopez* and *Morrison*.  I think those

21   cases are not applicable in any way, shape, or form.

22       Those -- the reason those laws are unconstitutional had

23   nothing to do with the fact that they -- somebody was bringing

24   a facial challenge to the -- to those particular laws.  It had

25   to do with the fact that Congress inherently lacked the

```
 1    authority to pass those particular laws.  Their -- that was the
 2    jurisdictional hook.
 3        This isn't a case where -- where we're dealing with a
 4    commerce clause issue or we're dealing with an interstate
 5    commerce clause issue, and I understand that -- setting aside
 6    the plaintiff's extra- -- extraterritorial argument --
 7    territoriality argument, we're not -- we're not dealing with a
 8    case about Congress's inherent legislative powers.  We're
 9    dealing with whether the California legislature's use of their
10    legislative power is consistent with the Constitution.  And,
11    here, it is.
12        I do -- I mean, I also want to mention the immunity issue,
13    touch on it very briefly.  The immunity that is created by
14    PLCAA is created for actions, not for statutes.  That is the
15    plain language of the statute.  The statute doesn't say a
16    statute -- PLCAA doesn't say a statute may not run afoul of
17    these particular provisions.  It says actions may not be
18    brought.  And so the immunity that plaintiffs seek here is
19    intact, is absolutely intact.
20        If a law -- or excuse me.  If an action is brought
21    pursuant to -- or that runs afoul of PLCAA, they have the exact
22    immunities that they've indicated in *Ileto* and in the other
23    cases that they cited in their brief where a case was brought
24    and that, at some point during the regular litigation process,
25    be it at the pleading stage or the summary judgment stage, the
```

1    immunity was vindicated.

2        So there's no -- I -- obviously, I disagree with Counsel

3    with regard to the -- the provision that we cited, but I do

4    want to point out that it -- it says "cause of action or

5    remedy." And here, plaintiff is -- is seeking a remedy, and

6    the remedy is to deem a statute unconstitutional.

7        And so with that, I would -- I would submit.

8            THE COURT: All right. Thank you, Mr. Woods.

9        I'm going to take a brief recess to review my notes and

10   just make sure I don't have any further questions for the

11   parties, and then I'll be back to talk to you soon.

12       Thank you.

13           MR. WOODS: Thank you, Your Honor.

14                   (Recess taken at 3:20 p.m.)

15                (Proceedings resumed at 3:41 p.m.)

16           THE COURT: We are back on the record at 3:41 p.m.,

17   and I do have a few follow-up questions, and we'll keep our

18   arguing order the same. So this will first be addressed to

19   Mr. Rowen and plaintiffs.

20       Mr. Rowen, you mentioned, sort of in passing, that you

21   thought the First Amendment would also cover Subsection (b) --

22   Section 3273.51, Subsection (b).

23       So I'm -- I'm interested to know how Subsection (b)

24   implicates the First Amendment, in your view. Unlike

25   Subsection (c), it doesn't mention marketing. And, in fact,

1    I'd also be interested to know how you think Subsection (b)

2    implicates the Second Amendment, if at all.

3         So --

4              **MR. ROWEN:**  Sure.

5         So with respect -- with respect to the First Amendment --

6    I apologize for the squeaking in the background.  I left my

7    door open, and my dog has now entered.  Give me one sec,

8    Your Honor.  Let me --

9              **THE COURT:**  Okay.

10             **MR. ROWEN:**  Let me take him out.  One sec.  Sorry

11   about that.

12             **THE COURT:**  Either that or I'd have to let everybody

13   else bring their dogs in.

14             **MR. WOODS:**  I think Mr. Rowen should make his dog's

15   appearance, if he --

16             **THE COURT:**  That's right.

17             **MR. WOODS:**  -- if he can.

18                             (Laughter.)

19             **MR. ROWEN:**  Sorry about that.  I thought that was it,

20   but he came.

21        So yes.  Yes.  Griffey Rowen for -- for plaintiff.

22             **THE COURT:**  Yeah.

