PAUL D. CLEMENT*
ERIN E. MURPHY*
MATTHEW D. ROWEN
(Cal. Bar # 292292)
NICHOLAS A. AQUART*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
matthew.rowen@clementmurphy.com

ANDREW LOTHSON*
SWANSON, MARTIN & BELL, LLP
330 N. Wabash
Suite 3300
Chicago, IL 60611
alothson@smbtrials.com

*admitted *pro hac vice*

*Attorneys for Plaintiff National Shooting
Sports Foundation*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATIONAL SHOOTING SPORTS FOUNDATION,<br><br>        Plaintiff,<br><br>v.<br><br>ROB BONTA, Attorney General of California<br><br>        Defendant. | CASE NO.: 3:23-cv-00945-AGS-KSC<br><br>**AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE, OR OTHER RELIEF**<br><br>BEFORE THE HONORABLE ANDREW G. SCHOPLER<br><br>MAGISTRATE KAREN S. CRAWFORD |

## AMENDED COMPLAINT

Plaintiff National Shooting Sports Foundation ("NSSF") brings this amended complaint against Rob Bonta, Attorney General of California. NSSF brings this amended complaint based on personal knowledge as to all NSSF facts, and on information and belief as to all other matters.

## PRELIMINARY STATEMENT

1.    This lawsuit challenges the constitutionality of a provision of a recently-enacted California statute that, both by design and in effect, seeks to evade the judgment of the Supreme Court and the Constitution.

2.    On June 30, 2022, California Governor Gavin Newsom signed into law Assembly Bill 1594, titled the "Firearm Industry Responsibility Act," 2022 Cal. Legis. Serv. Ch. 98 ("AB 1594"), in an elaborate ceremony in which he explicitly decried the Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), and implicitly told the world that the Golden State would not comply unless forced to do so. Under AB 1594, the lawful and constitutionally protected "manufacture, distribution, importation, marketing, [and] sale of firearm-related products" may be deemed to violate California law and justify the imposition of sweeping liability if a judge or jury later finds that such products are "abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety in California," Cal. Civ. Code §§3273.50(f), 3273.51(c), no matter where the supposedly offending conduct took place.

3.    That provision is breathtaking in its scope. Although application of the statute is ostensibly triggered by criminal misuse of a firearm, AB 1594 does not regulate the use of firearms. Nor does AB 1594 impose liability on individuals who criminally misuse firearms to the detriment of themselves or others. Instead, the statute regulates selling, manufacturing, and advertising legal (and constitutionally protected) firearms and related products. In other words, AB 1594 regulates lawful commerce in lawful arms—even when it takes place outside of California and in full compliance with

2

the laws and regulations of the federal government and other states, as will often be the case.

4.      That is not consistent with the Constitution, as the Commerce Clause prohibits states from directly regulating commerce that takes place beyond their borders, even when that commerce has effects within the state.  Indeed, as this Court has already determined, "[w]hen a state law like [AB 1594] completely bans—or even just 'directly affects'—commercial 'transactions that take place entirely outside of the state's borders,' it plainly contravenes the … Commerce Clause." *Nat'l Shooting Sports Found. v. Bonta*, 718 F.Supp.3d 1244, 1256 (S.D. Cal. 2024) (quoting *Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1323-24 (9th Cir. 2015) (en banc)).

5.      For that reason, NSSF seeks a declaration that the "abnormally dangerous" provision of AB 1594, Cal. Civ. Code §3273.51(c), is unconstitutional, a permanent injunction preventing California from enforcing it against NSSF or its members, nominal damages, and any other relief this Court deems proper.[1]

## THE PARTIES

6.      NSSF is a Connecticut non-profit, tax-exempt, non-stock corporation with its principal place of business in Connecticut.  It is the trade association for the firearm, ammunition, and hunting and shooting sports industry.  It has a membership of more than 10,000, including manufacturers, distributors, and retailers of firearms, ammunition, and related products, as well as other industry members throughout the United States, California included.  NSSF's mission is to promote, protect, and preserve hunting and shooting sports by providing leadership in addressing industry challenges,

---

[1] NSSF has argued, and continues to believe, that AB 1594 is invalid for a host of other reasons too. *See generally* Dkt.1.  But in accordance with the parties' recent stipulation and this Court's subsequent order, Dkts.71-72, NSSF has agreed to dismiss *without prejudice* its other causes of action.  NSSF has included background relating to the subject matter of those claims merely as context for California's enactment of AB 1594 and to provide a thorough recitation of the litigation up to this point.

advancing participation in and understanding of hunting and shooting sports, reaffirming and strengthening its members' commitment to the safe and responsible sale and use of their products, and promoting a political environment supportive of America's traditional hunting and shooting heritage. NSSF serves the interests of its members, which are impaired by the threat of sweeping liability under AB 1594. NSSF is authorized to bring this action on its members' behalf, in light of the economic and other injuries AB 1594 will cause them.

7. Defendant Rob Bonta is the Attorney General of California. He is "the chief law officer of the State," and, in that capacity, has a "duty … to see that the laws of the State are uniformly and adequately enforced." Cal. Const. art. V, §13. Attorney General Bonta is a resident of California, and his principal place of business is 1300 I Street, Sacramento, California. At all relevant times, Attorney General Bonta, as well as those subject to his supervision, direction, or control, are and will be acting under color of state law.

