PAUL D. CLEMENT*
ERIN E. MURPHY*
MATTHEW D. ROWEN (Cal. Bar # 292292)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
matthew.rowen@clementmurphy.com

ANDREW LOTHSON*
SWANSON, MARTIN & BELL, LLP
330 N. Wabash
Suite 3300
Chicago, IL 60611
alothson@smbtrials.com

* admitted *pro hac vice*

*Attorneys for Plaintiff National Shooting Sports Foundation*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NATIONAL SHOOTING SPORTS FOUNDATION,<br><br>　　　　*Plaintiff*,<br><br>v.<br><br>ROB BONTA,<br>　Attorney General of California,<br><br>　　　　*Defendant*. | Case No.: 3:23-00945-AGS-KSC<br><br>**PLAINTIFF'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Hon. Andrew G. Schopler |

# INTRODUCTION

NSSF had standing to bring this action when it filed suit, and its challenge remains live. The AG's continued insistence that NSSF cannot challenge AB 1594's onerous regulations that are—by the agreement of the parties (which they entered *after* AB 1263's enactment)—*directed at NSSF's members* defies the record, the law, and common sense.

# BACKGROUND

Assembly Bill 1594 created a "standard of conduct" with which all "firearm industry member[s]" must comply. Cal. Civ. Code §3273.51(a). The statute defines "firearm industry member" to mean a person or entity "engaged in the manufacture, distribution, importation, marketing, wholesale sale, or retail sale of firearm-related products." *Id.* §3273.50(f). AB 1594 in turn defines "firearm-related product[s]" to include "a firearm, ammunition, [or a related] accessory that" is "sold, made, or distributed in California," "is intended to be sold or distributed in California," or "is or was possessed in California [if] it was reasonably foreseeable that the item would be possessed in California." *Id.* §3273.50(d). Under the provision presently at issue, firearm industry members "shall not manufacture, market, import, offer for wholesale sale, or offer for retail sale a firearm-related product that is abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety in California." *Id.* §3273.51(c).

At the time NSSF filed suit, the Firearm Industry Responsibility Act created "a presumption that a firearm-related product is abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety if any of the following is true":

(A) The firearm-related product's features render the product most suitable for assaultive purposes instead of lawful self-defense, hunting, or other legitimate sport and recreational activities.

(B) The firearm-related product is designed, sold, or marketed in a manner that foreseeably promotes conversion of legal firearm-related products into illegal firearm-related products.

(C) The firearm-related product is designed, sold, or marketed in a manner that is targeted at minors or other individuals who are legally prohibited from accessing firearms.

1

*Id.* §3273.51(c)(2).  Since NSSF members engage in activities that arguably fall within each of those categories, NSSF challenged that provision in its entirety, *see* Dkt.73 ("Am. Compl.") ¶¶34-42, 73-82, which this Court recognized early on, *see, e.g.*, Dkt.48 (PI Op.) 11 (noting that a "manufacturer [of] youth-model rifles *and AR-style long guns* that are legal in its state" could be "sued under the 'abnormally dangerous' firearm provision" of §3273.51(c) if "a thief steals the firearms" from a retailer in "Yuma, Arizona," and then "drives into California to commit a gun crime" (emphasis added)).

After this Court preliminarily enjoined §3273.51(c) and declined the state's invitation to narrow that injunction, the parties agreed to forego discovery and proceed to final judgment on a stipulated record.  Dkt.67.  In the meantime, the State Legislature enacted, and the Governor signed into law, California Assembly Bill 1263, which amended §3273.51 to strike "at minors or other" from subparagraph (c)(2)(C).  Under AB 1263, a firearm or related product is no longer *presumed* to be "abnormally dangerous" just because it is targeted at minors.  AB 1263 does not, however, give firearm industry members any assurance that they will not be held liable for manufacturing, marketing, or selling youth-model firearms.  And it does not alter §3273.51(c)(2)(A) as to any of the *other* products NSSF members lawfully manufacture and sell across the nation—including, most notably, "AR-style long guns," which NSSF and its members have consistently expressed concern may satisfy §3273.51(c)(2)(A)'s "assaultive purposes" definition.