23                             (Laughter.)

24             **MR. ROWEN:**  But -- so -- sorry about that, Your Honor.

25   My -- my apologies.

1    So with respect to Subsection (b) -- so as Your Honor

2    mentioned, it doesn't specifically say that marketing falls

3    within the province of Subsection (b).  But Subsection 50(g),

4    that defines "reasonable controls," is any acts, procedures, or

5    practices.  And my clients' members have been sued under

6    similar provisions on the theory that their marketing was

7    unreasonable.

8        So our argument -- you know, the scope of injunctive

9    relief that we're seeking for that provision is essentially

10    exactly the same.  It's to the extent the Attorney General were

11    to enforce it as to marketing, that would violate the

12    First Amendment.

13        **THE COURT:**  Okay.  I follow.

14        The other follow-up question that came to mind is I

15    believe you said that, if you win, you believe that all -- if

16    you win all your claims, that then AB 59- -- 1594 would fall in

17    total.

18        **MR. ROWEN:**  Yes, sir.

19        **THE COURT:**  I don't recall any argument with regard to

20    3273.51, Subsection (d), as in "Delta," which seems like it

21    could stand alone, even if Sections (b) and (c) were enjoined.

22        So I guess I want to find out whether you challenge

23    Subsection (b) and, if so, how.

24        **MR. ROWEN:**  Yeah.

25        So we did challenge Subsection (d).  It's obviously been

 1    a -- it hasn't come to the fore thus far, but it is encompassed

 2    within our challenge, and I think that it is encompassed -- so

 3    I can sort of run through how this would work.

 4         So, basically, while we have a First Amendment challenge

 5    to it, just sort of on a preservation basis, I'm not going to

 6    spend much time talking about that because there are farce --

 7    false and misleading marketing statutes that have been upheld.

 8    So, you know, that's why we didn't sort of go down that route.

 9         The sort of same is true, basically, for the

10    Second Amendment.  You know, I -- it's actually difficult to

11    think of applications of those provisions that -- that would

12    implicate the Second Amendment, but preemption is sort of where

13    the rubber heat -- meets the road for our challenges to

14    Subsection (d).

15         And I suppose, in saying that, the -- you know, that does

16    sort of lead to the conclusion that perhaps what we asked for

17    in saying the whole enchilada fell -- is actually slightly

18    incorrect.  So I appreciate the opportunity to -- to correct

19    that.

20         So definitely, with respect to Subsections (b) and (c),

21    that's sort of how it would fall out, given our substantive

22    constitutional claims.  But with respect to Subsection (b), it

23    would just be sort of the exact same analysis.  The injunction

24    would be --

25             THE COURT:  Subsection (d), you mean?

 1          **MR. ROWEN:**  (d).  (d).  (d) as in "Dog" that intruded

 2     on the argument.

 3          **THE COURT:**  Yeah.  Yeah.  Right.

 4          **MR. ROWEN:**  The analysis would be exactly the same as

 5     it -- you know, the injunction that we'd be asking for would be

 6     an injunction prohibiting the Attorney General from bringing,

 7     you know, what counts as a qualified civil liability action

 8     under 3273.52(c) alleging a violation of one of the statutes

 9     set forth in 51(d) that didn't otherwise satisfy the predicate

10     exception.

11          **THE COURT:**  Okay.  The last follow-up question I had

12     for you, Mr. Rowen -- and I haven't decided which way the

13     Court's going to go on this, but I do want to make sure I've

14     addressed all of the potential options in the -- the -- the

15     Court has to consider here in this *Choose Your Own Adventure*.

16     That's the word I was looking for, for those of you who

17     remember that.

18          So the -- with regard to the scope, one of the questions

19     that the Court asked in supplemental briefing was to define the

20     scope.  I guess I'm concerned that defining an injunction by

21     the membership of NSSF would be ungovernable.

22          In other words, you know, let's say hypothetically the

23     Court were to impose an injunction that applied to NSSF's

24     membership.  Couldn't, the very next day, NSSF could define its

25     membership or letting everyone in the entire universe be

1  members of NSSF?