## **BACKGROUND**

**Congress Attempts to Curb State-Law Civil Actions that Unduly Burden the National Firearm Industry and Infringe Fundamental Constitutional Rights.**

8. The Constitution "confer[s] an individual right to keep and bear arms." *Bruen*, 597 U.S. at 20 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008)); *see* U.S. Const. amend. II. And "the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc) (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)); *see also, e.g.*, *Yukutake v. Lopez*, 130 F.4th 1077, 1090 (9th Cir. 2025) ("[T]he purchase and acquisition of firearms is conduct that is protected by the plain text of the Second Amendment."); *United States v. Knipp*, 138 F.4th 429, 435 (6th Cir. 2025) ("[T]he

4

Second Amendment's text presumptively protects the act of selling or transferring a firearm[.]").

9.    Nevertheless, in the late 1990s, state and local governments began trying to use novel applications of state tort law to hold "manufacturers, distributors, dealers, and importers of firearms that operate as designed and intended" accountable "for the harm caused by the misuse of firearms by third parties, including criminals." 15 U.S.C. §7901(a)(3); *see id.* §7901(a)(4). They invoked a variety of theories, including: strict liability for abnormally dangerous activities or defective design, *Penelas v. Arms Tech., Inc.*, 778 So.2d 1042, 1043-44 (Fla. Dist. Ct. App. 2001); negligent marketing, *City of St. Louis v. Cernicek*, 145 S.W.3d 37, 38, 40 (Mo. Ct. App. 2004) (per curiam); negligent distribution, *District of Columbia v. Beretta U.S.A., Corp.*, 872 A.2d 633, 638-39 (D.C. 2005) (en banc); deceptive trade practices, *Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 367 F.3d 1252, 1252-53 (11th Cir. 2004) (per curiam); and public nuisance, *Sills v. Smith & Wesson Corp.*, 2000 WL 33113806, at *7 (Del. Super. Ct. Dec. 1, 2000), among others.

10.    Some of these suits succeeded in stretching the common law far beyond its traditional limits—and in allowing one state's courts to police the business practices of industry members operating elsewhere.  *See, e.g.*, *City of Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1143-47 (Ohio 2002); *James v. Arms Tech., Inc.*, 820 A.2d 27, 37-44, 46-47, 50-53 (N.J. Super. Ct. App. Div. 2003); *City of Gary ex rel. King v. Smith & Wesson Corp.*, 801 N.E.2d 1222, 1231-32, 1241-42 (Ind. 2003).  Others were unsuccessful.  *See, e.g.*, *Camden Cnty. Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp.*, 273 F.3d 536, 540 (3d Cir. 2001) (per curiam); *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1147-48 (Ill. 2004).

11.    But the final tally told only part of the story.  Had these sprawling suits been permitted to persist and proliferate, the legal fees alone would have bankrupted the industry.  That, indeed, was in large part the point:  "[M]unicipal leaders pressed on

regardless of their chance of success, spending taxpayers' money in a war of attrition against the firearm[] industry." Recent Legislation, *Protection of Lawful Commerce in Arms Act*, 119 Harv. L. Rev. 1939, 1940 (2006).

12.     It did not take long for Congress to recognize these lawsuits for what they were:  a coordinated effort to try to destroy the firearm industry by saddling it with liability for the acts of criminals.  States pressed "theories without foundation in hundreds of years of the common law and jurisprudence of the United States" and threatened interstate comity by permitting one state to penalize lawful conduct in another state. 15 U.S.C. §7901(a)(7)-(8).  They did so, moreover, at substantial cost to individual rights, including the Second Amendment right to keep and bear arms, *id.* §7901(a)(2), (a)(6), as well as the rights of industry members to pursue their trade consistent with the Constitution's privileges-and-immunities guarantee, *id.* §7901(a)(7).  And it was profoundly unfair, to boot, to hold lawful businesses engaged in the lawful sale of constitutionally protected products liable "for the harm caused by those who criminally or unlawfully misuse … products that function as designed and intended." *Id.* §7901(a)(5).

13.     Congress enacted the Protection of Lawful Commerce in Arms Act ("PLCAA") to put an end to such state-law actions.  Indeed, the PLCAA's very first enumerated "purpose[]" is to "prohibit causes of action against manufacturers, distributors, dealers, and importers of firearms or ammunition products, and their trade associations" based on harm "caused by the criminal or unlawful misuse of firearm products" by third parties. *Id.* §7901(b)(l); *see also id.* §790l(a)(6) (finding that such suits are "an abuse of the legal system, … threaten[] the diminution of a basic constitutional right and civil liberty, … and constitute[] an unreasonable burden on interstate and foreign commerce").

14.     The statute makes good on that promise, prohibiting all such suits from being "brought in any Federal or State court." *Id.* §7902(a).  The PLCAA preempts

"civil action[s] … brought by any person against a manufacturer or seller of a qualified product, or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party." *Id.* §7903(5)(A); *see id.* §7903(2)-(4), (6), (8)-(9) (defining "person," "manufacturer," "seller," "trade association," "qualified product," and "unlawful misuse").

15.     Only six enumerated types of claims are not so prohibited.  *See id.* §7903(5)(A).  These exceptions are limited to circumstances in which the manufacturer or seller itself engaged in some well-defined type of wrongful conduct, such as claims for design or manufacturing defect, fraudulent transfer, negligent entrustment, breach of contract or warranty, or violation of a statutory or regulatory requirement specific to the sale or manufacture of arms.

16.     None of the enumerated exceptions extends to state laws that authorize imposition of liability against manufacturers and sellers of firearms and ammunition for alleged "public nuisance" caused by the criminal conduct of third parties.  In fact, such efforts, founded on novel expansions of general common-law tort theories, are exactly what the PLCAA was enacted to—and does—stamp out.  *See id.* §7901(a)(7); *Camden Cnty.*, 273 F.3d at 540-41 ("To extend public nuisance law to embrace the manufacture of handguns would be unprecedented[.]").