Though AB 1263 was signed on October 11, 2025, and scheduled to take effect on January 1, 2026, the AG did not raise any concern that it might moot this case.  To the contrary, the AG proceeded to stipulate on October 31, 2025—*after* AB 1263's enactment—that "[m]any NSSF members … are 'firearm industry member[s]' within the meaning of AB 1594," and that "[m]any NSSF members manufacture, … market, or sell products that fall within the scope of §3273.51(c), including 'youth-model firearms' that are 'smaller size and lighter weight' than standard models."  Dkt.77-1 ("JSUMF") ¶¶6-7.

On January 9, 2026, the Court ordered the parties to submit "briefing [on] the impact of AB 1263 on their arguments, with particular attention to the issue of standing."  Dkt.79.

# ARGUMENT

## A. NSSF Had Standing To Bring This Action When It Filed Suit.

Standing concerns whether Article III jurisdiction exists when suit is filed. *Tucson v. City of Seattle*, 91 F.4th 1318, 1325-26 (9th Cir. 2024); *ACLU of Nev. v. Lomax*, 471 F.3d 1010, 1015 (9th Cir. 2006). NSSF had standing when it filed this action in May 2023 for two independently sufficient reasons. First, its members faced imminent injury from the credible threat that the AG would enforce AB 1594 against them. Second, its members faced imminent financial harm because AB 1594 made it unlawful for them to sell firearms that California deems "abnormally dangerous." *See* Dkt.76 ("NSSF MSJ Reply") 1-4 (raising both arguments as a basis for finding standing at summary judgment). Both injuries are traceable to AB 1594 and the AG, and both would be redressed by a decision declaring §3273.51(c) unlawful and enjoining the AG from enforcing it against NSSF's members.

AB 1263 does not affect NSSF's standing because it was enacted after the organization brought its suit and filed the amended complaint. *See Yamada v. Snipes*, 786 F.3d 1182, 1203-04 (9th Cir. 2015). Whether Article III jurisdiction continues to exist goes to mootness, not standing. *See, e.g., Union Gospel Mission of Yakima Wash. v. Brown*, 162 F.4th 1190, 1199-200 (9th Cir. 2026). That distinction may be academic in some cases, but not here. NSSF bore the burden of proving its standing at the outset, whereas the AG bears the "heavy" burden of proving that AB 1263 moots this case. *Forest Guardians v. Johanns*, 450 F.3d 455, 461 (9th Cir. 2006). NSSF met its burden to show standing at the outset of this suit. The AG, by contrast, has not met his burden to show mootness.

## B. AB 1263 Does Not Moot This Action.

"A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Native Vill. of Nuiqsut v. Bureau of Land Mgmt.*, 9 F.4th 1201, 1208 (9th Cir. 2021) (quoting *Knox v. SEIU, Loc. 1000*, 567 U.S. 298, 307 (2012)). "The available remedy … does not need to be 'fully satisfactory' to avoid mootness"; there just needs to be some remedy still available. *Calderon v. Moore*, 518 U.S. 149, 150 (1996) (per curiam); *see, e.g., Neighbors of Cuddy Mountain v. Alexander*, 303

F.3d 1059, 1065-66 (9th Cir. 2002). "[A]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Knox*, 567 U.S. at 307-08 (quoting *Ellis v. Railway Clerks*, 466 U.S. 435, 442 (1984)).