2      I mean, is it -- would that be appropriate?

3          MR. ROWEN:  So no.  And so the way that this generally

4  works in associational standing cases -- it's the members that

5  exist at the time the lawsuit was filed --

6          THE COURT:  Uh-huh.

7          MR. ROWEN:  -- because standing is measured at the

8  time the lawsuit is filed -- that the lawsuit is filed.

9          THE COURT:  Uh-huh.

10         MR. ROWEN:  And so, you know, the -- I would also note

11 that it would be pretty tough for NSSF to just extend this to

12 everybody.  They only have manufacturers and sellers who are

13 federally licensed.  Like, the sort of universe of those are --

14         THE COURT:  Well, the -- the complaint also says

15 "other industry members throughout the United States," and I

16 wasn't exactly sure what -- what that meant.  So I didn't know

17 if it -- it actually swept a little broad- -- broader than --

18 than what you're describing.

19         MR. ROWEN:  So as I understand the membership, it

20 includes only federally licensed manufacturers and sellers.

21 There are different categories of sellers, and -- because the

22 way that the FFL system works is you get sort of a different

23 license.

24     The reason that we had that language is we didn't run down

25 every member's current FFL registration status --

1        THE COURT:  Hmm.

2        MR. ROWEN:  -- and we didn't want to claim that

3   somebody who used to be licensed and is currently not licensed

4   but is still, like, a member, you know, paying their

5   membership.

6        THE COURT:  Uh-huh.

7        MR. ROWEN:  So we were just trying to be, like,

8   exceedingly technically accurate --

9        THE COURT:  Gotcha.

10        MR. ROWEN:  -- but I understand the -- Your Honor's

11   sort of question about that.

12        THE COURT:  Okay.  Well, let me give Mr. Woods a

13   chance to -- I do want to give you a chance, Mr. Woods, to add

14   anything with regard to the questions I just raised.

15        But a specific question I had for the defense here is:  In

16   light of your current understanding of plaintiff's challenges,

17   how do you see plaintiff having to show standing to challenge

18   AB 1594?

19        In other words, does plaintiff need to show standing under

20   Sections (b), (c), and (d) separately, or just one of them, to

21   have standing to seek relief on all three of these sections?

22        MR. WOODS:  So let me under- -- make sure I understand

23   Your Honor's question.

24        So are you asking whether standing runs through all of the

25   claims or whether standing is individualized?

1           THE COURT:  Yeah.

2      I'm -- so, yes, I'm asking whether standing is

3  individualized.

4           MR. WOODS:  Well, I think that the same analysis

5  applies to all of the -- the individual provisions that are

6  being challenged.  This is still a pre-enforcement challenge

7  seeking to enjoin a statute in a vacuum without any facts on

8  the ground.

9      I think that, to the extent that the Court disagrees with

10  our previously stated standing arguments as to any one

11  provision, then that standing would only be valid for that one

12  provision, if that makes sense.

13           THE COURT:  Uh-huh.

14           MR. WOODS:  There would only be standing for that

15  one -- to challenge that one provision rather than you get, as

16  Counsel mentioned earlier, the whole enchilada --

17           THE COURT:  Uh-huh.

18           MR. WOODS:  -- based on one provision.

19           THE COURT:  Sure.

20           MR. WOODS:  If I can be heard on some of the other

21  issues --

22           THE COURT:  Absolutely.  Absolutely.

23           MR. WOODS:  Yeah.

24      So Counsel mentioned -- or you asked about Subsection (d),

25  and, you know, it was something that we brought up in our -- in

our opposition.  We cited to that subsection.  At no point was

there any argument with -- raised with regard to that

subsection.

    And what that subsection does is very, very banal, which

is to -- or banal, which is to apply, you know, very well-worn,

you know, consumer protection statutes to firearm industry

members -- members from a statutory perspective.  That's it.

    And, you know, I -- I think -- I'm not entirely clear as

to the basis of -- as to what, you know, Counsel would argue as

to how they run afoul.