**Courts Uphold the PLCAA Against Constitutional Challenges and Routinely Reject Efforts to Circumvent Its Protections.**

17.     After Congress passed the PLCAA, federal and state courts routinely rejected efforts to evade the law's protections for the firearm industry.

18.     Some plaintiffs challenged the statute's constitutionality, but courts across the country rejected such challenges, holding that the PLCAA is a lawful exercise of Congress' power under the Commerce Clause, *see, e.g.*, *Adames v. Sheahan*, 909 N.E.2d 742, 765 (Ill. 2009); *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384,

393-95 (2d Cir. 2008); is consistent with the Constitution's separation of powers, *see, e.g.*, *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1139-40 (9th Cir. 2009); *District of Columbia v. Beretta U.S.A. Corp.*, 940 A.2d 163, 172-73 (D.C. 2008); *City of New York*, 524 F.3d at 395-96; comports with the Tenth Amendment, *see, e.g.*, *Delana v. CED Sales, Inc.*, 486 S.W.3d 316, 323-24 (Mo. 2016); *City of New York*, 524 F.3d at 396-97; *Adames*, 909 N.E.2d at 764-65; and does not violate the Takings, Equal Protection, Due Process, or Petition Clauses, *see, e.g.*, *Ileto*, 565 F.3d at 1140-42; *Delana*, 486 S.W.3d at 324; *District of Columbia*, 940 A.2d at 173-82; *City of New York*, 524 F.3d at 397-98.

19.    Other plaintiffs sought to skirt the PLCAA's general prohibition on covered actions.  Just as often, courts carefully policed the statute's ban and rejected efforts to expand its narrow exceptions.  For instance, the Missouri Supreme Court held that, to qualify as a prohibited action "resulting from the criminal … misuse" of a firearm under §7903(5)(A), the PLCAA does not require the criminal misuse to have resulted in criminal conviction or to have been the sole cause of injury.  *Delana*, 486 S.W.3d at 321-22.  The Supreme Court of Texas rejected an effort to invoke the negligent entrustment exception under §7903(5)(A)(ii) because that state's common law did not recognize such an action.  *In re Acad., Ltd.*, 625 S.W.3d 19, 30-32 (Tex. 2021).  And the Second and Ninth Circuits concluded that statutory codification of state tort law on wrongful death, nuisance, and negligence actions could not satisfy the so-called "predicate exception" set forth in §7903(5)(A)(iii).  *City of New York*, 524 F.3d at 400-04; *Ileto*, 565 F.3d at 1136-38.

20.    More recently, the Pennsylvania Supreme Court unanimously rejected a Pennsylvania plaintiff's attempt to circumvent the PLCAA, holding that the PLCAA embodies "a valid exercise of Congress's Commerce Clause authority and does not violate the Tenth Amendment or principles of federalism" and that it "operates to bar" plaintiff's state law products liability claims against a firearm manufacturer's lawful commerce.  *Gustafson v. Springfield, Inc.*, 333 A.3d 651, 683 (Pa. 2025).

21.   And just last week, the Supreme Court of the United States reiterated that "Congress enacted the [PLCAA] to halt a flurry of lawsuits attempting to make gun manufacturers pay for the downstream harms resulting from misuse of their products." *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, --- S.Ct. ----, 2025 WL 1583281, at *9 (U.S. June 5, 2025).  The civil actions "Congress had in mind" when it enacted the PLCAA, the Court explained, are those that "seek[] to recover from American firearms manufacturers for the downstream damage [criminals] wreak with their guns."  *Id.*  Thus, while the PLCAA "includes the predicate exception," "that exception" cannot be read so broadly as to "swallow … the rule."  *Id.*; *see also id.* at *8 (emphasizing that the PLCAA prohibits efforts to hold "manufacturer[s] of" lawful firearms liable under state law just for "fail[ing] to make" "unaffiliated retailer[s] … follow the law" or just because they "design and market[]'" lawful firearms and other "legal" products that criminals happen to "like … too").

**In the Wake of *Bruen*, States Again Attempt to Circumvent the PLCAA.**

22.   In the decades since the PLCAA was enacted, the Supreme Court has repeatedly made clear that the Second Amendment protects an individual and fundamental right.  *See, e.g.*, *United States v. Rahimi*, 602 U.S. 680, 690 (2024); *Bruen*, 597 U.S. at 17; *McDonald v. Chicago*, 561 U.S. 742, 749-50, 778 (2010); *Heller*, 554 U.S. at 592.  The Court has further confirmed that the right "to keep and bear Arms" protects the right to keep and bear arms both inside and outside the house.  *See Bruen*, 597 U.S. at 70-71.  And in doing so, the Court has made clear that when the government seeks to restrict the exercise of Second Amendment rights, the government bears the burden of proving that its law is "consistent with this Nation's historical tradition" of regulating firearms.  *Id.* at 17-31; *see also Rahimi*, 602 U.S. at 691.

23.   All of these cases should have prompted states to reconsider their laws to ensure that they are sufficiently protective of rights the Supreme Court has repeatedly reaffirmed are fundamental.  Unfortunately, they have repeatedly prompted the opposite

reaction in certain states.  Almost immediately after *Bruen* was decided, some of the same very few states that had endeavored to prevent their law-abiding citizens from carrying firearms undertook efforts "to offset the impact of the court's decision." Giavanni Alves, *N.Y.'s New Gun Control Laws*, Staten Island Live (July 9, 2022), https://bit.ly/3Q8l2K0.  While some of those efforts are novel, others are re-runs.  In particular, nine states (beginning with New York, the state whose restrictive carry regime *Bruen* invalidated) have passed laws purporting to authorize civil suits against firearms manufacturers, distributors, and sellers based on harms caused by gun violence—in other words, purporting to authorize the very same suits that prompted Congress to pass the PLCAA almost 20 years ago.  *See* Cal. Civ. Code §3273.51; Colo. Rev. Stat. §6-27-104; 10 Del. Code §3930; Haw. Rev. Stat. §134-102; 815 Ill. Comp. Stat. 505/2DDDD; Md. Code Ann., Cts. & Jud. Proc. §3-2502; N.J. Stat. Ann. §2C:58-35(a); N.Y. Gen. Bus. Law §898-b to -c; Wash. Rev. Code §7.48.330.