That test is easily satisfied here, as NSSF's challenge to §3273.51(c) has never been confined to the portion that AB 1263 removed, i.e., the presumption that firearms marketed toward minors are abnormally dangerous. *See* 2025 Cal. Legis. Serv. ch. 636, §2. NSSF's operative complaint instead seeks a "declaration" that §3273.51(c) violates the Constitution, along with "a permanent injunction enjoining [the AG] … from enforcing or otherwise bringing suit against NSSF and its members under [it]." Am. Compl., Prayer for Relief, ¶¶1-2. The Court thus still can and should grant that effectual relief.

Indeed, this case would not be moot even if NSSF's "request for injunctive relief ha[d] become moot," as "a suit should not be dismissed in its entirety so long as the plaintiff has alleged a cognizable claim for nominal damages for the constitutional violation [it] suffered." *Ward v. Santa Fe Indep. Sch. Dist.*, 35 F.App'x 386 (5th Cir. 2002) (table) (per curiam); *see, e.g.*, *Clementine Co., LLC v. Adams*, 74 F.4th 77, 82 (2d Cir. 2023) (noting that a plaintiff may pursue nominal-damages claims under §1983 notwithstanding the dismissal of accompanying declaratory and injunctive claims as moot). And, here, NSSF expressly seeks "nominal damages" as well. Am. Compl., Prayer for Relief, ¶3. "[B]ecause [NSSF] ha[s] requested nominal damages in addition to declaratory and injunctive relief, this case is not moot." *Comm. to Recall Dan Holladay v. Wiley*, 2024 WL 1854286, at *2 (9th Cir. Apr. 29, 2024).[1]

---

[1] NSSF also sought all relief the "Court deems just and proper," plus "costs and reasonable attorneys' fees." Am. Compl., Prayer for Relief, ¶4. The AG does not promise to pay NSSF all the fees and costs it may seek, let alone nominal damages. And while an interest in costs and fees ordinarily is "insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim," *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 480 (1990), there remains a very live controversy on the merits here.

### C. The AG's Contrary Arguments Are Meritless.

The AG repeats the same arguments he raised twice before about why, in his view, NSSF has *never* shown standing to challenge §3273.51(c). Dkt.84 ("AG Supp.Br.") 7-8; *see* Dkt.75 ("AG Br.") 5-8; Dkt.77 ("AG Reply") 2-4. Those arguments are wrong for the reasons NSSF already explained. *See* NSSF MSJ Reply 1-4. In light of AB 1263, however, the AG now argues that any standing NSSF may once have had is now gone, because (he says) it was based solely on the intent of NSSF's members to violate §3273.51(c) by selling youth-model firearms, and AB 1263 removed the presumption that those firearms are abnormally dangerous. *See* AG Supp.Br. 7-10. That argument fails twice over. NSSF members continue to face a credible threat of prosecution by the AG for violating §3273.51(c) because they still sell products that fall within that provision's plain terms, even as amended. NSSF members also suffer ongoing financial harm as a result of being prohibited by AB 1594 from selling certain firearms. *See* NSSF MSJ Reply 1-4. Each theory forecloses the AG's mootness argument.

1.a. Section 3273.51(c) provides that "[a] firearm industry member shall not manufacture, market, import, offer for wholesale sale, or offer for retail sale a firearm-related product that is abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety in California." Cal. Civ. Code §3273.51(c). The parties stipulated for purposes of summary judgment that "[m]any NSSF members manufacture, distribute, import, market, or sell products that fall within the scope of §3273.51(c), including 'youth-model firearms' that are 'smaller size and lighter weight' than standard models." JSUMF ¶7. While that stipulation used youth-model firearms as an illustrative example, there has never been any serious doubt that NSSF members make, market, and sell other firearm-related products that the AG believes are presumptively "abnormally dangerous" under §3273.51(c)(2) too—which is why NSSF challenged §3273.51(c) in its entirety, and why the parties' stipulation says "including." *See also, e.g.*, Dkt.29 (NSSF PI Reply) 1 ("Another example: NSSF members make and sell AR-style rifles out of state; but as the AG admits …, they now face liability for that conduct if a citizen brings into California an AR