    But, again, this is sort of a hypothetical situation where

somebody brings a case alleging, you know, some violation of

one of those subsections, the California UCL, saying that -- I

don't know -- "I was injured by an abnormally dangerous weapon,

and so I'm going to sue the firearm manufacturer."

    In that case, in that particular as-applied case, you

would get a situation where a court could take a look at it and

say, "Okay.  Well, in this case, is" -- first of all, is PLCAA

satisfied?  Second of all, is there actual standing?  You know,

do they meet the other requirements of those particular

statutes?  We don't have that.

    And so I -- so, you know, I -- we would dispute that that

has been challenged in this motion, and we -- I don't see how

any of those subsections would implicate or would be -- that

a -- it would -- should be valid for a preliminary injunction

1    to issue against Subsection (d).

2        And, again, I -- I would just like to mention to the

3    Court, you know, something that I said last time with regard to

4    both Subsection (b) and Subsection (c), is that, at this time,

5    the Attorney General has no plans to enforce AB 1594 against

6    any members for otherwise lawful conduct.  And that includes

7    post-*Junior Sports* advertising for youth weapons.

8        So -- yeah.  And unless the Court has any additional

9    questions for me --

10        **THE COURT:**  I appreciate it, Mr. Woods.

11        Any final thoughts from Mr. Rowen or Griffey?

12        **MR. ROWEN:**  Sure.

13        Yes.  Griffey has many, many thoughts, mostly revolving

14    around tennis balls.

15        **THE COURT:**  Uh-huh.

16        **MR. ROWEN:**  So, I mean, I think -- you know, I agree

17    with -- with most of what Mr. Woods said.

18        So to your question about standing -- so it's not

19    dispensed in gross.  And if we -- if Your Honor would find that

20    we've only satisfied standing to obtain relief vis-à-vis

21    Subsection (c), then we could only obtain relief vis-à-vis

22    Subsection (c).

23        I mean, I could see Your Honor -- you know, we would think

24    that that's incorrect, but I could see Your Honor saying,

25    "Well, it's clear that NSSF's members manufacture and sell arms

1    that fall within the ambit of Subsection (c).  Therefore, the

2    *Driehaus* factors are satisfied, but it's less clear that

3    there's an imminent threat of enforcement under the reasonable

4    controls and reasonable precautions provisions or under

5    Subsection (d)."

6        Again, we're not asking the Court to reach that

7    conclusion, but I could see that.  And if that were how

8    Your Honor ruled, then we would be entitled to relief only with

9    respect to Subsection (c).

10        And so on the -- on the last thing that Mr. Woods said,

11   which is that the State has no plans to enforce as to conduct

12   that's unlawful -- so, I mean, I would just love to know what

13   that means.

14        So if my clients' members comply with all federal and

15   state laws, but the Attorney General thinks that their conduct

16   is nonetheless unreasonable, does the Attorney General intend

17   to enforce the reasonable controls and reasonable precautions

18   provisions?

19        If not, my clients will happily enter into a consent

20   decree right now.  But if he's not willing to go that far, then

21   I think our standing is pretty clear because that's exactly

22   what we're worried about.

23        **THE COURT:**  Uh-huh.

24        All right.  Thank you, Mr. Rowen.

25        Any final thoughts, Mr. Woods?

1          **MR. WOODS:**  No, Your Honor, not -- other than we --

2    what we've already covered.

3          **THE COURT:**  Okay.  Well, I appreciate the additional

4    briefing and the parties' arguments today, and I will be

5    working on -- on the Court's ruling starting this afternoon.

6       So I look forward to seeing you-all again in the future.

7    Take care.

8          **MR. WOODS:**  Thank you, Your Honor.

9          **MR. ROWEN:**  Thank you, Your Honor.

10            (Proceedings adjourned at 3:56 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Wednesday, March 13, 2024

_____/S/ James C. Pence-Aviles_____

James C. Pence-Aviles, RMR, CRR, CSR No. 13059
U.S. Court Reporter