**California Enacts AB 1594, Which Authorizes Sweeping Liability on Firearm Industry Members, in Direct Contravention of the Constitution and Federal Law.**

24.    On July 12, 2022, Governor Newsom signed into law AB 1594, which tracks in large part these recent efforts to circumvent the PLCAA, and as most relevant here, goes even further.

25.    AB 1594 applies only to "firearm industry members."  That term is defined broadly to mean "a person, firm, corporation, company, partnership, society, joint stock company, or any other entity or association engaged in the manufacture, distribution, importation, marketing, wholesale sale, or retail sale of firearm-related products."  Cal. Civ. Code §3273.50(f); *see also id.* §3273.50(d) (defining "Firearm-related product" to mean "a firearm, ammunition, a firearm precursor part, a firearm component, firearm manufacturing machine, and a firearm accessory that … is sold, made, or distributed in California," "is intended to be sold or distributed in California," or "is or was possessed in California [if] it was reasonably foreseeable that the item would be possessed in

California"); *id.* §§3273.50(a), (b), (e) (defining "Ammunition," "Firearm," and "Firearm precursor part" by reference to the state Penal Code); *id.* §3273.50(c) (defining "Firearm accessory" to mean "an attachment or device designed or adapted to be inserted into, affixed onto, or used in conjunction with a firearm that is designed, intended, or functions to alter or enhance the firing capabilities of a firearm, the lethality of the firearm, or a shooter's ability to hold and use a firearm").

26.    AB 1594's operative section, Civil Code §3273.51, creates a new, four-pronged "standard of conduct" for "firearm industry member[s]." *Id.* §3273.51(a).

27.    <u>First</u>, under Civil Code §3273.51(b)(1), firearm industry members "shall … [e]stablish, implement, and enforce reasonable controls."

28.    The statute does not identify what "controls" are or are not "reasonable." It instead defines the term "reasonable controls" in terms of things that such controls should accomplish—namely, "reasonable procedures, acts, or practices that are designed, implemented, and enforced to do the following:"

> (1) Prevent the sale or distribution of a firearm-related product to a straw purchaser, a firearm trafficker, a person prohibited from possessing a firearm under state or federal law, or a person who the firearm industry member has reasonable cause to believe is at substantial risk of using a firearm-related product to harm themselves or another or of possessing or using a firearm-related product unlawfully.
>
> (2) Prevent the loss or theft of a firearm-related product from the firearm industry member.
>
> (3) Ensure that the firearm industry member complies with all provisions of California and federal law and does not otherwise promote the unlawful manufacture, sale, possession, marketing, or use of a firearm-related product.

Cal. Civ. Code §3273.50(g).

29.    California thus requires industry members to have in place, among other things, procedures designed to screen for customers who appear "at substantial risk of

using a firearm-related product to harm … another," *id.* §3273.50(g)(1), which describes most individuals with a heightened need to lawfully possess and lawfully carry a lawful firearm for self-defense. After all, using a firearm-related product for self-defense may entail harm to another—namely, the assaultive person who forced the law-abiding gun owner to resort to self-defense.

30. A federally licensed manufacturer must employ all of these unidentified "reasonable controls," moreover, even if it manufactures all of its products outside of California, even if it completes all of its retail sales outside of California (i.e., it has no California retail stores), and even if all of its wholesale transactions with distributors take place outside of California.

31. The statute creates "a rebuttable presumption that [a] firearm industry member failed to implement reasonable controls," and thus violated §3723.51(b)(1), if "(A) [t]he firearm industry member's action or failure to act created a reasonably foreseeable risk that the harm alleged by the claimant would occur," and "(B) [t]he firearm industry member could have established, implemented, and enforced reasonable controls to prevent or substantially mitigate the risk that the harm would occur." *Id.* §3273.52(e)(1). "If th[is] rebuttable presumption … is established, the firearm industry member has the burden of proving by a preponderance of the evidence that [it] established, implemented, and enforced reasonable controls." *Id.* §3273.52(e)(2).

32. <u>Second</u> and relatedly, under Civil Code §3273.51(b)(2), firearm industry members "shall … [t]ake reasonable precautions to ensure that [they] do[] not sell, distribute, or provide a firearm-related product to a downstream distributor or retailer of firearm-related products who fails to establish, implement, and enforce reasonable controls."

33. It is not enough under AB 1594 for an out-of-state manufacturer *itself* to implement reasonable controls. Under AB 1594, a federally licensed manufacturer of firearms or related products must also refrain from selling any products to distributors

unless it has assured itself that both the distributors themselves and any retailers to whom the distributors may sell products have in place whatever unidentified procedures California considers "reasonable."

34.    Third, and most relevant to this amended complaint, under Civil Code §3273.51(c), AB 1594 effectively bans an unknowable set of firearms entirely:  Firearm industry members "shall not manufacture, market, import, offer for wholesale sale, or offer for retail sale a firearm-related product that is abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety in California."

35.    Notably, §3273.51(c) does not track the test the Supreme Court has articulated for purposes of determining which arms may be banned consistent with the Second Amendment—i.e., whether arms are "in common use today," Bruen, 597 U.S. at 47.  Section 3273.51(c) instead borrows from strict liability principles for "abnormally dangerous" products to create California's own, substantially less protective test for determining what arms people are entitled to keep and bear.