Case 3:23-cv-00945-AGS-KSC   Document 85   Filed 02/20/26   PageID.1261   Page 7 of 12

1  rifle that was lawfully made and acquired out of state."). The stipulation thus confirms that
2  NSSF members have always engaged in a variety of conduct that is "arguably … pro-
3  scribed" by §3273.51(c). *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 489 (9th Cir. 2024).
4  Because the AG has never disavowed his intent to enforce §3273.51(c) against NSSF mem-
5  bers for any of that conduct, NSSF's standing is clear. *See* Dkt.74-1 (NSSF MSJ Br.) 2.

6       b. NSSF also established standing because AB 1594 directly inflicts financial harm
7  on its members by forbidding them from selling certain firearms that they would continue
8  to sell and profit from but for the challenged law. The Ninth Circuit's decisions in *National*
9  *Audubon Society, Inc. v. Davis*, 307 F.3d 835 (9th Cir. 2002), and *Montana Shooting Sports*
10 *Association v. Holder*, 727 F.3d 975 (9th Cir. 2013), confirm as much.

11       In *National Audubon Society*, trappers challenged California's ban on "the use of
12 certain traps and poisons to capture or kill wildlife in the state." 307 F.3d at 843. The
13 district court held that they lacked standing because they had not shown an "imminent
14 'threat of prosecution.'" *Id.* at 846. The Ninth Circuit reversed. As it explained, the trap-
15 pers "allege[d] direct financial loss caused by" the challenged law. *Id.* at 855. And "[w]hen
16 such tangible economic injury is alleged," courts "need not rely" on the *Susan B. Anthony*
17 *List* threat-of-prosecution factors, "for the gravamen of the suit is economic injury rather
18 than threatened prosecution." *Id.* The trappers thus had standing because their "economic
19 injury is directly traceable to the fact that [the challenged law] explicitly forbids the trap-
20 ping they would otherwise do," and the requested relief would redress that harm by allow-
21 ing them to resume "trapping if not constrained by" the law. *Id.* at 856.

22       *Montana Shooting Sports Association* applies those principles in the specific context
23 of firearms regulations. There, a business owner wanted to "manufacture and sell firearms
24 and ammunition … without complying with applicable federal laws regulating firearms"
25 that he alleged were unconstitutional. 727 F.3d at 978. He argued that "economic injury
26 and the threat of criminal prosecution each provide a basis for standing." *Id.* at 979. The
27 Ninth Circuit "conclude[d] that [he] has standing on account of economic injury" alone;
28

6

NSSF's Supplemental Brief | No. 3:23-cv-00945-AGS-KSC

the court did "not reach his alternative argument for standing." *Id.* The jurisdictional analysis was straightforward: "Economic injury caused by a proscriptive statute is sufficient for standing to challenge that statute." *Id.* And the plaintiff plausibly alleged economic injury because the federal laws that he challenged prohibited him from selling firearms that he would otherwise have sold but for the allegedly unconstitutional law. *Id.* at 980.

This case is on all fours. Like the plaintiffs in *National Audubon Society* and *Montana Shooting Sports Association*, NSSF's members here suffer direct "[e]conomic injury" from "a proscriptive statute." *Id.* at 979. "By prohibiting the sale of certain weapons, §3273.51(c) directly inflicts … a textbook pocketbook injury on NSSF's members in the form of lost sales," NSSF MSJ Reply 4, as the undisputed record confirms, *see* JSUMF ¶11; *see also* Dkt.14-1 (Decl. of Kevin B. Reid on Behalf of Sturm, Ruger & Company, Inc.) ¶15; Dkt.14-2 (Decl. of Susan Cupero on Behalf of Smith & Wesson Inc.) ¶16.