36.    On top of that, the statute departs substantially even from ordinary principles of strict liability.

37.    Under California common law, manufacturers of "abnormally dangerous" products (or products that pose "an unreasonable risk of harm") can sometimes be subject to strict liability for harms that their products cause.  See Anderson v. Owens-Corning Fiberglas Corp., 810 P.2d 549, 553 (Cal. 1991).  Whether a product or activity is "abnormally dangerous" is usually decided by "look[ing] to the factors described in section 520 of the Restatement Second of Torts," i.e., "(a) existence of a high degree of risk of some harm …; (b) likelihood that the harm that results from it will be great; (c) inability to eliminate the risk by the exercise of reasonable care; (d) extent to which the activity is not a matter of common usage; (e) inappropriateness of the activity to the place where it is carried on; and (f) extent to which its value to the community is

outweighed by its dangerous attributes." *Ahrens v. Super. Ct.*, 243 Cal. Rptr. 420, 424 & n.5 (Ct. App. 1988) (quotation marks omitted).

38.    But that is not how things work under AB 1594.  Rather, under AB 1594, "[t]here shall be a presumption that a firearm-related product is abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety if any of the following is true:"

> (A) The firearm-related product's features render the product most suitable for assaultive purposes instead of lawful self-defense, hunting, or other legitimate sport and recreational activities.
>
> (B) The firearm-related product is designed, sold, or marketed in a manner that foreseeably promotes conversion of legal firearm-related products into illegal firearm-related products.
>
> (C) The firearm-related product is designed, sold, or marketed in a manner that is targeted at minors or other individuals who are legally prohibited from accessing firearms.

Cal. Civ. Code §3273.51(c)(2).

39.    Unlike other presumptions in the law, the statute's "abnormally dangerous" presumption *does not appear to be rebuttable.  Compare id.* (nowhere using "rebuttable" or explaining how the abnormal-dangerousness presumption could be rebutted), *with id.* §3273.52(e)(1) & (2) (describing as "rebuttable" the separate "presumption that [a] firearm industry member failed to implement reasonable controls" under specific circumstances).

40.    AB 1594 does not define the term "assaultive purposes," *see id.* §3273.51(c)(2)(A), which finds no purchase in the Supreme Court's decisions articulating what takes a firearm outside the scope of the Second Amendment's protections.

41.    Nor does it explain why "minors" are treated the same way as "individuals who are legally prohibited from accessing firearms"—or how designing, selling, or

marketing firearms that are safer for minors to use can be unlawful—when minors are permitted to access and use firearms under California law. *See, e.g.*, Cal. Penal Code §§29615(a)-(d), 29655 (minors may legally handle and shoot firearms in California under adult supervision or with parental consent); Cal. Bus. & Prof. Code §22949.80(a)(3)-(b) ("youth hunting program[s]" are "lawful hunting activ[ities]"; "firearm industry member[s]" are expressly authorized to market "youth hunting program[s]" "directed to minors," and are likewise expressly authorized to market "to minors" "any firearm safety program, hunting safety or promotional program, firearm instructional course, sport shooting event or competition, or any similar program").

42.    Moreover, §3273.51(c)(2)(C) oddly appears to ban the *sale* of certain firearms based on how they are *marketed*, rather than simply banning certain marketing practices.  To state what should be obvious, there is no Second Amendment exception allowing states to ban firearms that are designed to be easier and safer for minors to use.

43.    Fourth, under Civil Code §3723.51(d), "[a] firearm industry member shall not engage in any conduct related to the sale or marketing of firearm-related products that is in violation of" California's general statutory provisions prohibiting unfair methods of competition and deceptive acts, unfair competition, and false or misleading statements in advertising.

44.    Failure to "comply with any requirement of [§3723.51]" "shall be a violation" of California law, Cal. Civ. Code §3723.51(a), which "shall be actionable under [§3723.52]," *id.* §3273.52(a).

45.    To enforce the new standard of conduct it imposes, AB 1594 creates a "civil action" against firearm industry members for violations of statute.  *Id.* §§3273.52(b)-(c).

46.    "A person who has suffered harm in California because of a firearm industry member's [violation of §3273.51] may bring an action in a court of competent jurisdiction." *Id.* §3273.52(b).

15

47.    "The Attorney General," "city attorney[s]," and "county counsel" may also "bring a civil action in a court of competent jurisdiction … to enforce [AB 1594] and remedy harm caused by a violation of [it]."  *Id.* §3273.52(c).

48.    If the plaintiff in such an action prevails on the merits, then "the court may award any or all of the following:  (1) Injunctive relief sufficient to prevent the firearm industry member and any other defendant from further violating the law.  (2) Damages. (3) Attorney's fees and costs.  (4) Any other appropriate relief necessary to enforce this title and remedy the harm caused by the conduct."  *Id.* §3273.52(d).  These remedies are not exclusive.  *See id.* §3273.54(a), (b).

49.    Ordinary principles of proximate causation do not apply in actions under AB 1594.  "An intervening act by a third party, *including, but not limited to, criminal misuse of a firearm-related product*, shall not preclude a firearm industry member from liability under this section."  *Id.* §3273.52(f) (emphasis added).