c. The AG does not meaningfully dispute any of that. He instead argues that "NSSF's evidence was always insufficient to establish pre-enforcement standing" because AB 1594 "only presumes firearm-related products *directed at California* are abnormally dangerous, and NSSF never provided any evidence that its members directed its products at California." AG Supp.Br. 8. That is a merits argument, not a standing argument. And it cannot be reconciled with the AG's stipulation that NSSF members "sell products that fall within the scope of §3273.51(c)." JSUMF ¶7. To fall within the scope of that provision, a product must be "sold, made, or distributed in California" or "intended to be sold or distributed in California," or it must be "reasonably foreseeable that the item would be possessed in California." Cal. Civ. Code §3273.50(d). Thus, the parties' factual agreement confirms that NSSF members satisfy the directed-at-California element.

The AG's continued insistence that NSSF lacks standing is truly remarkable. NSSF has thousands of members that manufacture and sell all different types of firearms. JSUMF ¶8. California enacted AB 1594 because firearm industry members—a term that, by the AG's admission, includes NSSF members, JSUMF ¶6—engage in "business conduct" that "has enormous direct and secondary impacts … across California," 2022 Cal. Legis. Serv.

ch. 98, §2(b) (AB 1594).  Those members sell what California deems to be "lethal products" that "cause enormous harms." *Id.*  That is why California created a new "standard of conduct" designed to change how firearm industry members operate. *Id.* §2(e).

It is obvious from that recitation of purpose that AB 1594 was designed to force firearm industry members to stop manufacturing and selling certain firearms not only "to California consumers," but to non-California consumers too when industry members "have reason to believe that their products will be sold or possessed in California." *Id.* §2(f). NSSF members thus must either cease manufacturing and selling products that arguably trigger liability under AB 1594 (and incur financial harm), or continue engaging in that conduct (and face the real risk that the AG or someone else will bring an enforcement action against them).  Either way, NSSF members face a concrete Article III injury.

At bottom, the AG's position boils down to the premise that *none* of the firearms or related products that NSSF members manufacture and sell—i.e., not just youth-model firearms—fall within the scope of AB 1594.  It would undoubtedly come as quite a surprise to the legislature—which enacted AB 1594's capacious terms with the specific intent to regulate the firearms that can flow into and out of California—to learn that its law actually has no effect on the bulk of the firearms industry.  But if the AG truly believes that to be the case, then NSSF invites him to submit a stipulation with the Court saying as much, and to agree that he will be judicially estopped from enforcing the law against *any* of the firearm-related products that NSSF members manufacture, market, or sell.  Yet while the AG has had ample opportunity to memorialize that position, he has never even taken it, let alone agreed to be bound by it.  To the contrary, he agreed to *stipulate* that members manufacture, market, and sell products that fall within §3273.51(c).  AG Supp.Br. 13.  And rightly so, as the notion that the legislature did not intend AB 1594 to cover any of the firearms that industry members actually commonly make and market "sounds absurd, because it is." *Sekhar v. United States*, 570 U.S. 729, 738 (2013).

2. The AG's mootness and ripeness arguments (at 8-11) are equally flawed, as they rest on the mistaken premise that NSSF's only basis for standing was its members' sale of

youth-model firearms. To be sure, NSSF's members *do* offer those types of firearms, as the parties stipulated. JSUMF ¶7. But they sell many other types of firearms too. After all, NSSF has thousands of members, including "some of the country's most popular firearms manufacturers." JSUMF ¶¶2, 8. *Of course* those members manufacture many firearms that California enacted AB 1594 to keep out of the Golden State—which explains why the AG stipulated for purposes of summary judgment that "[m]any" NSSF members "sell products that fall within the scope of §3273.51(c), *including* 'youth-model firearms.'" JSUMF ¶7 (emphasis added). By using the word "including," the stipulation makes clear "that the exampl[e] enumerated in the text [is] intended to be illustrative, not exhaustive." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 162 (2012). The parties so stipulated because NSSF members lawfully manufacture and sell products beyond youth-model firearms that implicate §3273.51(c)—a point that NSSF could and would have proven in spades had the AG not agreed to that broadly worded stipulation. Indeed, the parties agreed to that broad stipulation *after AB 1263 had already been signed into law*. Nothing in AB 1263 changes the basic dynamics underlying this litigation. Because NSSF still wants and needs relief from §3273.51(c) vis-à-vis the other lawful firearms "includ[ed]" in that stipulation, this dispute remains very much live.