50.    AB 1594 "bec[a]me operative on July 1, 2023."  *Id.* §3273.55.

**California Separately Enacts Code of Civil Procedure §1021.11 to Deter Individuals and Associations from Challenging Unconstitutional Firearms Laws like AB 1594 in Court.**

51.    Shortly after signing into law AB 1594, Governor Newsom also signed into law Senate Bill 1327 ("SB 1327").

52.    Most of SB 1327 is devoted to creating a private right of action to enforce state laws relating to the unlawful manufacture, distribution, or sale of specified firearms.  *See* 2022 Cal. Legis. Serv. Ch. 146, §1 (adding Bus. & Prof. Code §§22949.60-.71).  Plaintiffs do not challenge those provisions here.  But SB 1327 also establishes Code of Civil Procedure §1021.11, *see id.* §1 (adding Cal. Civ. Proc. Code §1021.11), which is California's attempt to suppress firearms-related litigation by putting civil rights litigants and their attorneys on the hook for the government's

attorney's fees if a case raising Second Amendment challenges results in anything short of victory on every single claim alleged in the complaint.

53.     Section 1021.11 is based on Texas's SB 8, enacted in 2021 in the abortion context.  Indeed, it tracks the Texas statute almost word-for-word.  Notably, Defendant Bonta decried that Texas law as "blatantly unconstitutional."  Press Release, Cal. Dep't of Just., *Attorney General Bonta: Texas Cannot Avoid Judicial Review of Its Constitutional Abortion Ban* (Oct. 27, 2021), https://bit.ly/3pRWA4F.  And after the Supreme Court held that a pre-enforcement challenge to the Texas law could proceed "against some of the named defendants but not others," *Whole Woman's Health v. Jackson*, 595 U.S. 30, 35 (2021), Governor Newsom lambasted the Court's decision as "an abomination" because it did not prevent enforcement of SB 8.  Gavin Newsom, *The Supreme Court Opened the Door to Legal Vigilantism in Texas. California Will Use the Same Tool to Save Lives*, Wash. Post (Dec. 20, 2021), https://wapo.st/3wxWoeI.

54.     California's new fee-shifting statute begins as follows:

> Notwithstanding any other law, any person, including an entity, attorney, or law firm, who seeks declaratory or injunctive relief to prevent this state, a political subdivision, a governmental entity or public official in this state, or a person in this state from enforcing any statute, ordinance, rule, regulation, or any other type of law that regulates or restricts firearms, or that represents any litigant seeking that relief, is jointly and severally liable to pay the attorney's fees and costs of the prevailing party.

Cal. Civ. Proc. Code §1021.11(a).

55.     Unlike any other ordinary "fee shifting" statute, however, under §1021.11, "a prevailing party" categorically cannot be a *plaintiff* who brings a case seeking declaratory or injunctive relief regarding a state or local firearm regulation, even if the plaintiff wins on every claim it brought and receives all the relief it sought.  *Id.* §1021.11(e).

56.    What is more, government defendants in a firearms case will be treated as "a prevailing party" under §1021.11(b) if the court either (1) "[d]ismisses *any* claim or cause of action" in the case, "regardless of the reason for the dismissal," or (2) "[e]nters judgment in favor of the [government] party" "on *any* claim or cause of action." *Id.* §1021.11(b) (emphasis added).

57.    What §1021.11(e) and §1021.11(b) mean is simple.    Imagine that a plaintiff (such as NSSF) challenges a California firearms regulation (such as Business & Professions Code §22949.80) on multiple grounds; the plaintiff ends up prevailing on one of its claims, which is dispositive and results in facial invalidation of the challenged regulation; and the court, rather than waste its time, dismisses the plaintiff's remaining challenges as moot.    In that case, under §1021.11, the plaintiff not only is *not* entitled to fees as a prevailing party, but will *owe* the state fees even though the state did not win anything.    And, to add insult to injury, the plaintiff's *attorneys* will also be on the hook, "jointly and severally," for the government's fees.    *See* Cal. Civ. Proc. Code §1021.11(a) ("[A]ny person, *including an entity, attorney, or law firm*, who seeks declaratory or injunctive relief to prevent this state … from enforcing any statute … that regulates or restricts firearms, *or that represents any litigant seeking that relief*, is jointly and severally liable to pay the attorney's fees and costs of the prevailing party." (emphases added)).

58.    Section 1021.11(c) gives these "prevailing party" government defendants a three-year window to bring a state-law action against the plaintiff and its attorneys to recover their fees.

59.    Section 1021.11(a) explicitly applies "[n]otwithstanding any other law." The most relevant "other law" is 42 U.S.C. §1983, which is the statute under which most firearms litigation, including this case, is brought.    Another relevant "other law" is 42 U.S.C. §1988, which provides that a party that prevails in a §1983 action is entitled to attorneys' fees as a matter of federal law.

18

60.    On December 19, 2023, the Honorable Judge Roger T. Benitez of this Court issued an opinion concluding (1) "that the purpose and effect of § 1021.11 is to trench on a citizen's right of access to the courts and to discourage the peaceful vindication of an enumerated constitutional right" (and thus that "the state law chills the First Amendment right to petition government for the redress of grievances, which, in turn, chills the Second Amendment right"), and (2) that §1021.11 conflicts with federal law and is therefore preempted.  Op. & Order Enjoining Enforcement of Cal. Code of Civ. Proc. §1021.11 at 10, *Miller v. Bonta*, No. 22-cv-1446 (S.D. Cal. Dec. 19, 2022), Dkt.43.  The Court entered "a permanent negative injunction" in favor of the plaintiffs there, *id.* at 16, and later "Judgment … in favor of Plaintiffs" in both *Miller* and *South Bay Rod & Gun Club, Inc. v. Bonta*, No. 22-cv-1461 (S.D. Cal.), on First Amendment, preemption, and Equal Protection Clause grounds.  Judgment, *Miller*, No. 22-cv-1446 (S.D. Cal. Mar. 20, 2023), Dkt.49; *see also NSSF*, 718 F.Supp.3d at 1258 n.2 (noting that the statute has been declared "unconstitutional" and is "permanently" enjoined).