*Teter v. Lopez*, 125 F.4th 1301 (9th Cir. 2025) (en banc), does not suggest otherwise. The plaintiff in *Teter* was a "Hawaii resident who wishe[d] to own butterfly knives," and he sued to challenge Hawaii's longstanding statute that "prohibited the[ir] possession." *Id.* at 1304. His "complaint challenged 'the applicable Hawaii laws which prevent[ed] [him] from owning butterfly knives,' and [] sought a declaration that the State's 'ban on the ownership of butterfly knives violates the Second Amendment.'" *Id.* at 1307. Hawaii amended the statute while the litigation was pending to "no longer prohibit[]" the possession of butterfly knives. *Id.* at 1304. The court held that the amendment mooted the case. Because the amendment got rid of the "ban" of butterfly knives, it "gave Teter 'everything [he] hoped to achieve' in th[e] litigation." *Id.* at 1307-08 (last alteration added).

NSSF has not received "'everything [it] hoped to achieve' in this litigation." *Id*. Not even close. While AB 1263 eliminates the *presumption* that youth-model firearms are abnormally dangerous, that is all it does. It does not even render those firearms *lawful*; all it means is that, if the AG were to bring suit against a firearm industry member for manufacturing, marketing, or selling such a firearm, he would bear the ordinary burden of persuasion that obtains in any civil action. And AB 1263 does not give NSSF members *any* relief as to the other types of firearms they manufacture, market, or sell that arguably qualify as "abnormally dangerous" under §3273.51(c). It is instead still unlawful under AB 1263 to "manufacture, market, import, offer for wholesale sale, or offer for retail sale a firearm-related product that is abnormally dangerous," Cal. Civ. Code §3273.51(c)—a term that the AG himself recognized via stipulation "includ[es]," but is not limited to, the youth-model firearms that NSSF members manufacture, market, and/or sell. JSUMF ¶7. AB 1263's minor tweak thus comes nowhere close to giving NSSF all the relief it seeks.

3. Finally, the ripeness doctrine poses no barrier to entering judgment for NSSF, just as it posed no barrier to entering preliminary injunctive relief. *See* NSSF MSJ Reply 4. NSSF has shown through evidence that its members are suffering financial harm as a direct result of §3273.51(c) and face the threat of prosecution under it for their conduct. Those are ongoing, concrete injuries that provide an adequate basis for finding standing to fully and finally resolve the purely legal issues that this case presents now, so this Court need not await any further developments to do so.

## CONCLUSION

NSSF has established standing, and the AG has not established that this case is now moot. The Court should declare §3273.51(c) unconstitutional, permanently enjoin the AG from enforcing it against NSSF's members, and award NSSF the monetary relief it has expressly sought.

Respectfully submitted,

|  |  |
|---|---|
| ANDREW LOTHSON* | s/ Matthew D. Rowen |
| SWANSON, MARTIN & BELL, LLP | PAUL D. CLEMENT* |
| 330 N. Wabash | ERIN E. MURPHY* |
| Suite 3300 | MATTHEW D. ROWEN (Cal. Bar #292292) |
| Chicago, IL  60611 | CLEMENT & MURPHY, PLLC |
| alothson@smbtrials.com | 706 Duke Street |
|  | Alexandria, VA 22314 |
|  | (202) 742-8900 |
|  | matthew.rowen@clementmurphy.com |

\* admitted *pro hac vice*

*Attorneys for Plaintiff*