**This Court Preliminarily Enjoins AB 1594 As Unconstitutional.**

61.    On May 23, 2023, NSSF filed this lawsuit seeking an injunction against California's enforcement of AB 1594 and SB 1327.  In its initial complaint, NSSF raised various causes of action, including claims under the First and Second Amendments, the Supremacy Clause, the Due Process Clause, and the Commerce Clause.  *See* Dkt.1 ¶¶70-182.  Shortly thereafter, NSSF filed a motion for a preliminary injunction based on those same causes of action.  *See* Dkt.14.

62.    After substantial briefing and multiple hearings on the matter, this Court granted in part NSSF's request for a preliminary injunction.  *See* Dkt.48; *NSSF*, 718 F.Supp.3d at 1258.

63.    As relevant here, this Court found that NSSF "has standing to challenge [AB 1594's] ban on selling, manufacturing, importing, or marketing certain

'abnormally dangerous' firearm-related products" because its members face a "credible threat of prosecution" under that particular provision. *NSSF*, 718 F.Supp.3d at 1251. For example, the Court reasoned, NSSF members "have demonstrated that their policies" of making and selling "weapons that are targeted at juveniles, such as 'youth-model firearms'"—which AB 1594 deems "presumptively forbidden"—establishes "a 'concrete plan' to violate" the statute. *Id.* In light of the state's refusal to disavow enforcement and the expansive private right of action AB 1594 creates, this Court (rightfully) had no trouble concluding that NSSF has standing and that the case was ripe for adjudication. *Id.* at 1252, 1254.[2]

64. On the likelihood of the merits, this Court found that "Plaintiff's surest march to victory is under the banner of the dormant Commerce Clause"—the doctrine that "forbids states from, among other things, 'directly' regulating commercial activity that 'takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Id.* at 1255 (quoting *Sam Francis*, 784 F.3d at 1323). And the Court agreed with NSSF that because the "abnormally dangerous" provision of AB 1594 regulates "commercial 'transactions that take place entirely outside of the state's borders,' it plainly contravenes the dormant Commerce Clause." *Id.* at 1256. As this Court explained, "[n]o matter how narrow the reading," AB 1594's "abnormally dangerous" provision "is a prohibited extraterritorial regulation." *Id.* at 1256-57 (rejecting state's attempts to "cherry-pick a scenario that avoids the evils justifying a constitutional protection").

65. After finding that the other preliminary injunction factors also weighed in NSSF's favor, this Court "preliminarily enjoined" California's Attorney General "from enforcing [AB 1594's] 'abnormally dangerous' restriction." *Id.* at 1258.

---

[2] The Court found that NSSF lacked standing to assert its various causes of action against AB 1594's "reasonable controls" and "unfair-business-practices" provisions, and that its challenge to SB 1327 was moot because that provision was already enjoined. *Id.* at 1252-54, 1258 n.2.

66.     The Court also provided NSSF the opportunity to amend its complaint to include "any additional facts to establish standing over the 'reasonable controls' and unfair-business-practices provisions" of AB 1594.  *Id.*  But to streamline this litigation, NSSF instead—with the permission of this Court and the consent of the state—agreed to dismiss *without prejudice* all of its claims other than its Commerce Clause challenge to California Civil Code §3273.51(c).  *See* Dkt.71.

## JURISDICTION AND VENUE

67.     Plaintiff's now-single cause of action in this amended complaint arises under 42 U.S.C. §1983 and the United States Constitution.  This Court therefore has jurisdiction pursuant to 28 U.S.C. §1331.

68.     Venue lies in this district pursuant to 28 U.S.C. §1391 because Defendant is located in and performs his official duties in the Southern District of California, and is therefore considered to reside within this district as a matter of law.

## CLAIM FOR RELIEF

### Count One
### (Commerce Clause)

69.     Plaintiff re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

70.     Consistent with the Framers' "special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres," *Healy v. Beer Inst.*, 491 U.S. 324, 335-36 (1989) (footnotes omitted), the Supreme Court has long held that the Commerce Clause, U.S. Const. art. I, §8, cl. 3, prohibits a state from "directly regulat[ing]"—that is, imposing liability based upon—conduct that takes place "'wholly outside the State' and involve[s] individuals 'having no connection with [it],'" *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 n.1 (2023) (italics omitted) (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 641-43 (1982) (plurality op.)).  Such a law is unconstitutional even if it "is addressed only to" conduct

"in [the state]," *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 583 (1986), and even if the regulated "commerce has effects within the State," *Healy*, 491 U.S. at 336.

71.   AB 1594 violates that bedrock constraint on state power.

72.   As an initial matter, it is important to underscore that AB 1594 does not regulate products; it regulates conduct.  And for purposes of the Commerce Clause, what matters is where the conduct that is alleged to violate the statute—i.e., that is the basis of liability—occurred.  If the "regulat[ed] commercial activity [] 'takes place wholly outside of the State's borders,'" then the state regulation is unconstitutional, "whether or not the commerce has effects within the State."  *NSSF*, 718 F.Supp.3d at 1255 (quoting *Sam Francis*, 784 F.3d at 1323).

73.   Under AB 1594, firearm industry members "shall not manufacture, market, import, offer for wholesale sale, or offer for retail sale a firearm-related product that is abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety in California."  Cal. Civ. Code §3273.51(c).

74.   Very little of *that* conduct happens in California.  Indeed, because of the state's unrelenting regulations, most firearm industry members do not have a physical presence in California, which means that most of the conduct this provision of AB 1594 regulates will take place entirely outside of California.  For instance, as this Court has already explicated, a "Tennessee manufacturer and Arizona retailer" could buy and sell "youth-model rifles and AR-style long guns that are legal in [their] states, but meet California's definition of 'abnormally dangerous'" and be "sued under [AB 1594]" if "a thief steals the firearms and drives into California to commit a gun crime."  *NSSF*, 718 F.Supp.3d at 1255-56.  Put differently, "[a]lthough the commercial transactions were conducted entirely out of state—and the lawful participants never set foot in California—the Tennessee manufacturer and Arizona retailer could both be" liable for violating AB 1594.  *Id.*; *see* Cal. Civ. Code § 3273.52(f) (clarifying that an "intervening

act by a third party," including "criminal misuse" of a firearm, does not "preclude … liability").

75.    None of that is remotely consistent with the Commerce Clause.  Indeed, imposing state-law liability (and damages and other relief) on out-of-state actors for actions taken entirely out of state is the definition of unconstitutional extraterritorial state regulation.

76.    That is true even if that out-of-state conduct has effects in California. Again, what matters under the extraterritoriality doctrine of the Commerce Clause is where the regulated commerce takes place:  "If the transaction to be regulated occurs 'wholly outside' the boundaries of the state, the regulation is unconstitutional," even if the actor resides in, is incorporated in, or does some other business in the regulating state.  *A.S. Goldmen & Co. v. N.J. Bureau of Sec.*, 163 F.3d 780, 786 (3d Cir. 1999); *see, e.g.*, *Sam Francis*, 784 F.3d at 1322 (invalidating California statute that regulated out-of-state art sales, even though the statute applied only to transactions involving California residents); *Daniels Sharpsmart, Inc. v. Smith*, 889 F.3d 608, 612-16 (9th Cir. 2018).

77.    Because AB 1594's "abnormally dangerous" provision "directly regulates out-of-state commercial transactions," it "runs afoul of the dormant Commerce Clause." *NSSF*, 718 F.Supp.3d at 1256.

78.    AB 1594's remedial provisions make matters worse.  AB 1594 authorizes private persons, city and county attorneys, and the Attorney General to obtain, among other things, "[i]njunctive relief sufficient to prevent the firearm industry member and any other defendant from further violating the law."  Cal. Civ. Code §3273.52(d)(1).  If, as will almost always be the case, some or all of that otherwise-lawful conduct— manufacturing, marketing, selling, etc.—takes place in other states, then the injunctive relief the statute authorizes will necessarily end up regulating *and enjoining* commerce occurring wholly outside California's borders, in violation of the Commerce Clause.

79.    AB 1594 violates the Commerce Clause in another way as well.    In addition to prohibiting states from regulating conduct that takes place outside of their borders, the Commerce Clause "prohibit[s] States from discriminating against or imposing excessive burdens on interstate commerce" within their borders. *Comptroller of Treasury of Md. v. Wynne*, 575 U.S. 542, 549 (2015); *see also Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).  AB 1594 does that too.  Because it imposes liability for commercial transactions occurring in other states by inviting civil actions in California, AB 1594 unlawfully discriminates against and burdens out-of-state commercial interests within the state.  It also negates the legitimate regulatory regimes governing the sale, marketing, and manufacture of firearms and related products in other states and under federal law by rendering conduct that is lawful where it occurs unlawful in California.

80.    The extreme burdens AB 1594 imposes on interstate commerce outweigh any benefits, and the local interest in reducing crime within California could be achieved by other restrictions that have a lesser impact on interstate commerce.  Firearm industry members have little choice but to attempt to comply with the strictest state restrictions, like those in California (assuming compliance is even possible), regardless of federal law or the law of the individual state of operation.  AB 1594 therefore unduly burdens interstate commerce.  What is more, because AB 1594 creates liability based on the behavior of third parties who are outside their control, firearm industry members can do very little to even attempt to lessen their potential liability; the only way to truly eliminate all risk of liability under AB 1594 would be to cease or significantly limit operations altogether, even if those operations are lawful elsewhere.    That is unconstitutional discrimination against, and an unconstitutional undue burden on, interstate commerce.

81.    Congress anticipated exactly this sort of problem in the PLCAA, which explicitly found that allowing civil actions like the ones AB 1594 authorizes would

1    usher in "unreasonable burden on interstate and foreign commerce of the United States."

2    15 U.S.C. §7901(a)(6).

3        82.    Consistent with Congress' judgment, and this Court's preliminary

4    injunction, AB 1594 violates the Commerce Clause.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PRAYER FOR RELIEF**

Plaintiff prays for the following relief from the Court:

1.  a declaration, pursuant to 28 U.S.C. §2202, that California Code §3273.51(c) violates the United States Constitution, and is therefore void and unenforceable on its face, or, in the alternative, that it is invalid as applied to NSSF and its members;

2.  a permanent injunction enjoining Attorney General Bonta, as well as all officers, agents, and employees subject to his supervision, direction, and/or control, from enforcing or otherwise bringing suit against NSSF and its members under California Code §3273.51(c);

3.  nominal damages;

4.  such costs and reasonable attorneys' fees to which NSSF may be entitled by law; and any further relief Court deems just and proper.


June 13, 2025,                                     Respectfully submitted,

                                                  s/Matthew D. Rowen
ANDREW LOTHSON*                                   PAUL D. CLEMENT*
SWANSON, MARTIN & BELL, LLP                       ERIN E. MURPHY*
330 N. Wabash                                     MATTHEW D. ROWEN
Suite 3300                                        (Cal. Bar # 292292)
Chicago, IL 60611                                 NICHOLAS A. AQUART*
alothson@smbtrials.com                            CLEMENT & MURPHY, PLLC
                                                  706 Duke Street
                                                  Alexandria, VA 22314
                                                  (202) 742-8900
                                                  matthew.rowen@clementmurphy.com

                                                  *admitted *pro hac vice*

*Attorneys for Plaintiff National Shooting Sports Foundation*